**Case No. 25-3706**

---
---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

◆

### MARK PANNEK; THOMAS STROTMAN,

Plaintiffs – Appellants,

v.

### U.S. BANK NATIONAL ASSOCIATION

Defendant – Appellee.

◆

Appeal from the Final Judgment of The United States District Court for the
Southern District of Ohio, Western Division
Case No. 1:19-CV-00852

---
---

### BRIEF OF PLAINTIFFS-APPELLANTS

---
---

/s/ Joshua M. Smith
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
Bailey E. Sharpe (0103565)
SSP LAW CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
jms@sspfirm.com
**Attorneys for Plaintiffs-Appellants**

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to 6th Cir. R. 26.1, Plaintiffs-Appellants Mark Pannek ("Pannek") and Thomas Strotman ("Strotman") (collectively, the "Plaintiffs") make the following disclosures:

1. Are said parties a subsidiary or affiliate of a publicly owned corporation?

**No.**

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

**No.**

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES................................................................. iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT......................................... iv

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................................2

STATEMENT OF THE CASE AND FACTS ...............................................4

    A.    Introduction ...................................................................4

    B.    Facts.........................................................................4

SUMMARY OF ARGUMENT...........................................................30

ARGUMENT ..........................................................................34

    A.    Standard of Review ........................................................34

    B.    Title VII Retaliation .......................................................35

    C.    Title VII Hostile Work Environment.......................................43

    D.    Age Discrimination (Pannek)..............................................47

CONCLUSION .......................................................................51

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(b)...........................52

ADDENDUM # 1 .....................................................................53

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ............................................. 34, 43

*Brennan v. Tractor Supply Co.*, 237 Fed. Appx. 9 (6th Cir. 2007) ..........................49

*Briggs v. Univ. of Cincinnati*, 11 F.4th 498 (6th Cir. 2021) ....................................35

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257 (1998)...............45

*Dews v. A.B. Dick Co.,* 231 F.3d 1016 (6th Cir. 2000).............................................49

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992)........34

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263 (6th Cir. 2009)..........46

*George v. Youngstown State Univ.,* 966, F.3d 446 (6th Cir. 2020)..........................36

*Griffin v. Finkbeiner*, 689 F.3d 584 (6th Cir. 2012).................................................36

*Harris v. Forklift Sys.,* 510 U.S. 17 (1993) ..............................................................44

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008) ................ 41, 44, 45

*Howely v. Fed. Express Corp.*, 682 F. App'x 439 (6th Cir. 2017) ..........................35

*Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999)..........................................45

*Jenkins v. Nashville Pub. Radio*, 106 F. App'x 991 (6th Cir. 2004) .......................38

*King v. Super Serv.,* 68 Fed. Appx. 659 (6th Cir. 2003).............................................

*Mack v. Otis Elevator Co.*, 326 F.3d 116 (2d Cir. 2003)..........................................45

*Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806 (6th Cir. 2011) ...........................49

*Stokes v. Detroit Pub. Sch.*, 807 F. App'x 493 (6th Cir. 2020) ...............................39

*Thornson v. Fed. Express Corp.,* 530 F.3d 451 (6th Cir. 2008) ...............................45

*Williams v. Ford Motor Co.*, 187 F.3d 533 (6th Cir. 1999).....................................34

**Statutes**

12 U.S.C. 1829(a)(1) ........................................................................................ 33, 50

28 U.S.C. 1291 ...........................................................................................................1

28 U.S.C. 1294(1) ......................................................................................................1

29 U.S.C. 621 .............................................................................................................1

42 U.S.C. 2000e ..........................................................................................................1

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Plaintiffs Pannek and Strotman submit that oral argument would assist the Court in resolving the issues presented in this appeal. In particular, there are significant factual questions as to the timing of Defendant U.S. Bank's ("Defendant" or "U.S. Bank") decision to include Plaintiffs in a purported reduction in force (RIF) immediately following their Title VII-protected complaints of a hostile work environment. Permitting oral argument will enable Counsel to address any questions the Court may have regarding the facts and applicable law in this appeal, particularly given the number of witnesses, breadth of testimony, and volume of documents in the record.

## <u>STATEMENT OF JURISDICTION</u>

The district court properly exercised federal-question subject-matter jurisdiction over this case because the Complaint raised retaliation and hostile work environment claims under Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. 2000e, *et seq.*, and discrimination claims under the Age Discrimination in Employment Act of 1967, 29 U.S.C. 621, *et seq.* (Complaint, R. 1, PageID # 7-11).

The district court granted summary judgment to Defendant on all claims by an Opinion & Order dated August 8, 2025. (Opinion & Order, R. 59, PageID # 2694-2726). The Plaintiffs-Appellants filed a timely Notice of Appeal on September 3, 2025. (Notice of Appeal, R. 61, PageID # 2728-2729). This Court has subject-matter jurisdiction under 28 U.S.C. 1291 and 28 U.S.C. 1294(1), because the appeal was taken from a final judgment of the Southern District of Ohio.

1

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

A.    Whether the district erred in finding no genuine dispute of material fact as to whether U.S. Bank's proffered reason for terminating Plaintiffs on May 18, 2018—a reduction in force—was a pretext for retaliation and discrimination where:

(1) Less than two months earlier, Plaintiff Mark Pannek filed an internal ethics hotline complaint against his former supervisor, Senior VP John Gemrich ("Gemrich"), for ongoing discrimination and creating a hostile work environment;

(2) Just four days after becoming aware of that internal complaint, Senior VP Bryan Bolton ("Bolton"), Plaintiffs' new supervisor, e-mailed HR the complaint, and in doing so questioned its timing and voiced suspicions that Plaintiff Tom Strotman will "take a similar tact," given he and Pannek "are close" and "both these guys are worried about their jobs" (Exhibits to Watson Dep., R. 49-1, PageID # 2438-2440);

(3) In the same e-mail, Bolton made a recommendation to include both Plaintiffs in a reduction in force, which was purportedly "based on their reduced scope and my performance concerns" (*Id*.);"

(4) Those performance concerns in the e-mail were entirely subjective "leadership concerns," and contradicted by objective evidence of Plaintiffs' strong performance in their roles including Strotman receiving a performance award reserved for the top 1% of performers at the Bank (*Id*.; Strotman Dec., R. 50-1, PageID # 2532, at ¶ 15);

(5) US Bank largely ignored Plaintiffs' hostile work environment complaints, failing to follow up with Plaintiffs and other witnesses regarding Gemrich's inappropriate sex-based comments and conduct;

2

(6) In terminating Plaintiffs based upon a RIF, U.S. Bank and Bolton completely failed to follow the bank's mandatory RIF policies, including performing a detailed peer group analysis ("PGA") of relevant comparators for a given role;

(7) In executing the RIF, U.S. Bank retained substantially less qualified candidates for Plaintiffs' roles, including a substantially younger candidate lacking experience and with a disqualifying criminal record under FDIC regulations; and

(8) At the time Plaintiffs were included in the RIF, there were other open and available positions at U.S. Bank for which they were qualified, and to which at least one Plaintiff repeatedly applied.

B.    Whether the district court erred by finding no genuine issue of material fact that the Title VII Hostile Work Environment alleged by Plaintiffs was "based on sex" as contemplated by the statute, or that it was severe and pervasive enough to alter the terms and conditions of Plaintiffs' employment.

C.    Whether the district court erred by finding that Pannek failed to establish a *prima facie* case of age discrimination, despite record evidence that U.S. Bank replaced him with a substantially younger and less qualified individual.

## STATEMENT OF THE CASE AND FACTS

### A.    Introduction

U.S. Bank terminated Plaintiffs Mark Pannek and Tom Strotman—two high-performing executives at U.S. Bank—on May 15, 2018, just weeks after they complained about the discriminatory and harassing conduct of their supervisor, John Gemrich. U.S. Bank's asserted justification for terminating Plaintiffs—a reduction in force (RIF) based upon a corporate reorganization—is belied by record evidence and testimony, and certainly raises issues of fact that a jury must resolve on remand.

### B.    Facts

Plaintiff Tom Strotman joined U.S. Bank on January 9, 2017 as VP of Governance Control in its consumer default management group. (Strotman Dep., R. 36, PageID # 868). Prior to his employment at U.S. Bank, Strotman had an extensive history working in risk management leadership across various financial institutions. (*Id*. at PageID # 979-988; Attachment 1 to Strotman Dec., R. 50-1, PageID # 2534-2535). At U.S. Bank, Strotman was responsible for executing multiple "risk control" programs, including those in audit and issue management, customer complaints, document control, third-party oversight, regulatory change, risk control self-assessment, and quality management. (Strotman Dep., R. 36, PageID # 874-878).

Strotman excelled in his role, and his performance showed it. After his first year, he received a glowing performance review from his supervisor, Mike Ryan,

4

and was awarded U.S. Bank's "Legends of Possible" award, given to the top 1% of U.S. Bank performers. (Strotman Dec., R. 50-1, PageID # 2532, at ¶ 15; Exhibits to Bolton Dep., R. 39-1, PageID # 1742; Bolton Dep., R. 39, PageID # 1674-1677).

In August 2017, Strotman had an opening on his team for a new third-party risk manager position. (Strotman Dep., R. 36, PageID # 881-882, 885-887). He reached out to co-Plaintiff Mark Pannek, a former colleague he worked with at Fidelity. (*Id*. at PageID # 881-882, 885-887; Pannek Dep., R. 35, PageID # 485-486). Pannek was then hired on August 28, 2017 as VP of Third-Party Risk in the U.S. Bank's consumer lending services group, where he worked directly for Strotman. (Pannek Dep., R. 35, PageID # 487).

Similar to Strotman, Pannek came to U.S. Bank as a seasoned risk manager in the banking and financial services industry, and performed well in his new VP role. (*Id*. at PageID # 468-482; Pannek Dec., R. 50-2, PageID # 2536, at ¶ 3). Pannek created and built up U.S. Bank's third-party risk program, and was successful in doing it. (Pannek Dep., R. 35, PageID # 490-491; Strotman Dec., R. 50-1, PageID # 2531-2532, at ¶¶ 7-13). By October 2017, Pannek was promoted to Vice President of Business Technology Control. (Pannek Dep., R. 35, PageID # 512-513). This promotion included an increased grade level, span of control, and number of direct reports. (*Id*. at PageID # 516-520).

Also in October 2017, U.S. Bank underwent its first "corporate reorganization," merging the U.S. Bank's lending and consumer services divisions. (Strotman Dep., R. 36, PageID # 887-888; Pannek Dep., R. 35, PageID # 517-518). As part of this restructuring, and with Pannek's promotion, Pannek and Strotman became peers, reporting directly to John Gemrich, U.S. Bank's Senior VP of Quality Control. (Pannek Dep., R. 35, PageID # 522; Gemrich Dep., R. 37, PageID # 1132).

At the time Gemrich became Plaintiffs' supervisor, he had been at U.S. Bank for approximately 18 years. (Gemrich Dep., R. 37, PageID # 1126-1127). He also had a history of behavioral concerns, and had been the subject of multiple prior ethics complaints due to his inappropriate behavior. (Exhibits to Bolton Dep., R. 39-1, PageID # 1709-1710 ("From all accounts this is behavior that…may span an extended period of time with US Bank. Behavior is creating a hostile work environment[.]"); *Id*. at PageID # 1712-1717 ("In closing Susan mention[ed] [Gemrich] had told her in the past he had many code of ethics call[s] on him.")). U.S. Bank records also show that Gemrich's direct reports had expressed past fears of retaliation from him for reporting his inappropriate behavior. (*Id*. at PageID # 1709-1710 ("From both his current and prior mgt teams a fear of retaliation if anything was elevated or shared about concerns with [Gemrich's] behavior or just be transparent when asked about his leadership style.")).

6

Almost immediately, Pannek and Strotman were subjected to Gemrich's aggressive, harassing, and hostile management style. (Pannek Dep., R. 35, PageID # 527-528). This frequently included belittling, talking down to, and degrading the women in the office. (*Id*. at PageID # 528). During their weekly meetings, Gemrich would routinely discuss his personal sex life and the details of his sexual conquests with Pannek and Strotman using extremely grotesque and inflammatory language. (*Id*. at R. 35, PageID # 530, 566-567; Gemrich Dep., R. 37, PageID # 1145-1146). By way of example, this included the following:

- That he was a "f***ing unicorn on the dating scene (Gemrich Dep., R. 37, PageID # 1147-1148; Pannek Dep., R. 35, PageID # 567; Strotman Dep., R. 36, PageID # 924-925);

- That he could "f*** any p***y he wanted" (Pannek Dep., R. 35, PageID # 572; Strotman Dep., R. 36, PageID # 925);

- Discussing who he had sex with the prior night (Pannek Dep., R. 35, PageID # 569); and

- Detailing an occasion where Gemrich described that he "f***ed a deaf woman," and re-enacting in detail how he "motorboated" her breasts (*Id*. at PageID # 531).

Gemrich also seemed to have a particular fixation on sharing his sexual desires with Plaintiffs, including his thoughts regarding female employees in the office. (Pannek Dep., R. 35, PageID # 530-533; Gemrich Dep., R. 37, PageID # 1145-1148).

Pannek and Strotman would leave these meetings feeling extremely uncomfortable and offended by Gemrich's comments. (Pannek Dep., R. 35, PageID

# 529-531). It got to be so uncomfortable that Pannek would often excuse himself

from the meetings and avoid Gemrich whenever he could. (*Id*. at PageID # 531, 609

("I didn't want to be near him. I didn't want to be in the same room as him. I don't

like him.")). After just a few months working under Gemrich, it got so bad that

Pannek began applying to other jobs within the bank in an attempt to transfer away

from Gemrich. (*Id*. at PageID # 610-611).

Beyond the sexually explicit and harassing comments made during their

weekly meetings, Plaintiffs observed Gemrich engage in other inappropriate conduct

targeting female employees in the office. In one instance, Gemrich followed Pannek

into the restroom and began describing how "hot" employee Alysa Oleynik's

Russian accent was, and that he would "like to f**k her." (Pannek Dep., R. 35,

PageID # 531-532). Gemrich was also observed leering and ogling at another female

employee named Samantha, a fact which Plaintiff testified was known around the

office. (*Id*. at PageID # 532-533). Pannek described that Gemrich would leer at

Samantha every time she walked by, testifying that Gemrich would "break his neck

staring at her," and that Gemrich would spend an inordinate amount of time loitering

around her workspace. (*Id*.).

Gemrich also exhibited aggressive and retaliatory behavior toward female

employees, which Plaintiffs observed. In December 2017, Gemrich sent an e-mail

to a female subordinate, Annette Tatman, with multiple other employees on the team

8

copied, publicly belittling her and questioning her intellect in front of her direct supervisor and peers. (*Id*. at PageID # 528-529; Strotman Dep., R. 36, PageID # 899-901; Buster Dep., R. 42, PageID # 1987-1990). Ms. Tatman was shaken up by Gemrich's e-mail, and Lydia Buster, a current U.S. Bank employee, reported the e-mail to HR on Mr. Tatman's behalf. (Buster Dep., R. 42, PageID # 1990-1991). When Gemrich learned that his e-mail had been sent to HR, he went ballistic, calling Ms. Tatman a "f***ing bitch" for reporting him to HR (wrongly believing it was Ms. Tatman, not Ms. Buster, who did so) on a conference call with Plaintiffs. (Pannek Dep., R. 35, PageID # 529-530, 546, 558-559; Strotman Dep., R. 36, PageID # 902-904; Buster Dep., R. 42, PageID # 1993-1994).

On February 1, 2018, during one of their weekly meetings, Gemrich aggressively challenged Pannek on his audit cost estimates. (Pannek Dep., R. 35, PageID # 536-539). Gemrich repeatedly bullied Pannek on the issue, chastising him that his estimate was inaccurate, and demanding that Pannek bet him $150.00 on it. (*Id*. at PageID # 534-539). When Pannek didn't automatically agree to the bet, Gemrich continued to taunt Pannek, cornering him in the office, calling him a "chicken," a "coward," and a "p***y," and repeatedly telling Pannek to "put your money where your mouth is." (*Id*.).

In an effort to deescalate the situation and end the harassment, Pannek gave up and agreed to the bet. (*Id*.). Shortly thereafter, when it was determined that

Pannek's estimate was in fact off. (*Id.*). Pannek, being a man of his word,  mailed Gemrich a $150.00 Jeff Ruby's gift card. (*Id.*).

In or around January or February of 2018[1], U.S. Bank underwent a second corporate reorganization, this time merging the U.S. Bank's consumer and mortgage divisions into a new, single Consumer Banking and Business Services ("CBBS") division. Due to this merger, Pannek, Strotman, and the rest of the consumer services risk management division began reporting to U.S. Bank Senior VP and Chief Administrative Officer, Bryan Bolton. (Bolton Dep., R. 39, PageID # 1470-1471). Prior to this merger, Bolton had been in charge of risk management on the mortgage services side, and Gemrich previously oversaw the consumer side, where Pannek and Strotman directly reported to him. (*Id.*; Gemrich Dep., R. 37, PageID # 1131-1132).

Bolton began having conversations with his new reports (including Pannek and Strotman) in February 2018 to "understand kind of what they did, what their people did." (Bolton Dep., R. 39, PageID # 1484, 1469-1470). This included discussions with Gemrich, Plaintiffs' prior manager, who remained on the CBBS team and now also reported to Bolton. (*Id.* at PageID #1486-1487). At this point, no one at U.S. Bank was aware of any employees being recommended for termination

---

[1] No one at U.S. Bank could provide a definitive date when the reorganization began, , employees all estimate that they became aware of it in either January or February of 2018. (Strotman Dep., R. 36, PageID # 906; Pannek Dep., R. 35, PageID # 597; Watson Dep., R. 49, PageID # 2387-2388).

or position elimination within Bolton's team. (Watson Dep., R. 49, PageID # 2341-2342; Grey Dep., R. 40, PageID # 1875; Roberts Dep., R. 38, PageID # 1385; Little Dep., R. 48, PageID # 2170).

Bolton estimates that in "March or April of 2018," he began directing Rachel Votel, one of his reports, to start coordinating and running weekly meetings with Bolton's new team, with the goal of having the group meet, work collaboratively together, and "make sure that everyone was able to talk about their teams and their experiences…the things [Bolton] was trying to understand." (Bolton Dep., R. 39, PageID # 1478-1481). Again, at this time there were no reported discussions regarding any employees being terminated.

In March of 2018, U.S. Bank conducted ethics training for its employees, discussing hostile work environments and providing reporting resources to employees, including through U.S. Bank's Ethics Hotline. (Pannek Dep., R. 35, PageID # 645-646; Strotman Dep., R. 36, PageID # 922-923). U.S. Bank also has an overarching "Workplace Respect" policy which specifically refers to types of inappropriate conduct the bank "will not tolerate," and which can be considered sexual harassment:

| Verbal | Non-verbal |
|---|---|
| Making sexual or derogatory comments | Grabbing or touching parts of the body |
| Sending letters, notes, cartoons, emails or audio of a sexually suggestive nature | Brushing against another person's body |
| Making harassing phone calls | Physical attacks, rape or other gross sexual imposition |
| Making repeated requests for dates | Treating employees differently because of their gender |
| Requesting sexual favors | Viewing, downloading or displaying sex-related cartoons, pictures, videos or similar material |

(Grey Dep., R. 40, PageID # 1799-1800; Exhibits to Gray Dep., R. 40-1, PageID # 1919-1921).

On March 27, 2018, shortly after attending the ethics training, Pannek made the decision to call the U.S. Bank Ethics Hotline and report Gemrich's harassment, bullying, and other inappropriate conduct. (Pannek Dep., R. 35, PageID # 634-639). Although the initial complaint was made telephonically, Pannek recounted in detail Gemrich's inappropriate behavior, including the inappropriate comments referenced above. (*Id*.). After Pannek's complaint, the third-party hotline created an "Ethics and Compliance Hotline Report." (Exhibits to Watson Dep., R. 49-1, PageID # 2435-2467). The report labeled Pannek's complaint as "discrimination" by "John Gemrich" that had been "ongoing since 11/2017." (*Id*.). In the report's call description, it referred to Pannek's complaint that "John has created a hostile work environment." (*Id*.). While the report did not capture all the detail Pannek reported, it did include some examples of the hostile work environment, including Gemrich's December 2017 e-mail belittling Annette Tatman, his verbally aggressive behavior during employee meetings, his engaging in conduct which is "humiliating to the employees," and Gemrich's coercing Pannek into take a bet with him. (*Id*.).

Two days later on March 29, 2018, Diane Watson ("Watson"), the HR Business Partner for Bolton's team, shared Pannek's ethics complaint with Bolton.

(Watson Dep., R. 49, PageID # 2311-2312; Exhibits to Watson Dep., R. 49-1, PageID

# 2434). The two communicated about it over e-mail, stating the following:

Conversation started on Thu, Mar 29, 2018 3:44 PM UTC

diane.watson@usbank.com said:
  Hi there...can you ping me when your free?  We received a Code of Ethics complaint that I needed to share with you.

bryan.bolton@usbank.com said:
  Is it on me?

diane.watson@usbank.com said:
  No John Gemrich.

bryan.bolton@usbank.com said:
  Yikes

diane.watson@usbank.com said:
  Yikes is right

bryan.bolton@usbank.com said:
  11.30 CST

diane.watson@usbank.com said:
  that works for me.

Conversation ended on Thu, Mar 29, 2018 3:59 PM UTC

(Exhibits to Watson Dep., R. 49-1, PageID # 2434).

Then, just four days later on April 2, 2018, Bolton e-mailed Watson and three

other HR executives, Molly Werner ("Werner"), Andrea Bond ("Bond"), and Robine

Dunivan ("Dunivan"), with the subject line "HR Related Concerns." (*Id*., at PageID

# 2438-2440). In doing so, Bolton acknowledged Pannek's recent ethics complaint

and claimed he was "very concerned on what is in there," and that he would "like

you to hear my thoughts on the topic from a leadership perspective." (*Id*.). At the

same time, Bolton questioned "timing of [Pannek's] COE violation" as being tied to

the recent merger of the divisions. (*Id*.). He also opined that he "wouldn't be

surprised to see [Strotman] take a similar tact," given "these two gentlemen are close

and have worked together in the past," and "are very worried about their jobs in this new organization." (*Id.*).

In the same e-mail, Bolton for the first time recommends to Werner, Watson, Bond, and Dunivan that both Plaintiffs be included in a "severance exercise" (i.e., a RIF). (*Id.*). He attempts to justify this recommendation based upon vague and subjective "leadership concerns" about "tend[ing] to oversell things," that they are not "strong leader[s]," that they "lack strategic thinking ability." (*Id.*; *See also* Bolton Dep., R. 39, PageID # 1686-1688; Exhibits to Bolton Dep., R. 39-1, PageID # 1765). Bolton acknowledged much of the feedback came from Gemrich, which included claims that "[Pannek] had no plan, no true organized thoughts, just give him 10 people and 4 months and he would basically deliver a savings." (Exhibits to Watson Dep., R. 49-1, PageID # 2438-2440). Bolton concluded that "I am going to move his lite automation team under Varol, Vendor Management under Roberts…which leaves about 3 FTE left in his org which should be allocated somewhere else once I figure out exactly what they do and how much time they spend doing this[.]" (*Id.*). As to Strotman, Bolton simply claimed, "I don't see him as a strong leader for this organization," claiming (wrongly) his "inability to articulate what he's done" and thus "based on my observations and risk feedback we need to move forward without him." (*Id.*). This, despite Strotman having just received the "Legends of Possible"

award for being a top 1% performer at the Bank. (Strotman Dec., R. 50-1, PageID #
2532, at ¶ 15; Bolton Dep., R. 39, PageID # 1674-1677).

Critically, this e-mail is the first time any discussions surrounding Plaintiffs'
terminations based upon the merger are discussed. Prior to this e-mail, there are *zero*
documents or testimony affirming that Bolton was (in the district court's words)
"seriously considering" terminating Plaintiffs. (Opinion & Order, R. 59, PageID #
2710).

The only purported evidence of such contemplation that the district court
refers to is an e-mail from Bolton to one of his other reports, Alyson Roberts
("Roberts"), regarding team members that may join her team which were currently
reporting to Pannek. (Exhibits to Bolton Dep., R. 39-1, PageID # 1737-1738). But
Pannek had other direct reports, and neither this e-mail nor the prospect of
potentially moving employees contemplates that Pannek was being considered for
termination. (*Id*.).

Moreover, this evidence is refuted by Bolton's own testimony, which confirms
he did not make any decisions, including who would take over vendor management,
until the April 2018 timeframe:

Bolton Dep., R. 39, PageID # 1475-1476 (testifying that the "synergy"
exercise lasted roughly 60-90 days (February through April), that he cannot recall
when he determined that certain staff were not needed, *but that he would have made
that determination "closer to the end than in the beginning."*)(emphasis added); *Id*.
at PageID # 1501 ("*I think the final determination would have been made sometime
in the April timeframe. I would have formed – I began forming opinions before that*

15

– well before that timeframe, getting to know people, getting to understand people, and how they ran their operation and things of that nature. *But going through the process in its entirety and landing on final decisions that would have been most likely sometime in the April timeframe, as I recall*.")(emphasis added); *Id*. at PageID # 1525 ("Q. When was that determinate made that [Roberts] would take over that [vendor management] role? A. That would have been during that the whole timeframe that we've been talking about, so I can't tell you the specific date in which the decision was made. *My guess would have been sometime late March to early April*.")(emphasis added).

All other employees involved in the reorganization, including HR executives Watson and Laurie Grey ("Grey"), Roberts (who was theoretically receiving some of Pannek's direct reports), and Bolton's supervisor David Little ("Little") (EVP) confirmed that there had been no discussions about any employee terminations as part of the reorganization prior to Bolton's April 2, 2018 e-mail:

**<u>Watson Testimony (Watson Dep., R. 49, PageID # 2341-2342):</u>**

Q. At the time this complaint came in, were you aware that some employees within Mr. Bolton's group were being considered for job elimination?

A. No.

Q. When did you become aware that was a possibility?

A. I think after [Bolton] concluded his analysis of his new management team.

**<u>Grey Testimony (Grey Dep., R. 40, PageID # 1875):</u>**

Q. Did you have any knowledge at the time you were conducting your investigation with respect to Mr. Pannek's complaint that either him or Mr. Strotman were being considered for termination of their employment at U.S. Bank?

A. I don't recall having any knowledge of that, no.

16

**Roberts Testimony (Roberts Dep., R. 38, PageID # 1385):**

Q. Do you know if any decision had been made at this point as to whether Mr. Pannek or anyone else was going to be – if that position was going to be eliminated?

A. No, what I – according to my recollection. According to my recollection, a decision had been made that these people were likely coming to my organization.

Q. Okay. But no decision had been made as far as these individuals were going to be eliminated?

A. Not according to my recollection, no.

**Little Testimony (Little Dep., R. 48, PageID # 2170):**

Q. Was it your understanding that employees were going to be terminated as a result of this reorganization?

A. No expectations.

(*See also* Bolton Dep., R. 39, at PageID # 1501-1502 ("I think the final determination would have been sometime in the April [2018] timeframe."); *Id*. at PageID # 1524-1526 ("Q. When was that determination made that [Roberts] would take over that role? A. …My guess would have been sometime late March to early April [2018]. Q. Could it have been made at the very beginning, or are you pretty certain it would have been at least March or early April? A. I didn't make it at the very beginning[.]")).

Moreover, the February e-mail regarding some of Pannek's reports being moved to Roberts says nothing of Bolton's thoughts on Strotman. (Exhibits to Bolton

Dep., R. 39-1, PageID # 1737-1738). Indeed, as of April 2018, Bolton was still considering Strotman for a potential position. (*Id*. at PageID # 1751). He inquired to Gemrich as to his thoughts on Strotman for the role, however, Gemrich recommended Strotman's subordinate Greg Hovis instead. (*Id*.). This recommendation by Gemrich, which Bolton followed, came *immediately after* Gemrich was interviewed by HR regarding Plaintiffs' harassment complaints.

After receiving the April 2, 2018 e-mail, Werner—Watson's supervisor in HR—responded to Bolton thanking him for his thoughts on the situation, and then looped in HR Generalist Laurie Grey, who would be investigating the complaint. (Exhibits to Grey Dep., R. 40-1, PageID # 1926-1929). Werner referred to Grey as Bolton's point of contact regarding Pannek's complaint, and stated she had already begun her investigation. (*Id*.).

The "investigation" was in fact conducted, but the focus was entirely on the $150 gift card bet complaint, with Grey not taking any time to dig into the hostile work environment claims, including Gemrich's inappropriate comments about women. Pannek stated his discomfort in sharing the specific words used by Gemrich with Gray, but he did provide generalized examples of the crude and guttural comments, including those used to describe female employees of U.S. Bank. (Pannek Dep., R. 35, PageID # 638-640, 658-661; Grey Dep., R. 40, PageID # 1833-1836). Grey made notes of Pannek's examples, indicating that Gemrich used the "p

word" and referenced that Gemrich's language was similar to the "Access Hollywood" tapes (a reference to the leaked Access Hollywood recordings involving Donald Trump during the 2016 presidential election). (Grey Dep., R. 40, PageID # 1833; Exhibits to Grey Dep., R. 40-1, PageID # 1930-1932). Despite this, Grey declined to investigate the comments further.

Grey also interviewed Strotman, but asked only about the bet and nothing about the sex-based harassing comments. (Strotman Dep., R. 36, PageID # 923-926). Nevertheless, Strotman took initiative and brought up Gemrich's inappropriate comments and conduct to Grey, reiterating the same inappropriate comments Pannek raised in his complaint (e.g., Gemrich referring to himself as a "f***ing unicorn," that he could "hit any p***y he wanted," and the e-mail berating Ms. Tatman). (*Id.*).

Grey then interviewed Gemrich. In doing so, however, she only asked him about the bet, and nothing about his inappropriate comments and behaviors reported by Pannek and Strotman. (Grey Dep., R. 40, PageID # 1862-1863 ("My conversation with [Gemrich] was focused on the bet[.]")).

After Grey completed her interviews, she asked Watson if she should follow up with Gemrich or others on the sex-based comments. (*Id.* at PageID # 1854-1856, 1863-1864). According to Grey, Watson told her not to do so, as Watson had received additional complaints about Gemrich from other employees, and that Watson would instead follow up on those comments directly. (*Id.*). According to

19

Watson, however, she now "cannot recall" those additional complaints nor performing any additional follow up as to Gemrich's comments or behaviors. (Watson Dep., R. 49, PageID # 2363-2365, 2370-2371). Given the conflicting stories, it would appear that no one actually looked into the inappropriate comments or the extent of them, despite Plaintiffs' and other employees' reports about them.

Following the conclusion of the investigation, Bolton and Watson had a phone call with Pannek on April 27, 2018. (Watson Dep., R. 49, PageID # 2357-2358; Exhibits to Watson Dep., R. 49-1, PageID # 2449; Pannek Dep., R. 35, PageID #665-666; Exhibits to Pannek Dep., R. 35-1, PageID # 776). Once again, however, the two focused solely on the bet and not the inappropriate comments. (Watson Dep., R. 49, PageID # 2358; Exhibits to Watson Dep., R. 49-1, PageID #2450-2454; Pannek Dep., R. 35, PageID # 668-670). And even with respect to the bet, the two insinuated that Pannek shared in fault for engaging in the bet (despite reporting he was coerced). (*Id*.).

When the two did not bring up the hostile work environment, Pannek took initiative (again) and did so, making clear his concerns that those complaints had still not been addressed (Pannek Dep., R. 35, PageID # 668-670; Exhibits to Pannek Dep., R. 35-1, PageID # 777-781). Following this call, Pannek submitted his contemporaneous call notes to Bolton and Watson, in which he complained (again) that no one was addressing Gemrich's inappropriate behaviors and the hostile work

20

environment. (Exhibits to Pannek Dep., R. 35-1, PageID # 777-781). Nevertheless, no follow up on these concerns was performed. (Watson Dep., R. 49, PageID # 2359-2360, 2363-2364).

At the same time the April 2018 HR investigation was occurring, Bolton began taking steps to effectively paper over his April 2, 2018 recommendation to terminate Plaintiffs pursuant to a RIF. This included working through U.S. Bank's "Peer Group Analysis" (PGA) process, which according to the policy "must be completed where there are two or more employees in the position being considered for elimination, but not all employees in the job will be severed[.]" (Exhibits to Watson Dep., R. 49-1, PageID # 2441). Per the policy, "[u]se of the PGA ensures that employees are evaluated and ranked consistently against criteria that take into account relevant skills, knowledge and experience." (*Id.*). The policies highlights that "decisions should be non-discriminatory and consistent with the business purpose of the reduction-in-force (RIF). (*Id.*).

The PGA process is required to be performed for non-cause termination (i.e., terminations based upon position elimination). (Watson Dep., R. 49, PageID # 2332-2333; Little Dep., R. 48, PageID # 2175-2176). U.S. Bank takes the PGA process seriously, and has disciplined—even terminated—employees for failing to properly administer the PGA process. Interestingly, that included Gemrich, who was terminated a year after this occurred, in part for failing to follow U.S. Bank's PGA

Guidelines. (Exhibits to Gemrich Dep., R. 37-1, PageID # 1262-1270 (substantiated finding that "Gemrich elected not to execute the RIF/PGA process according to guidelines" resulting in the "potential elimination of two managers who, by the guidelines, should not have been eliminated," which resulted in a recommendation of involuntary termination).

Here, notwithstanding that Bolton had already voiced an intention to terminate Plaintiffs as part of a RIF on April 2, 2018, he *now* claims to have performed a PGA of Pannek and Roberts to "decide" who would lead the third-party risk/vendor management function for the new CBBS team, and of Strotman and Rhonda Gombold ("Gombold") to "decide" who would be selected to lead the regulatory change management function. (Bolton Dep., R. 39, PageID # PageID # 1523-1525; *See also id.* at PageID # 1538 ("For this particular event, I think we would have done those [PGAs] probably around April[.]"). This was contrary to the regular practice at U.S. Bank, which was to not to come to any decisions or conclusion until the PGA process was completed. (*Id.* at PageID # 1659-1660; Watson Dep., R. 49, PageID # 2337 ("Q. When doing a peer group analysis, obviously no decision would be made or should be made as to who's going to be terminated before that analysis is performed; is that right? A. Correct."); Grey Dep., R. 40, PageID # 1906 ("Q. When would that form [PGA] typically be completed? A. Toward the beginning of the reduction process."); *Id.* at PageID # 1912 ("Q. Is a peer group analysis typically

22

performed before an actual decision to terminate is made as to that employee? A. Yes.")).

In purportedly conducting the PGA analyses, Bolton followed none of the detailed steps in completing it. First, Bolton never identified the specific skills for the positions being evaluated. According to the PGA instructions, the manager of the employee being evaluated must complete the "Skills Inventory" tab, including selecting job-specific skills from a list, and recommendations to review the position's job description:



**1. Skills Inventory tab -**
Review the Skills Inventory to determine the most relevant job-specfic skills required for the job being evaluated. While the list includes many common skills, it is not intended to be a complete list. You may want to add more specific skills like the examples shown in the "Job-Specific" skills column; you should also review the position's job description to help identify the most important job skills.

(Exhibits to Watson Dep., R. 49-1, PageID # 2441). To help identify job-specific skills, the instructions provide examples of both general and job-specific skills:

| General Skills | Job-Specific Skills (Examples) |
|---|---|
| Industry/market | Creates test plan scenarios |
| Decision making | Works with business line to understand requirements |
| Business acumen | Follows enterprise standard test processes according to established |
| Change management | Requirements analysis |
| Communication | Application testing |
| Continuous learning | System testing |
| Critical judgment | System development life cycle |
| Decision making | Application delivery process |
| Detail orientation | |
| Problem solving | |
| Project management | |
| Technology savvy | |
| Time management | |
| Writing skills | |
| Results orientation | |
| Teamwork | |
| Collaboration | |

23

(*Id*. at PageID # 2442).

Once the general and job specific skills are selected, the manager is required to fill out a specific "Skills and Performance Overview" tab form, rating each employee in each skills category on a 1-3 point scale:

> **2. Skills and Performance Overview tab -**
> a) Fill in the key job-related skills you identified in step one (up to five).
> b) Evaluate each employee based on the key skills and performance using the following scale:
> Exceeds expectations (3 points); Meets expectations (2 points); or Does not meet expectations (1 point). USE ONLY WHOLE NUMBERS. The criteria for each rating qualifier is explained in more detail in the Scale Definitions tab.
> c) The data populated in the skills and performance overview tab will automatically populate into the PGA Summary on the next tab.

(*Id*. at PageID # 2441, 2443-2444).  From there, the points are populated into a "PGA Summary Form." (*Id.*).

Lastly, the manager—with the assistance of their HR business partner (Watson, in Bolton's case)—must complete the remaining PGA sections, including "Experience," "Tenure," "License/Certifications," and "Written Disciplinary Action," with points assigned to each:

> **3. Experience, Tenure and License/Certifications-**
> With support from the HR business partner, the manager should complete the remaining sections of the PGA summary using the following understanding:
> - *"Experience"* refers to the amount of time the employee has spent in this field
> - *"Tenure"* refers to the employee's overall time at U.S. Bank in any position or business line
> - *"License/Certifications"* – List any relevant licenses and certifications that relate to the job, fill in the PGA form to reflect those items and score accordingly. If not, disregard that factor and mark "N/A" on the PGA Summary.
> - *"Written disciplinary action"* – If the employee has been placed on a documented warning and/or action plan in the previous 12 months, include the date and nature of the corrective action.

(*Id*.).

24

When the three PGA steps are completed, a PGA Summary Form is finalized with an overall score for that employee, to be used in comparison with any other employee(s) to determine who will be selected for the position(s). (Watson Dep., R. 49, PageID # 2352-2353; *See also, e.g.,* Exhibits to Watson Dep., R. 49-1, PageID # 2445-2446).

Here, Bolton failed to follow <u>any</u> of the above  requirements in his purported PGA assessments. First, Bolton completed the PGA process entirely by himself, and without any input from his HR business partner as required. (Bolton Dep., R. 39, PageID # 1660 ("I would have completed this [PGA] myself.").

Second, Bolton failed to complete steps one and two—the Skills Inventory and Skills and Performance Overview forms. He did not select any job-specific skills, or rate those when comparing Plaintiffs to others in the same role. This is demonstrated by the fact that the Position-Related Skills listed on the PGA forms completed by Bolton—"technical capability/substantive knowledge," "quality of work product," "quantity of work product," "cross-functional expertise," and "additional skill to be used as needed"—do not correlate to any of the skills listed in the Skills Inventory form. (*See* Exhibits to Watson Dep., R. 49-1, PageID # 2445-2446 and Exhibits to Smith Dec., R. 50-3, PageID # 2571-2572; *C.f.*, Exhibits to Watson Dep., R. 49-1, PageID # 2442).

Instead, Bolton simply completed the PGA Summary form—the last step—which is meant to be derived from input in the first two steps. (*See* Exhibits to Watson Dep., R. 49-1, PageID # 2445-2446 and Exhibits to Smith Dec., R. 50-3, PageID # 2571-2572; *C.f.*, Exhibits to Watson Dep., R. 49-1, PageID # 2443-2444).

As far as Bolton's reasoning for the scores he gave in the made-up skills categories, Bolton could provide no detail either. Instead, he testified that Plaintiffs' scores were simply based on "what [Bolton] had learned over those couple months" supervising them. (Bolton Dep., R. 39, PageID # 1661-1662; Exhibits to Watson Dep., R. 49-1, PageID # 2445; Exhibits to Smith Dec., R. 50-3, PageID # 2571).

With respect to his scoring on the Performance Rating section, Bolton testified, "I would guess that I looked at a performance review or had like HR look up [the] performance review." (Bolton Dep., R. 39, PageID # 1663-1664). However, the record contains no evidence of any 2017 performance reviews for Pannek, Strotman, or Roberts. (Smith Dec., R. 50-3, PageID # 2540, at ¶ 1-4). Yet, Bolton rated both Pannek and Strotman as 2/4 in this category, and Roberts as 3/4. (Exhibits to Watson Dep., R. 49-1, PageID # 2445-2446; Exhibits to Smith Dec., R. 50-3, PageID # 2571).

Bolton underwent the same process when completing Robert's PGA, who was meant to be compared to Pannek for the vendor management position. (Bolton Dep., R. 39, PageID # 1665-1669). Roberts received all 4s on the Position-Related Skills

26

section, and a 3/4 on the Performance Rating (despite there being no record evidence of a 2017 performance review for Roberts). (Exhibits to Watson Dep., R. 49-1, PageID # 2446).

After "completing" the PGA process, Pannek and Strotman received identical scores of 23, Roberts received a score of 26, and Gombold (Strotman's comparator) received a score of 21. (Exhibits to Watson Dep., R. 49-1, PageID # 2445-2446; Exhibits to Smith Dec., R. 50-3, PageID # 2571-2572). It is based on this process that U.S. Bank claims that Pannek and Strotman would be "selected for a reduction in force caused by corporate reorganization." (Exhibits to Bolton Dep., R. 39-1, PageID # 1771).

Notably, Gombold (Strotman's comparator) was also terminated, and instead of retaining Strotman for the open change management position, Bolton opted to hire one of Strotman's direct reports—Greg Hovis—into the role. (Bolton Dep., R. 39, PageID #1681-1683). Bolton did not complete any form of PGA as to Hovis, instead relying on a recommendation from Gemrich not to select Strotman for the role. (Exhibits to Bolton Dep., R. 39-1, PageID # 1751).

Plaintiffs were ultimately terminated on May 15, 2018—Strotman first, then Pannek. That day, Bolton and Watson called Strotman to a downstairs conference room next to building security. (Strotman Dep., R. 36, PageID # 844-848). In this meeting—which lasted only minutes—Strotman was informed he was being

terminated and offered severance paperwork, which Strotman declined to sign. (*Id*.). After the meeting, Strotman went up to his office to collect his things, and then left the building. (*Id*.). Shortly thereafter, Watson and Bolton called Pannek into a similar meeting. (Pannek Dep., R. 35, PageID # 619-621). Just as with Strotman, Bolton and Watson told Pannek that U.S. Bank had made the decision to eliminate him. (*Id*.). Again, Watson tried to get Pannek to sign a severance agreement, but Pannek refused, and immediately left the building. (*Id*.).

At the time Pannek and Strotman were terminated, there were two open positions in Bolton's own chain of command. (Bolton Dep., R. 39, PageID # 1672-1674; Exhibits to Bolton Dep., R. 39-1, PageID # 1741). Yet neither Plaintiff was placed in either role despite being qualified. (Bolton Dep., R. 39, PageID # 1672-1674; Strotman Dec. ¶¶ 18-19, R. 50-1, PageID # 2532; Pannek Dec. ¶ 10, R. 50-2, PageID # 2537). In fact, Strotman submitted approximately eight applications for open risk management positions at U.S. Bank between May 2018 and August 2018. (Exhibits to Strotman Dep., R. 36-1, PageID # 1052-1115; Exhibits to Bolton Dep., R. 39-1, PageID # 1743-1750). All were rejected without an interview. (*Id*.). However, two of Bolton's other reports who were deemed to be in duplicate positions following the CBBS merger—Matt Kobin and Susan Stephens—were *not* terminated, but rather were permitted to transfer outside the department to other roles

within U.S. Bank. (Exhibits to Watson Dep., R. 49-1, PageID #2438-2440; Bolton

Dep., R. 39, PageID # 1519-1520).

# SUMMARY OF ARGUMENT

The district court erred by granting summary judgment in favor of U.S. Bank on Plaintiff's Title VII retaliation and hostile work environment claims, as well as Pannek's age discrimination claim.[2] In doing so, the district court improperly credited disputed facts in favor of *the Defendant* rather than Plaintiffs, and committed other errors of law including finding that Plaintiffs' same-sex harassment claims were not actionable, and that Plaintiff could not establish a *prima facie* case of age discrimination. (Opinion & Order, R. 59, PageID # 2721-2722, 2726).

Starting with Plaintiffs' retaliation claims, the district court improperly decided to accept as an undisputed fact that the timing of Plaintiffs' terminations *did not support* their retaliation claims, including as supporting evidence of pretext. (*Id*. at PageID # 2710-2711). In doing so, the district court found—based on a single e-mail—that U.S. Bank was already "seriously contemplating" terminating Plaintiffs before it ever became aware of Plaintiffs' Title VII protected activity. (*Id*. at PageID # 2710). This is a disputed fact, however, which is refuted by testimony from the decisionmaker himself and other bank employees, all of whom make clear that there had been no discussions around terminating employees based upon a corporate reorganization until *after* the bank became aware of Plaintiffs' complaints. (Bolton

---

[2] Plaintiffs do not appeal the district court's decision with respect to their state law claims (Counts II, IV, and VI of the Complaint) or the district court's decision with respect to Strotman's age discrimination claim (Count V).

Dep., R. 39, PageID # 1525; Watson Dep., R. 49, PageID # 2341; Roberts Dep., R. 38, PageID # 1385).

The district court also improperly construed or otherwise disregarded other pretext evidence in U.S. Bank's favor, including a complete failure to follow the bank's mandatory reduction in force (RIF) procedures on which it claimed Plaintiff's terminations were based (Exhibits to Watson Dep., R. 49-1, PageID # 2441, 2445; Exhibits to Smith Dec., R. 50-3, PageID # 2571; Bolton Dep., R. 39, PageID # 1660), evidence of Bolton's claimed suspicions as to the timing of Plaintiffs' hostile work environment complaints (Exhibits to Watson Dep., R. 49-1, PageID # 2438)—which later dissuaded HR from fully investigating the harassment concerns—and refusal to consider either Plaintiff for open and available positions on the team for which they were highly qualified. (Bolton Dep., R. 39, PageID # 1672-1674; Exhibits to Bolton Dep., R. 39-1, PageID # 1741; Strotman Dec., R. 50-1, PageID # 2532, at ¶ 18-19; Pannek Dec., R. 50-2, PageID # 2537, at ¶ 10).

By disregarding this evidence, the district court turned the summary judgment standard on its head, resolving factual disputes in Defendant's favor, and as a result, finding that no evidence of pretext could be inferred.

As to Plaintiff's hostile work environment claims, the district court erred here too, by simply finding that such claims were not actionable because there was no evidence they were based on sex. But Plaintiffs submitted evidence of severe,

31

pervasive, and sexually explicit comments made by Gemrich to them—and only to them—about women, including female employees at U.S. Bank. (Pannek Dep., R. 35, PageID # 527-533, 546, 558-559, 566-567, 569, 572; Strotman Dep., R. 36, PageID # 899-901, 902-904, 924-925; Gemrich Dep., R. 37, PageID # 1145-1148). There is no record evidence that others were subjected to these inappropriate comments, including women. However, the district court disregarded this evidence, instead finding that such harassment in this context simply cannot be actionable. (Opinion & Order, R. 59, PageID # 2720-2721). That was an error of law which requires reversal.

Finally, the district court erred in determining Plaintiff Mark Pannek could not make out a *prima facie* case of age discrimination, on the basis that his termination was (purportedly) pursuant to a RIF and he was not replaced. (*Id*. at PageID # 2723-2726). However, Plaintiff was replaced by Alyson Roberts, a substantially younger individual. While the district court held this was not a technical replacement, Roberts was retained for a vendor management role over Pannek, and at the time, both employees underwent consideration for the open position. (Exhibits to Watson Dep., R. 49-1, PageID # 2445-2446). Roberts' selection over Pannek's resulted in Pannek's termination. (Exhibits to Bolton Dep., R. 39-1, PageID # 1771). Thus, Plaintiff was in fact replaced, but even if he was not there is direct and circumstantial evidence that he was singled out for impermissible purposes.

32

Further, based on the fact that Pannek and Roberts were considered for an open and available position, the district court also failed to analyze these claims under a failure to hire or promote discrimination framework. Had it done so, it would have determined that there are issues of fact as to whether the stated reason for selecting Roberts—that she was the more qualified candidate—was a pretext for age discrimination. In particular, Plaintiff was objectively more qualified than Roberts, given he had more years of experience, had more cross-functional experience, and Roberts was uniquely *unqualified* for the role given a criminal record that disqualified her from holding employment with an FDIC-insured institution. (Pannek Dep., R. 35, PageID # 468-482; Pannek Dec., R. 50-2, PageID # 2536, at ¶ 3; Roberts Dep., R. 38, PageID # 1285-1307); *See also* 12 U.S.C. 1829(a)(1).

In light of the above, the district court erred in granting summary judgment on Plaintiffs claims under Title VII and the ADEA. That decision should be reversed, and the case remanded for trial.

**ARGUMENT**

The district court erred in granting summary judgment in U.S. Bank's favor as to Plaintiffs' Title VII and ADEA claims. There are multiple disputes of fact requiring resolution by a jury, any one of which should have been sufficient to deny Defendant's Motions. The district court's decision should be reversed, and remanded for trial on each of Plaintiff's claims.

**A.    Standard of Review**

This Court reviews a district court's grant of summary judgment de novo. *Williams v. Ford Motor Co.*, 187 F.3d 533, 537 (6th Cir. 1999). "Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *See also Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992). At the summary judgment stage, the court determines whether there are genuine disputes of material fact that should go to a jury; it does not find facts. *See Anderson* at 252. There is a genuine dispute of material fact if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249.

**B.    Title VII Retaliation**

Title VII retaliation cases based upon circumstantial evidence are generally analyzed under the *McDonnell Douglas* burden-shifting framework. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 514 (6th Cir. 2021), citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543-44 (6th Cir. 2008). To establish a prima facie case of retaliation, a plaintiff must establish that he (1) engaged in a protected activity; (2) his exercise of such protected activity was known by the defendant; (3) the defendant subsequently took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. *Id.*, citing *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018).

Once a plaintiff establishes a *prima facie* case of retaliation, an employer is provided the opportunity to overcome the *prima facie* case by articulating a legitimate, nonretaliatory reason for the adverse employment action. *Id.* If the employer carries its burden, the plaintiff is then afforded an opportunity to provide evidence that the reasons offered by the employer were not its true motivations, but were a mere pretext for retaliation. *Id.* In doing so, a plaintiff must "produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Howely v. Fed. Express Corp.*, 682 F. App'x 439, 444 (6th Cir. 2017). However, a plaintiff is not required to disprove the employer's stated reasons.

Rather, "to survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012); *See also George v. Youngstown State Univ.,* 966, F.3d 446, 462 (6th Cir. 2020)("This burden is not heavy though, as summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual.").

Here, the district court properly found that both Plaintiffs met all four elements of their *prima facie* cases of retaliation, including evidence of a causal connection between Plaintiffs' protected conduct and U.S. Bank's decision to terminate them.

However, in nearly the same breath the district court went on to find there was no evidence of pretext, slicing up the very evidence which combines to establish pretext into "several theories." (Opinion & Order, R. 59, PageID # 2709).

First, the district court discredited the timing of Plaintiff's terminations as "cut[ting] in U.S. Bank's favor at the pretext stage" despite that same timing supporting a causal connection. (*Id.* at PageID # 2710). As support, the district court refers to the February 2018 e-mail regarding some of Pannek's direct reports being theoretically moved to Alyson Roberts, which, according to the district court, "indicates that Bolton was seriously considering moving Pannek's direct reports over

the Alyson Roberts' department *prior* to Pannek's complaint about Gemrich's workplace conduct[.]" (*Id.*; Exhibits to Bolton Dep., R. 39-1, PageID # 1737-1738).

No doubt, that is one way to interpret the evidence. But a jury could also reasonably infer based on all the other evidence and testimony that no such decision to terminate Plaintiffs was being "seriously considered" until *after* becoming aware of Plaintiffs' protected conduct. For one thing, multiple employees involved in the corporate reorganization made clear that they had no awareness of any position eliminations until April 2018, *after* U.S. Bank became aware of Pannek's ethics complaint. (Watson Dep., R. 49, PageID # 2341 ("Q. At the time this complaint came in [March 28, 2018], were you aware that some employees within Mr. Bolton's group were being considered for job elimination? A. No."); Roberts Dep., R. 38, PageID # 1385 ("Q. Do you know if any decision had been made at this point [February 22, 2018] as to whether Mr. Pannek or anyone else was going to be – if that position was going to be eliminated? A. No.")). Bolton himself testified that he did not come to any decisions "until the late March to early April timeframe." (Bolton Dep., R. 39, PageID # 1525).

Given this, and the lack of any discussion in the February 2018 e-mail regarding considering a *termination* of employment, there are certainly questions of fact as to the timing between when U.S. Bank became aware of the protected activity, and determined it would terminate Plaintiff's employment. That includes Bolton,

who made clear he made no such decisions until after he became aware of that protected activity.

The second and related evidence of pretext that the district court glossed over was Bolton's abject failure to follow U.S. Bank's mandatory RIF procedures (i.e., the PGA process) in terminating Plaintiffs. Indeed, U.S. Bank's insistence, and the district court's agreement, that Bolton was already "seriously contemplating" selecting Roberts over Pannek as early as February 2018, *months before* the RIF procedures even began, would be evidence of pre-selection and in contravention of the established, mandatory policy. (Watson Dep., R. 49, PageID # 2337 ("Q. When doing a peer group analysis, obviously no decision would be made or should be made as to who's going to be terminated before that analysis is performed; is that right? A. Correct."); Grey Dep., R. 40, PageID # # 1912 ("Q. Is a peer group analysis typically performed before an actual decision to terminate is made as to that employee? A. Yes.")). Bolton's April 2, 2018 e-mail likewise confirms this, given Bolton is *recommending* including Plaintiffs in a "severance exercise" before having performed any PGA Analysis. (Exhibits to Watson Dep., R. 49-1, PageID # 2438-2440). This Court has held that "evidence of irregularities in the application and selection process" can raise a genuine issue of pretext. *Jenkins v. Nashville Pub. Radio*, 106 F. App'x 991, 995 (6th Cir. 2004). In fact, where a plaintiff shows "how the irregularities prejudiced [them] in the selection process or indicate any

dishonesty or bad faith on the part" of the employer, this creates a strong irregularity arguments going to pretext. *Stokes v. Detroit Pub. Sch.*, 807 F. App'x 493, 501 (6th Cir. 2020). Here, there is evidence of such irregularities, thus highlighting a genuine dispute as to material facts from which a jury could reasonably find pretext.

Bolton's failure to follow the PGA steps is also evidence of pretext. Indeed, the policy is clear that it is to be followed to avoid bias and ensure consistency in decisions. (*Id.* at PageID # 2441). Bolton did the opposite, never bothering to identify job-specific skills, assess those skills, involve HR, check performance reviews, or otherwise conduct any objective assessment. (*Id.* at PageID # 2441, 2445; Exhibits to Smith Dec., R. 50-3, PageID 2571; Bolton Dep., R. 39, PageID # 1660 ("I would have completed this [PGA] myself."); *Id.* at PageID # 1661-1662; *Id.* at PageID # 1663-1664; Smith Dec., R. 50-3, PageID # 2540, at ¶ 1-4).

Despite having this evidence before it, the district court disposes of the argument by stating that the evidence "supports U.S. Bank's contention that Bolton followed the PGA process in broad strokes, even if he did not conduct it as fastidiously as was the norm at U.S. Bank." (Opinion & Order, R. 59, PageID # 2711). Yet again, however, while this is one way to interpret the evidence, the district court improperly disregards evidence leading to an equally reasonable inference that Bolton's complete failure to follow the mandatory policy and to simply make up evaluation numbers evinces a pretext for retaliation.

39

After disregarding the above, the district court then addresses "Pannek's third argument" regarding the content of Bolton's April 2 e-mail, which questioned the timing of Pannek's ethics complaint. (*Id*. at PageID # 2712; Exhibits to Watson Dep., R. 49-1, PageID # 2438-2440). The court disregards this too, based upon Bolton's other statements in the e-mail that his "reasons [for termination] are unrelated to Pannek's complaint against Gemrich," and the fact that he feigned concern in the e-mail regarding Gemrich's conduct. (Opinion & Order, R. 59, PageID # 2712).

While Bolton's statement could avoid arguments that the e-mail is *direct* evidence of a retaliatory intent, it would still support an inference of discrimination based on the weight of other circumstantial evidence. In that regard, the district court failed to consider that (1) these suspicions about timing were being made to HR, who was preparing to investigate this complaint (Exhibits to Watson Dep., R. 49-1, PageID # 2438 ("I believe the timing of [Pannek's] COE violation complaint is tied to [Bolton's belief that Pannek was worried about his job].")); (2) the statements could dissuade HR from investigating the complaints, given the simultaneous intention to terminate the complainants; and (3) that HR in fact did not investigate the harassing conduct or comments in any way, instead focusing on the $150 bet. (Strotman Dep., R. 36, PageID # 923-926; Grey Dep., R. 40, PageID # 1862-1863; Watson Dep., R. 49, PageID # 2358; Pannek Dep. R. 35, PageID # 668-670; Exhibits to Pannek Dep. R. 35-1, PageID # 777-781).

40

As to the lack of investigation into Plaintiff's complaints of a hostile work environment, the district court wrongly disregards this evidence too based upon an assumption that a "less-than-desired response to a complaint [cannot] supports a plaintiff's argument that he was terminated for making that complaint." (Opinion & Order, R. 59, PageID # 2713). This statement underplays what happened, however, as U.S. Bank simply chose *not to* investigate any of the sex-based statements or conduct, and instead move forward with a termination of Plaintiffs. Such evidence, particularly in the context of all the other evidence as to timing, support an inference that U.S. Bank's indifference or unreasonableness supports a claim of retaliation. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008)(finding employer liability for retaliation where "supervisors or members of management… have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances.").

Next, the court disregards evidence submitted by both Plaintiffs as to open and available positions for which they were denied.

As to Pannek, the district court states that "Pannek offers no evidence…to show that he was qualified for any particular new position that became available during this period." (Opinion & Order, R. 59, PageID # 2713). But that is *exactly* what Plaintiffs offered and pointed to in the record—specifically, that there were two "open and available risk management positions" on Bolton's team, for which

both Plaintiffs were qualified. (Bolton Dep., R. 39, PageID # 1672-1674; Exhibits to Bolton Dep., R. 39-1, PageID # 1741; Strotman Dec. R. 50-1, PageID # 2532, at ¶ 18-19; Pannek Dec., R. 50-2, PageID # 2537, at ¶ 10). These were supported by an organizational chart that Bolton testified to, showing two open positions on his team in "Risk and Controls" and "Risk Strategy." (Bolton Dep., R. 39, PageID # 1672-1674; Exhibits to Bolton Dep., R. 39-1, PageID # 1741). According to Bolton, he could not recall considering whether Plaintiffs might be good fits for those roles during the severance exercise. (Bolton Dep., R. 39, PageID # 1672-1674).

As to Strotman, the district court gives some additional consideration given Strotman applied to several open risk management positions. (Opinion & Order, R. 59, PageID # 2716-2717). However the district court went on to quickly disregard those too, on a conclusory finding that "the record substantiates U.S. Bank's assertion that despite Strotman being a high performer historically, Bolton developed a negative view of Strotman's ability to succeed under the Bank's reorganized corporate structure." (*Id*. at PageID # 2717). Once again, however, this improperly construed the disputed evidence in U.S. Bank's favor. An equally reasonable inference from the evidence is that Strotman, despite being a historically strong performer and being highly qualified for open and available risk management positions, was rejected because he had raised complaints of a hostile work environment against his supervisor John Gemrich.

42

In granting summary judgment, the district court improperly disregarded evidence of pretext, and improperly viewed the disputed evidence in a light most favorable to Defendant, *the moving party*. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S. Ct. 2505 (1986)("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge...the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."). Further, the district court failed to weigh the evidence of pretext as a whole, instead dissecting the arguments into various "theories" while failing to consider that their weight combined is sufficient to create an issue of fact as to pretext. *See Cline v. Catholic Diocese*, 206 F.3d 651, 668 (6th Cir. 1999)(affirming from *Anderson* that "the court must look at the evidence and make all reasonable inferences in a light most favorable to [plaintiff]" and "if, in that light, the evidence is such that a reasonable jury could return a verdict for the non-moving party, a trial—and not summary judgment—is warranted.").

### C. Title VII Hostile Work Environment

The district court also erred in granting U.S. Bank summary judgment on Plaintiff's Title VII hostile work environment claims. The district court did so based on a finding that Plaintiffs did not experience sex-based harassment actionable under Title VII.  (Opinion & Order, R. 59, PageID # 2720-2721).

As the Supreme Court has made clear, same-sex harassment is actionable under Title VII, including through "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *King v. Super Serv.,* 68 Fed. Appx. 659, 663 (6th Cir. 2003).

The record evidence establishes that Plaintiffs were regularly subjected to inappropriate sex-based commentary from Gemrich. (Pannek Dep., R. 35, PageID # 527-528). It occurred during weekly meetings, and Plaintiffs both found it highly objectionable. (*Id*. at PageID # 529-531). And yet, there is no similar evidence of Gemrich similarly subjecting female employees to these comments—rather, many of the comments were explicitly *about* those female employees. (*Id*. at PageID # 528-533, 546, 558-559; Gemrich Dep., R. 37, PageID # 1145-1148; Strotman Dep., R. 36, PageID # 899-904). That Gemrich specifically directed those types of inappropriate and harassing sex-based comments to men only confirms he was doing so on the basis of sex.

The harassment was also severe and pervasive, given record evidence that it altered the conditions of Plaintiffs' employment and created an abusive working environment. *Harris v. Forklift Sys.,* 510 U.S. 17, 21 (1993). Summary judgment is improper if plaintiff advances evidence of harassment that is "ongoing," "commonplace," and "continuing." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333-34 (6th Cir. 2008).

44

Here, the comments from Gemrich were guttural, demeaning to women, and specifically directed to Plaintiffs during weekly meetings with Gemrich. Gemrich's conduct and comments, considered together and with the discomfort it caused Plaintiffs (to the point that both sought to avoid Gemrich and move out of his supervision), are certainly enough to create questions of fact as to whether they are severe or pervasive. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 659-660 (6th Cir. 1999)(Courts are to consider the "totality of the circumstances" in determining whether a hostile work environment exists); *Thornson v. Fed. Express Corp.,* 530 F.3d 451, 456 (6th Cir. 2008)(denying summary judgment where plaintiff's supervisor was preoccupied with sex talk and made unwelcome, persistent, and increasingly intimidating advances; *Hawkins,* 517 F.3d at 334-35 (denying summary judgment where harasser repeatedly made "graphic, personal, and sexually explicit" comments and regularly touched multiple women).

Finally, there is also a basis for employer liability. Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior "culminate[d] in a tangible employment action" against the employee. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257 (1998). If it did, "the employer will, ipso facto, be vicariously liable." *Mack v. Otis Elevator Co.*, 326 F.3d 116, 124 (2d Cir. 2003). "In the absence of such tangible action, an employer will still be liable for a

hostile work environment created by its supervisors unless it successfully establishes an affirmative defense that  (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275 (6th Cir. 2009), quoting *Ellerth*, 524 U.S. at 765.

Here, there *was* a tangible employment action taken against Plaintiffs—namely, their terminations in retaliation for complaining about Gemrich's harassing conduct. As such, the affirmative defense under *Faragher-Ellerth* does not apply.

Even assuming a lack of tangible action, however, liability would still apply given U.S. Bank's response to the complaint of harassment was anything but reasonable. To the contrary, the record shows that the Bank failed to follow up on any of the harassment allegations, even when Pannek complained that nothing was being done. (Strotman Dep., R. 36, PageID # 923-926; Grey Dep., R. 40, PageID # 1862-1863; Watson Dep., R. 49, PageID # 2358; Pannek Dep. R. 35, PageID # 668-670; Exhibits to Pannek Dep. R. 35-1, PageID # 777-781). Instead, they simply focused on the $150 bet. (*Id.*).

The record is also clear that both Pannek and Strotman properly reported Gemrich's behavior. Pannek did so to U.S. Bank's Ethics Hotline, which U.S. Bank policy specifically states is a route to report complaints of harassment. (Pannek Dep.,

46

R. 35, PageID # 634-639, 645-646; Strotman Dep., R. 36, PageID # 922-923). Strotman also reported the behavior, including through his interview with HR following Pannek's complaint. (Strotman Dep., R. 36, PageID # 923-926).

In all events, Pannek and Strotman reasonably and in good faith believed that the harassment they reported was actionable. They made complaints about a supervisor who made demeaning comments about women specifically to them, belittled a female subordinate in an e-mail, created widespread fear of retaliation, and, as U.S. Bank conceded, engaged in behavior that was creating a hostile work environment. (Exhibits to Bolton Dep., R. 39-1, PageID # 1709-1710 (Gemrich's May 7, 2018 written warning confirming Gemrich's "[b]ehavior is creating a hostile work environment.").

### D. Age Discrimination (Pannek)

Finally, the district court erred in dismissing Pannek's age discrimination claims on summary judgment. As to this claim, the district court found Pannek could not make a prima facie case because, according to the court, as a matter of law Pannek "was not 'replaced' for purposes of the Court's age discrimination analysis." (Opinion & Order, R. 59, PageID # 2725).

But in reaching this conclusion, the district court's own reasoning shows that Pannek was in fact compared with a substantially younger employee—Alyson Roberts—for a now combined vendor management role to include the job duties he

held prior to the merger, and that Roberts was selected for that role. (*Id*. at PageID # 2723-2724). Notwithstanding this analysis, however, the district court found that Pannek was not "replaced" and therefore could not state a prima facie case of age discrimination. (*Id*. at PageID # 2726).

The court errs in its analysis. Whether or not Pannek's prior position was eliminated, the fact is, he was considered by Bolton for a new role while he was still employed. Further, based upon the very merger that U.S. Bank claims resulted in his termination—his job being replaced with a new position—that was filled by a substantially younger employee he was purportedly compared to as part of the PGA analysis. This is evidence of a replacement, thus satisfying the fourth element, which in any event would satisfy the additional "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons" as the district court quoted from *Pio v. Benteler Auto Corp.*, No. 21-1231, 2022 U.S. App. LEXIS 3564, at *3 (6th Cir. Feb. 7, 2022).

Further, in engaging in this analysis, the district court also failed to consider that by determining Plaintiff's position was eliminated and his subsequent comparison with Roberts for selection in the new "merged" position, the district court was effectively analyzing a discriminatory failure to hire or promote claim. Under such a claim, Pannek again meets all four elements of a *prima facie* case, namely (1) he was a member of a protected class; (2) he applied for and was qualified

48

for a promotion; (3) he was considered for and was denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812-813 (6th Cir. 2011).

As to the 'applied for' element, U.S. Bank of course neither advertised nor notified employees of this new "open" position in vendor management—indeed, Pannek was not even aware his position was being eliminated and/or that he was being considered for the merged role. The lack of such notice or formal process obviates the need for the "applied for" element, as this Court has long held. *See Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1022 (6th Cir. 2000)(Holding that "in failure to promote cases a plaintiff does not have to establish that he applied for and was considered for the promotion when the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion. Instead, the company is held to a duty to consider all those who might reasonably be interested in a promotion were its availability made generally known."); *Brennan v. Tractor Supply Co.*, 237 Fed. Appx. 9, 17 (6th Cir. 2007)(applying *Dews* exception to ADEA failure to promote claim).

As to the 'similarly qualified' prong, the evidence is clear that Pannek was *at least* as qualified as Roberts, and actually was the plainly superior candidate.

Pannek was plainly superior for a number of reasons, including his 35 years of experience in banking, particularly in risk management, compared to Roberts's total of 20 years in the same field, with even less in banking. (Pannek Dep., R. 35, PageID # 468-482; Pannek Dec., R. 50-2, PageID # 2536, at ¶ 3; Roberts Dep., R. 38, PageID # 1285-1305). Beyond that, Roberts was in fact uniquely unqualified for the vendor management role or any other role at U.S. Bank, given she has a prior criminal record of passing bad checks. (Roberts Dep., R. 38, PageID # 1306-1307); *See also* 12 U.S.C. 1829(a)(1)("except with the prior written consent of the Corporation [FDIC], any person who has been convicted of any criminal offense involving dishonesty or a breach of trust or money laundering, or has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such offense, may not...(iii) otherwise participate, directly or indirectly, in the conduct of the affairs of any insured depository institution.").

Finally, as Bolton admitted in testimony, Pannek had cross-functional experience and simply cannot recall why Pannek would not have received a higher score in that category in his PGA summary versus Roberts. (Bolton Dep., R. 39, PageID # 1662-1663).

And, this speaks to a larger point that the district court disregarded, but which for the same reasons discussed above is evidence of pretext. Bolton completely failed to conduct a proper PGA analysis between Roberts and Pannek. He failed to

50

identify specific skillsets for the position, to assess those skillsets against each applicant, and to enlist HR to assist in assessing the other categories including performance reviews and cross-functional experience.

Both Pannek's superior qualifications, and Bolton's failure to follow the mandatory PGA process, create questions of fact as to whether the Bank's purported reasons for selecting Roberts over Pannek for the vendor management role—that she was the more qualified candidate—was a pretext for discrimination.

## <u>CONCLUSION</u>

For the reasons discussed above, the judgment below must be reversed, and the case remanded for trial.

Respectfully submitted,

/s/ Joshua M. Smith

Joshua M. Smith (0092360)
Peter A. Saba (0055535)
Bailey E. Sharpe (0103565)
SSP LAW CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
jms@sspfirm.com
**Attorneys for Plaintiffs-Appellants**

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(B)

In accordance with Rule 37(g), I certify that this brief complies with the type-volume requirements of Rule 32(a)(7)(b)(i). As determined by the word-count function of Microsoft Word, this brief contains 11,336 words.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and accurate copy of the foregoing was served electronically through the Court's electronic case filing system upon Patricia Anderson Pryor, Esq., and Patricia K. Gavigan, Esq., Jackson Lewis P.C., 201 E. Fifth Street, 26th Floor, Cincinnati, Ohio 45202, this 11th day of December, 2025.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)

# ADDENDUM # 1

## DESIGNATION OF RELEVANT DOCUMENTS

| Docket Entry Number | Description | PAGEID# and Range |
|---|---|---|
| 1 | Plaintiffs' Complaint | 7-11 |
| 35 | Deposition of Plaintiff Mark Pannek | 468-482, 485-486, 487, 490-491, 512-513, 517-518, 522, 527-529, 530-533, 534-539, 546, 566-567, 569, 572, 558-559, 567, 569, 597, 609-611, 619-621, 634-640, 645-646, 658-661, 665-666, 668-670 |
| 35-1 | Exhibits to Deposition of Plaintiff Mark Pannek | 776-781 |
| 36 | Deposition of Plaintiff Thomas Strotman | 844-848, 868, 874-878, 881-882, 885-888, 899-901, 902-904, 922-926, 979-988, |
| 36-1 | Exhibits to Deposition of Plaintiff Thomas Strotman | 1052-1115 |
| 37 | Deposition of John Gemrich | 1126-1127, 1131-1132, 1144-1148 |
| 37-1 | Exhibits to Deposition of John Gemrich | 1262-1270 |
| 38 | Deposition of Alyson Roberts | 1285-1305, 1385 |

| 39 | Deposition of Bryan Bolton | 1469-1471, 1475-1476, 1478-1481 1484, 1486-1487, 1501, 1519-1520, 1523-1525, 1538, 1659-1669, 1672-1677, 1681-1683, 1686-1688 |
|---|---|---|
| 39-1 | Exhibits to Deposition of Bryan Bolton | 1709-1710, 1712-1717, 1737-1738, 1741-1751, 1765, 1771 |
| 40 | Deposition of Laurie Grey | 1799-1800, 1833-1836, 1854-1856, 1862-1864, 1875, 1906, 1912 |
| 40-1 | Exhibits to Deposition of Laurie Grey | 1919-1921, 1926-1932 |
| 42 | Deposition of Lydia Buster | 1987-1991, 1993-1994 |
| 48 | Deposition of David Little | 2170, 2175-2176 |
| 49 | Deposition of Diane Watson | 2311-2312, 2332-2333, 2337, 2341-2342, 2352-2353, 2357-2360, 2363-2365, 2370-2371, 2387-2388 |
| 49-1 | Exhibits to Deposition of Diane Watson | 2434-2467, 2438-2446, 2449-2454 |
| 50-1 | Declaration of Thomas Strotman in Support of Plaintiffs' Motion in Opposition to Summary Judgment | 2531-2532, 2534-2535 |
| 50-2 | Declaration of Mark Pannek in Support of Plaintiffs' Motion in Opposition to Summary Judgment | 2536-2537 |
| 50-3 | Declaration of Joshua M. Smith in Support of Plaintiffs' Memorandum in Opposition to Summary Judgment | 2540, 2571-2572 |

| 59 | Opinion & Order Granting Defendant's Motions for Summary Judgment | 2694-2726 |
|----|------------------------------------------------------------------|-----------|
| 61 | Plaintiffs' Notice of Appeal | 2728-2729 |