No. 25-3706

**In the United States Court of Appeals for the Sixth Circuit**

MARK PANNEK; THOMAS STROTMAN,

*Plaintiffs–Appellants*

v.

U.S. BANK NATIONAL ASSOCIATION

*Defendant–Appellee*

On Appeal from the District Court for the Southern District of Ohio
(Case No. 1:19-cv-00852)

**BRIEF OF DEFENDANT-APPELLEE**

Patricia Anderson Pryor
Patricia K. Gavigan
JACKSON LEWIS P.C.
201 E. 5th Street, 26th Floor
Cincinnati, Ohio 45202
Telephone: (513) 898-0050
Fax: (513) 898-0051

Counsel for Defendant-Appellee

**CERTIFICATION OF FILING OF APPELLEE'S CORPORATE DISCLOSURE STATEMENT**

Appellee U.S. Bank National Association filed its Corporate Disclosure Statement with the Court in accordance with Fed. R. App. P. 26.1 and 6 Cir. R. 26.1 on September 11, 2025.

## **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT .................................... viii

STATEMENT OF JURISDICTION.................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................2

STATEMENT OF THE CASE.................................................................3

I.    U.S. Bank Strictly Prohibits Unlawful Discrimination, Harassment, And Retaliation. ...............................................................3

II.   U.S. Bank Hires Strotman in January 2017; Strotman Recruits his Friend Pannek. ...............................................................3

III.  After A Reorganization In November 2017, Strotman And Pannek Briefly Report To John Gemrich. ........................................4

IV.   After Another Reorganization In Early 2018, Strotman And Pannek Stop Reporting To Gemrich, And All Three Begin Reporting To Bryan Bolton...................................................5

        A.    Pannek's Termination. .........................................................7

        B.    Strotman's Termination...................................................10

V.    Pannek Files Complaint About Gemrich on March 27, 2018, As An "Insurance Policy"; U.S. Bank Conducts A Thorough Investigation And Disciplines Gemrich. ......................................13

VI.   Pannek and Strotman Assert Claims Of Discrimination, Harassment, and Retaliation. .........................................................16

SUMMARY OF THE ARGUMENT ......................................................17

ARGUMENT .........................................................................................19

I.    Standard of Review.............................................................................19

II.  The District Court Properly Granted Summary Judgment to U.S. Bank on Pannek and Strotman's Retaliation Claim. ...................................................................................................19

    A.  Pannek and Strotman Failed to Establish a *Prime Facie* Case of Retaliation. ....................................................19

    B.  Pannek and Strotman Failed to Show Pretext for Retaliation. ...............................................................22

        1.  Bolton Conducted a Thorough Evaluation of the Leaders on His Team Prior to Executing the Reduction-in-Force. ...........................................22

        2.  The Timing Undercuts Any Argument of Pretext. .................................................................24

        3.  Bolton Followed the Bank's Process .......................................30

        4.  Human Resources Conducted a Thorough Investigation, Which Resulted in Gemrich's Discipline. ................................................................32

        5.  Pannek and Strotman Offered No Evidence That They Were Qualified For Any Open and Available Positions. ..................................................35

III.  The District Court Properly Granted Summary Judgment to U.S. Bank on Pannek and Strotman's Harassment Claims. ...................................................................................37

    A.  The Alleged "Harassment" Was Not Based On Sex. ...................................................................................38

    B.  The Alleged "Harassment" Was Not Severe and Pervasive. ......................................................................42

    C.  U.S. Bank Is Not Liable for Any Alleged Harassment Under *Faragher/Ellerth*. ....................................44

IV.  The District Court Properly Granted Summary Judgment to U.S. Bank on Pannek's Age Discrimination Claim. ..................................48

V.    Pannek and Strotman Conceded Their Claims Under Ohio
      State Law and Strotman's ADEA Claim.........................................................53

CONCLUSION ............................................................................................................53

CERTIFICATE OF COMPLIANCE........................................................................55

CERTIFICATE OF SERVICE ..................................................................................56

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS .............57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfrey v. AK Steel Corp.*,
  211 F. App'x 393 (6th Cir. 2006) .......................................................................48

*Barnes v. Gencorp., Inc.*,
  896 F.2d 1457 (6th Cir. 1990) .....................................................................48, 49

*Baugham v. Battered Women, Inc.*,
  211 F. App'x 432 (6th Cir. 2006) .......................................................................40

*Black v. Zaring Homes*,
  104 F.3d 822 (6th Cir. 1997), *cert. denied*, 522 U.S. 865 (1997) ......................42

*Bowman v. Shawnee State Univ.*,
  220 F.3d 456, 463 (6th Cir. 2000) ......................................................................42

*Brennan v. Tractor Supply Co.*,
  237 F. App'x 9 (6th Cir. 2007) ...........................................................................51

*Chappell v. GTE Prods. Corp.*,
  803 F.2d 261 (6th Cir. 1986) ..............................................................................50

*Clark Cnty. Sch. Dist. v. Breeden*,
  532 U.S. 268 (2001) (per curiam)................................................................20, 24

*EEOC v. AutoZone, Inc.*,
  692 F. App'x 280 (6th Cir. 2017) .................................................................45, 47

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998)..............................................................................42, 43, 45

*Geiger v. Tower Auto*,
  579 F.3d 614 (6th Cir. 2009) ..............................................................................52

*Gross v. FBL Financial Services, Inc.*,
  557 U.S. 167 (2009)......................................................................................48, 49

*Handshoe v. Mercy Medical Center*,
  34 F. App'x 441 (6th Cir. 2022) .........................................................................42

*Harris v. Forklift Systems, Inc.*,
    510 U.S. 17 (1993) .............................................................................................42

*Hawk v. Providence Home Servs.*,
    83 F. App'x 191 (9th Cir. 2003) ......................................................................23

*Hedrick v. Western Reserve Care System*,
    355 F.3d 444 (6th Cir. 2004) ...............................................................35, 50, 51

*Hensman v. City of Riverview*,
    316 F. App'x 412 (6th Cir. 2009) ....................................................................37

*Johnson v. Lockheed Martin Corp.*,
    598 F. App'x 364 (6th Cir. 2015) ....................................................................35

*Judge v. Landscape Forms, Inc.*,
    592 F. App'x 403 (6th Cir. 2014) ....................................................................30

*Kappen v. Ashley Med. Supply, Inc.*,
    695 F. App'x 94 (6th Cir. 2017) ......................................................................19

*Lefevers v. GAF Fiberglass Corp.*,
    667 F.3d 721 (6th Cir. 2012) ...........................................................................23

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) .........................................................................................48

*Nathan v. Great Lakes Water Auth.*,
    992 F.3d 557 (6th Cir. 2021) ...........................................................................39

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998) ......................................................................................38, 39

*Pinkerton v. Colo. Dep't of Transp.*,
    563 F.3d 1052 (10th Cir. 2009) .......................................................................47

*Radvansky v. City of Olmsted Falls*,
    395 F.3d 291 (6th Cir. 2005) ......................................................................21, 53

*Reynolds v. Fed. Express Corp.*,
    544 F. App'x 611 (6th Cir. 2013) ................................................................21, 24

*Richmond-Hopes v. City of Cleveland*,
　1998 U.S. App. LEXIS 29572 (6th Cir. Nov. 16, 1998) .................................... 44

*Seeger v. Cincinnati Bell Tel. Co. LLC*,
　681 F.3d 274 (6th Cir. 2012) ............................................................................ 30

*Sosby v. Miller Brewing Co.*,
　211 F. App'x 382 (6th Cir. 2006) ...................................................................... 22

*Sosby v. Miller Brewing Co.*,
　415 F.Supp.2d 809 (S.D. Ohio 2005), *aff'd*, 211 F. App'x 382 (6th
　Cir. 2006) .................................................................................................. 25, 29

*Sublett v. Masonic Homes of Ky., Inc*,
　2022 U.S. App. LEXIS 19876 (6th Cir. July 18, 2022) .................................... 50

*Tharp v. Apel Int'l, LLC*,
　2022 U.S. App. LEXIS 21050 (6th Cir. July 28, 2022) .................. 19, 20, 24, 29

*Trepka v. Board of Educ.*,
　28 F. App'x 455 (6th Cir. 2002) ........................................................................ 43

*Univ. of Tex. Southwestern Med. Ctr. v. Nassar*,
　570 U.S. 338 (2013) ..................................................................................... 22, 29

*Wade v. Automation Pers. Servs.*,
　612 F. App'x 291 (6th Cir. 2015) ................................................................. 38, 39

*Walker v. Nat'l Revenue Corp.*,
　43 F. App'x 800 (6th Cir. 2002) ........................................................................ 44

*Walton v. Johnson & Johnson Servs., Inc.*,
　347 F.3d 1272 (11th Cir. 2003) (per curiam) .................................................... 47

*Wasek v. Arrow Energy Servs.*,
　682 F.3d 463 (6th Cir. 2012) ............................................................................ 41

*Williams v. Ford Motor Co.*,
　187 F.3d 533 (6th Cir. 1999) ............................................................................ 19

*Williams v. Memphis Light*,
　2024 U.S. App. LEXIS 17623 (6th Cir. 2024) ............................................. 45, 47

**Statutes**

28 U.S.C. 1291 ...........................................................................................1

28 U.S.C. 1331 ...........................................................................................1

28 U.S.C. 1367 ...........................................................................................1

**Other Authorities**

6 Cir. R. 26.1 .............................................................................................2

Fed. R. App. P. 34(a)(2) ....................................................................... viii

Fed. R. App. P. 26.1 ..................................................................................2

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Although Appellee U.S. Bank National Association believes that oral argument is unnecessary because the dispositive issues have been authoritatively decided, to the extent a panel of three judges pursuant to Fed. R. App. P. 34(a)(2) does not agree, U.S. Bank respectfully requests oral argument to aid in the decisional process.

## STATEMENT OF JURISDICTION

This is an appeal of a final judgment of the United States District Court for the Southern District of Ohio, which dismissed all of Appellants Pannek and Strotman's claims in this lawsuit. The District Court issued its final judgment on August 8, 2025. (Order, RE 59, PageID #2694-2726) Appellants Pannek and Strotman initiated this appeal on September 3, 2025. (Notice of Appeal, RE 61, PageID #2728-2729) The District Court had federal question jurisdiction pursuant to 28 U.S.C. 1331 and supplemental jurisdiction under 28 U.S.C. 1367 for all state-law claims. This Court has jurisdiction over the case pursuant to 28 U.S.C. 1291.

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1.      Did the District Court properly grant summary judgment on Appellants' retaliation claims where Appellants (1) cannot establish causal connection because the reduction in force decision was in the works before notice of any protected activity, (2) cannot establish that the legitimate reasons for their terminations during a reduction in force were pretextual, and (3) cannot establish any retaliatory motive?

2.      Did the District Court properly grant summary judgment on Appellants' sex harassment claims, where they cannot show the alleged conduct was because of sex or that the alleged conduct was severe and pervasive; and where U.S. Bank satisfies the *Faragher/Ellerth* Defense?

3.      Did the District Court properly grant summary judgment on Pannek's age discrimination claim, where Pannek cannot establish a *prima facie* case of age discrimination, let alone pretext or evidence that he was singled out because of his age by a decisionmaker older than him?

## STATEMENT OF THE CASE

### I.    U.S. Bank Strictly Prohibits Unlawful Discrimination, Harassment, And Retaliation.

U.S. Bank is an equal opportunity employer, and prohibits discrimination, harassment, and retaliation.  (Declaration of T. Bryan Bolton ("Bolton Decl."), RE 43-2, PageID #2095, ¶ 3; Deposition of Laurie Grey ("Grey Dep.") Ex. 1, RE 40-1, PageID #1919-1921)  U.S. Bank takes its commitment to maintaining a workplace free of harassment and discrimination seriously; its Workplace Respect Policy prohibits sexual harassment and other inappropriate conduct in the workplace, even if that conduct does not rise to the level of unlawful harassment or discrimination. (Grey Dep. Ex. 1, RE 40-1, PageID #1919-1921)  In addition, U.S. Bank provides multiple avenues for employees to report any alleged harassment, discrimination, or retaliation – including to a manager or supervisor, a human resources business partner, or through the U.S. Bank Ethics Line via telephone or online.  (*Id.* at PageID #1920)   Complaints are investigated, and disciplinary action is taken where appropriate.  (*Id.* at PageID #1920-1921)  U.S. Bank strictly prohibits retaliation against anyone who makes a good faith complaint of harassment or discrimination. (*Id.* at #1921)

### II.    U.S. Bank Hires Strotman in January 2017; Strotman Recruits his Friend Pannek.

U.S. Bank hired Strotman in January 2017, when he was 48 years old, as the Vice President of Governance Control for the Consumer Banking Default

Management group.  (Deposition of Thomas Strotman ("Strotman Dep."), RE 36, PageID #840, 868)

In his role as Vice President of Governance Control, Strotman was responsible for executing a number of risk control programs.  (Strotman Dep., RE 36, PageID #868, 874)  In July 2017, Strotman terminated Siobhan Whitlock, an African-American female who led the vendor management/third-party risk function on his team, and subsequently recruited his friend, Mark Pannek, for that role.  (Strotman Dep., RE 36, PageID #881-83, 885)

U.S. Bank hired Pannek in August 2017, when he was 53 years old, as the Vice President Third-Party Risk for Consumer Lending Services, and Pannek began reporting to Strotman.  (Deposition of Mark Pannek ("Pannek Dep."), RE 35, PageID #458, 468, 487; Strotman Dep., RE 36, PageID #881, 887)  In his role as Vice President Third-Party Risk for Consumer Lending Services, Pannek was responsible for making sure that the third-parties or vendors with whom the bank worked had appropriate controls in place for the bank's protection.  (Pannek Dep., RE 35, PageID #489-491)

## III.   After A Reorganization In November 2017, Strotman And Pannek Briefly Report To John Gemrich.

A few months after Pannek's hire, in late October or early November 2017, U.S. Bank underwent a reorganization of the Consumer Lending division in which Strotman and Pannek worked.  (Strotman Dep., RE 36, PageID #887-888; Pannek

Dep., RE 35, PageID #515-516)  The Consumer Lending, Commercial Lending, and Student Loan departments merged to form the Lending Services department. (Pannek Dep., RE 35, PageID #517; Strotman Dep., RE 36, PageID #887-889)  As a result, Strotman and Pannek both began reporting to John Gemrich.  (Strotman Dep., RE 36, PageID #888; Pannek Dep., RE 35, PageID #522)   Prior to the reorganization, neither had ever worked with Gemrich nor had any impression of him. (Strotman Dep., RE 36, PageID #889-890; Pannek Dep., RE 35, PageID #524-525, 528)

## IV.   After Another Reorganization In Early 2018, Strotman And Pannek Stop Reporting To Gemrich, And All Three Begin Reporting To Bryan Bolton.

They only reported to Gemrich for a few short months.  In approximately January 2018, the Lending Services division merged with the Mortgage Servicing division to form the CBSS Servicing Group.  (Strotman Dep., RE 36, PageID #908; Ex. 2, RE 36-1, PageID #1009-1012; Pannek Dep., RE 35, PageID #596-597; Ex. 4, RE 35-1, PageID #758-759)  Strotman and Pannek ceased reporting to Gemrich and began reporting to Bryan Bolton, Senior Vice President and Chief Administrative Officer of the Consumer Business Banking Operations area.  (Strotman Dep., RE 36, PageID #910; Strotman Dep. Ex. 2, RE 36-1, PageID #1009-1012; Pannek Dep., RE 35, PageID #599; Deposition of Bryan Bolton ("Bolton Dep."), RE 39, PageID #1463)  Gemrich also began reporting to Bolton.  (Strotman Dep. Ex. 2, RE 36-1, PageID #1011-1012; Pannek Dep., RE 35, PageID #600)  Prior to the merger, Bolton

5

did not know Pannek or Strotman, and had had only limited interactions with Gemrich. (Bolton Dep., RE 39, PageID #1469, 1471-1472; *see also* Strotman Dep., RE 36, PageID #911-912; Pannek Dep., RE 35, PageID #599-600)

At the time of the merger, there was overlap between the functions that were being performed on the Lending Services side and the Mortgage Servicing side. For example, Alyson Roberts led the third-party risk/vendor management function on the Mortgage Servicing side, similar to the third-party risk/vendor management function that Pannek led on the Lending Services side. (Bolton Dep., RE 39, PageID #1522-1523; Pannek Dep., RE 35, PageID #605) Roberts had been performing vendor management at the Bank since her hiring in August 2015. (Deposition of Alyson Roberts ("Roberts Dep."), RE 38, PageID #1324-1325)

Almost immediately upon the merger of the Lending Services and Mortgage Serving divisions in early 2018, Bolton began to evaluate his organization for potential synergies or duplication of functions in order to consolidate functions so that the group could operate more efficiently. (Bolton Dep., RE 39, PageID #1474-1475) He knew this process would result in terminations. (*Id.*) Lydia Buster testified that she and others knew that terminations were likely to result. (Deposition of Lydia Buster ("Buster Dep."), RE 42, PageID #1985-86, 1998-1999) Bolton's thorough evaluation process consisted of a number of different components, including gathering feedback from others, observing how well his direct reports were able to

work together collaboratively, and most importantly, having "a lot of discussions" with the direct reports who were new to his team to understand what they and their teams did.  (Bolton Dep., RE 39, PageID #1477-1478, 1484-1488)  While he used the feedback from others to help get a full picture, Bolton's own observations were the "overriding factor" on which he relied when making decisions.  (Bolton Dep., RE 39, PageID #1516-1517)

### A.     Pannek's Termination.

When considering who would lead the third-party risk/vendor management function for the new team, Roberts was immediately the "front runner" in Bolton's mind.  (Bolton Dep., RE 39, PageID #1526-1528)  Bolton had been her supervisor for approximately a year and a half, and believed that she was an "extraordinary" employee.  (Bolton Dep., RE 39, PageID #1531, 1699-1700)  He knew that she had a lot of experience with vendor management, and a track record of success, at the bank.   (Bolton Dep., RE 39, PageID #1526-1527)  Moreover, the vendor management function was larger on the Mortgage Servicing side than it was on the Lending Services side.  (Bolton Dep., RE 39, PageID #1526-1527)

Nonetheless, Bolton wanted to learn about Pannek and how he ran his organization.  (Bolton Dep., RE 39, PageID #1527)  Bolton sought feedback from Gemrich, who was Pannek's most recent supervisor, and other individuals within the risk department with whom Pannek worked.  (Bolton Dep., RE 39, PageID

#1486-1487) Bolton did not need to solicit feedback on Roberts or the other individuals who reported to him prior to the reorganization because he was already familiar with their work. (Bolton Decl., RE 43-2, PageID #2096, ¶ 6)  On March 1, 2018, Gemrich provided Bolton with his feedback. (Bolton Dep., Ex. 19, RE 39-1, PageID #1765)  Gemrich offered several positive comments, as well as some critical comments, including that Pannek "[d]oes not collaborate well," and had "[p]oor conflict resolution skills." (Bolton Dep. Ex. 19, RE 39-1, PageID #1765)  Bolton received similar feedback from the risk partners with whom Pannek worked. (Bolton Dep., RE 39, PageID #1510)  In addition, Bolton had asked all of his direct reports (including Pannek) to work collaboratively with one another to talk about their respective functions and teams and develop the best model going forward. (Bolton Dep., RE 39, PageID #1477-1478)  Rachel Votel, who Bolton asked to coordinate the project, reported to Bolton that Pannek was not participating in the calls and was causing conflict. (Bolton Dep., RE 39, PageID #1513-1514)  Bolton also personally had numerous discussions with Pannek about his organization. (Bolton Dep., RE 39, PageID #1484-1485; Pannek Dep., RE 35, PageID #615-616)  Bolton found these discussions to be frustrating because he felt he had to follow up with Pannek several times to get answers to his questions, and felt that a leader at Pannek's level should have a greater knowledge of his team than Pannek seemed to have. (Bolton Dep., RE 39, PageID #1515)  Furthermore, Pannek told Bolton that

he spent just 20% of his time on his vendor management responsibilities and 80% of his time on his process improvement responsibilities, leading Bolton to believe that Pannek was more passionate about the process improvement work. (Bolton Dep., RE 39, PageID #1527)

Although Bolton testified that he determined, over the course of February and March, that Pannek's leadership skills were not as strong as Roberts' skills (Bolton Dep., RE 39, PageID #1527), it was apparent by February 22, 2018 that he had decided that Roberts, not Pannek, would lead the vendor management function. (Bolton Decl., RE 43-2, PageID #2097, ¶ 10; Bolton Dep., RE 39, PageID #1652-1653) On February 22, 2018, Bolton sent Roberts an email identifying the employees from Pannek's organization who "would come to [her]" and asking her to put together a draft organization chart showing the new group "as a result of combining the groups." (Bolton Dep. Ex. 10, RE 39-1, PageID #1737-1738) Bolton decided to eliminate Pannek's position. (Bolton Dep., RE 39, PageID #1524, 1699) Roberts took over the third-party risk/vendor management function. (Bolton Dep., RE 39 PageID #1524, 1534; Pannek Dep., RE 35, PageID #625-626; Roberts Dep. RE 38, PageID #1401) Pannek's process improvement duties moved to another group outside of Bolton's organization. (Bolton Decl., RE 43-2, PageID #2097, ¶ 10)

### B.    Strotman's Termination.

With respect to Strotman, Bolton sought feedback from Gemrich, who was Strotman's most recent supervisor, and other individuals within the risk department with whom Strotman worked. (Bolton Dep., RE 39, PageID #1486-1487) Bolton did not need to solicit feedback on Gombold, Spurrier, or the other individuals who reported to him prior to the reorganization because he was already familiar with their work. (Bolton Decl., RE 43-2, PageID #2096, ¶ 6) On March 1, 2018, Gemrich provided Bolton with his feedback. (Bolton Dep., Ex. 19, RE 39-1, PageID #1765) Gemrich offered several positive comments, as well as some critical comments, including that Strotman could be "[r]esistant to ideas other than his own" and "[m]ay work against direction he does not agree with." (Bolton Dep. Ex. 19, RE 39-1, PageID #1765) Bolton received similar feedback from the risk partners with whom Strotman worked. (Bolton Dep., RE 39, PageID #1511-1512 (recalling that the risk partners told him that Strotman "kind of had…his way of doing things, and if the group decided to do it a certain way or the bank's way of doing things didn't align with what Tom thought was the right or the best way to do it, he would just go down the path of doing it his way, over than the bank's way.")) In addition, Bolton had asked all of his direct reports (including Strotman) to work collaboratively with one another to talk about their respective functions and teams and develop the best model going forward. (Bolton Dep., RE 39, PageID #1477-1478, 1513) Rachel Votel, who

10

Bolton asked to coordinate the project, reported to Bolton that Strotman was not participating in the calls.  (Bolton Dep., RE 39, PageID #1513)  Bolton also personally had numerous discussions with Strotman about his organization.  (Bolton Dep., RE 39, PageID #1484-1485; Strotman Dep., RE 36, PageID #938-939) Bolton found these discussions to be frustrating because he felt he had to follow up with Strotman several times to get answers to his questions, and felt that a leader at Strotman's level should have a greater knowledge of his or her team than Strotman seemed to have.  (Bolton Dep., RE 39, PageID #1515)

By late February or March, Bolton had formed his opinion that Strotman was not the right leader for his organization.  (Bolton Dep., RE 39, PageID #1508, 1530) Bolton had also decided that Gombold was also not right to lead the change management function because she had been struggling prior to the merger.  (Bolton Dep., RE 39, PageID #1529)  Bolton decided to eliminate both Strotman and Gombold's positions.  (Bolton Dep. RE 39, PageID #1529-1530, 1699)  He instead created a position that was a lower-level than Strotman's had been to lead the change management function, and moved Greg Hovis – who had previously reported to Strotman and was 55 years old at the time – into the role.  (Bolton Dep., RE 39, PageID #1682-1683; Strotman Dep. RE 36, PageID #943-948; Ex. 4, RE 36-1, PageID #1017; Bolton Decl., RE 43-2, PageID #2096, ¶ 7)  Bolton moved Strotman's procedures responsibilities to Amanda Spurrier.  (Bolton Decl., RE 43-

11

2, PageID #2097, ¶ 9; Strotman Dep., RE 36, PageID #943-944, 947; Ex. 4, RE 36-1, PageID #1017)  Some of Strotman's other duties moved to another department outside of Bolton's organization.  (Bolton Decl., RE 43-2, PageID #2097, ¶ 9)

Over the next several weeks, Bolton reviewed and finalized the termination decisions with Human Resources Business Partner Diane Watson.  (Bolton Dep., RE 39, PageID #1503-1504) Bolton and Watson informed Pannek and Strotman that their positions had been eliminated on May 15, 2018.  (Pannek Dep., RE 35, PageID #617, 619-620; Strotman Dep., RE 36, PageID #844)  Pannek was 54 years old at the time of his termination, slightly more than a year older than when he was hired. (Pannek Dep., RE 35, PageID #458)  Strotman was 49 years old at the time of his termination, less than a year older than when he was hired.  (Strotman Dep., RE 36, PageID #840)

After his termination, Strotman applied for several positions with U.S. Bank, including a risk strategy position that reported to Bolton.  (Bolton Dep., RE 39, PageID #1678; Strotman Dep., RE 36, PageID #989-1002)  Bolton did not interview Strotman for the position because he was looking for someone with credit risk and collections strategy experience, which he did not believe that Strotman had.  (Bolton Dep., RE 39, PageID #1678; Bolton Decl., RE 43-2, PageID #2097, ¶ 14)  The individual that Bolton hired for the position, Ellie Liu, had significant experience in credit risk and collections strategy.  (*Id*.)  Strotman does not know who was hired

12

for any other position to which he applied, none of which reported to Bolton.  (*See* Strotman Dep., RE 36, PageID #989-1002)

**V.     Pannek Files Complaint About Gemrich on March 27, 2018, As An "Insurance Policy"; U.S. Bank Conducts A Thorough Investigation And Disciplines Gemrich.**

Meanwhile, aware of Bolton's ongoing review and evaluation of his organization, Pannek filed an ethics hotline complaint on March 27, 2018, about Gemrich.  (Pannek Dep., RE 35, PageID #634-637; Ex. 7, RE 35-1, PageID #766-768)  Pannek referred to the complaint as his "insurance policy" against possible termination.  (Buster Dep., RE 42, PageID #1998)

In the complaint, Pannek alleged that nearly two months earlier, on February 1, 2018, Gemrich had pressured him into participating in a bet concerning the cost of a vendor, in violation of U.S. Bank's policy prohibiting gambling.  (Pannek Dep. Ex. 7, RE 35-1, PageID #766-768)  He also alleged that Gemrich had mistreated Pannek and other employees who used vacation time around the holidays, as well as employees who worked remotely.  (*Id.*)  Finally, Pannek alleged generically that Gemrich created a "hostile work environment" but there were no specific allegations related to sex, or any other protected category.  (*Id.*)  Bolton was not aware of any of the allegations in Pannek's complaint prior to the March 27, 2018 complaint, nor had he ever personally heard Gemrich make any sexually explicit comments. (Bolton Dep., RE 39, PageID #1553-1554, 1698)

13

U.S. Bank assigned Human Resources Business Partner Laurie Grey to investigate Pannek's complaint. (Grey Dep., RE 40, PageID #1827, 1836-1838) During the course of her investigation, Grey interviewed Pannek, Gemrich, and several other employees. (Grey Dep. Ex. 4, RE 40-1, PageID #1930-1937) She also received the documents that Pannek sent her regarding his purchase of the gift card. (Grey Dep., RE 40, PageID #1839-1840) During Grey's interview with Pannek, he provided more information about the bet and his other allegations. (Grey Dep., RE 40, PageID #1832-1836) He also alleged for the first time that Gemrich had made inappropriate comments about Gemrich's sex life. (*Id.*) Pannek refused to provide Grey with specific details about the alleged comments, except to say that Gemrich used the "p-word" and Pannek referenced the "Access Hollywood tapes." (Grey Dep., RE 40, PageID #1832-1836; Ex. 4, RE 40-1, PageID #1931; Pannek Dep., RE 35, PageID #658-659) Grey subsequently interviewed Strotman, who corroborated Pannek's allegations, including those concerning Gemrich's discussion of his sex life – though he declined to provide any details about verbiage that Gemrich allegedly used. (Grey Dep., RE 40, PageID #1848-1850; Ex. 4, RE 40-1, PageID #1934-1935; Strotman Dep., RE 36, PageID #923-928) Grey subsequently interviewed two other employees, Jeff Sorg and Kevin Turner, whom Pannek had identified as witnesses. (Grey Dep., RE 40, PageID #1850-1853; Ex. 4, RE 40-1, PageID #1936-1937)

At the conclusion of her investigation, Grey determined that Pannek's allegations were substantiated and that Gemrich's conduct violated U.S. Bank's Workplace Respect Policy. (Grey Dep., RE 40, PageID #1859) In consultation with Watson, Bolton decided to issue Gemrich a Written Warning as a result. (Grey Dep., RE 40, PageID #1860; Bolton Decl., RE 43-2, PageID #2097, ¶ 12) The Written Warning outlined several instances of poor judgment, including participation in the bet with Pannek and discussing details of his personal life at work, in addition to other leadership deficiencies. (Bolton Dep. Ex. 3, RE 39-1, PageID #1709-1710) Gemrich was cautioned that "[f]ailure to meet the expectations outlined [in the Written Warning] may result in further disciplinary action, up to and including termination of your employment." (*Id.*) The Written Warning had a "substantial financial impact" on Gemrich's annual variable compensation. (Bolton Dep., RE 39, PageID #1580-1581; Ex. 3, RE 39-1, PageID #1709-1710) Bolton is not aware of Gemrich ever making any sexually explicit comments after receiving the Written Warning. (Bolton Dep., RE 39, PageID #1698-1699) Bolton decided to terminate Gemrich's employment approximately one year later, in April 2019, based on other issues of poor judgment and leadership that did not involve any allegations of sexually explicit comments or sexual harassment. (Bolton Dep., RE 39, PageID #1624-1628)

**VI.    Pannek and Strotman Assert Claims Of Discrimination, Harassment, and Retaliation.**

Pannek and Strotman filed this lawsuit in October 2019, asserting claims for unlawful retaliation under Title VII and Ohio law (Counts I and II, respectively), sexual harassment under Title VII and Ohio law (Counts III and IV, respectively), and age discrimination under the ADEA and Ohio law (Counts V and VI, respectively).  (Complaint, RE 1, PageID #1-13)  Appellants abandoned their state law claims in response to U.S. Bank's motion for summary judgment and Strotman also abandoned his age discrimination claim since the individual retained, Hovis, was older than both Strotman and Pannek.  (Memo. In Opp., RE 50, PageID #2489, n.1; Bolton Decl., RE 43-2, PageID #2096-2097, ¶7, 15; Strotman Dep., RE 36, PageID #840) The District Court granted U.S. Bank's motion for summary judgment on all of Appellants' claims.  (Order, RE 59, PageID #2694)

## SUMMARY OF THE ARGUMENT

The District Court properly granted summary judgment on each of Appellants' claims as there is no genuine issue of material fact and their claims fail as a matter of law. Strotman and Pannek were both hired within 16 months or 9 months of their termination and at roughly the same age as when they were terminated. The decisionmaker, Bolton, was older than them, selected to retain individuals older than them and had largely decided that they would be terminated as part of the reorganization before they engaged in any protected activity. They worked under Gemrich for less than three months. There is no evidence that their complaint about Gemrich, with whom they had worked for less than three months, and as an admitted "insurance policy" against their anticipated terminations, caused their terminations. Gemrich did not make the decision. Bolton did not have a strong tie to Gemrich and U.S. Bank disciplined Gemrich as a result of the complaint.

The District Court properly granted summary judgment on Appellants' retaliation claim. There is no evidence of a retaliatory motive nor a causal connection. Although the decision to terminate Pannek and Strotman was finalized after Pannek's initial complaint, Bolton had already determined for himself by late February or March that their positions would be eliminated. Pannek was aware before his complaint that work was being taken away from him and his job was in jeopardy. The initial complaint made a generic claim of hostile work environment

17

but contained no allegations that it was sex-based. Appellants have not established that the legitimate reasons for their selection during a reduction in force was pretextual or had no basis in fact, did not actually motivate the decision or were insufficient to motivate the decision.

The District Court properly granted summary judgment on the hostile work environment claim. There is no evidence that any conduct was directed to Pannek or Strotman because of their sex. Moreover, the five or six incidents that they allegedly witnessed are not severe or pervasive as a matter of law. Finally, U.S. Bank has established the *Faragher/Ellerth* defense as it took reasonable steps to prevent and correct promptly any harassment and Appellants failed to reasonably take advantage of the preventative and corrective opportunities available to them.

The District Court properly granted summary judgment on Pannek's age discrimination claim because there is no evidence of any age bias by Bolton who was older than Pannek. Indeed, individuals older than Pannek were retained during the reduction in force (see Hovis, age 55). Pannek cannot establish a *prima facie* case because he was not replaced. His duties were distributed to several individuals along with their current duties. And regardless, Pannek cannot establish that the legitimate reasons for his termination were pretextual.

# ARGUMENT

## I.     Standard of Review.

The Court reviews *de novo* a district court's grant of summary judgment. *Williams v. Ford Motor Co.*, 187 F.3d 533, 537 (6th Cir. 1999).

## II.    The District Court Properly Granted Summary Judgment to U.S. Bank on Pannek and Strotman's Retaliation Claim.

### A.     Pannek and Strotman Failed to Establish a *Prime Facie* Case of Retaliation.

The District Court properly granted summary judgment on Appellants' retaliation claims. Bolton's decision to terminate them was already in process before any protected activity by Pannek or Strotman. Indeed, Pannek commented that the complaint was his insurance policy against the anticipated termination. To establish a claim of retaliation, Pannek and Strotman must prove (1) they engaged in protected activity; (2) U.S. Bank was aware of the protected activity; (3) U.S. Bank took an employment action adverse to Pannek and Strotman; and (4) a causal connection exists between the protected activity and the adverse employment action. *Kappen v. Ashley Med. Supply, Inc.*, 695 F. App'x 94, 96 (6th Cir. 2017). "To show causation, 'a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken' in the absence of the protected conduct." *Tharp v. Apel Int'l, LLC*, 2022 U.S. App. LEXIS 21050, at *7 (6th Cir. July 28, 2022). Pannek and Strotman's *prima facie* case fails as a matter of law because they cannot prove a causal connection between their alleged

protected activity – Pannek's March 27, 2018 complaint about Gemrich and Strotman's participation in the investigation on April 19, 2018 – and their terminations.  The District Court could have granted summary judgment on Pannek and Strotman's retaliation claims on this threshold issue alone.

This Circuit has held "that causation is lacking when an employer follows a pre-existing line of action regardless of the employee's protected action." *Tharp*, 2022 U.S. App. LEXIS 21050 at \*8. *See also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam) ("proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). With respect to Pannek, it is undisputed that Bolton formed his opinion that Roberts, not Pannek, would lead the third-party risk/vendor management function before Pannek filed his complaint on March 27.  (Bolton Dep., RE 39, PageID #1527, 1530; Ex. 10, RE 39-1, PageID #1737-1738; Bolton Decl., RE 43-2, PageID #2097, ¶ 10-11)  His testimony that over the course of February and into March, he determined that Pannek was not as strong as Roberts and made the preliminary decision to eliminate his position is undisputed.  (Bolton Dep., RE 39, PageID #1527; Bolton Decl., RE 43-2, PageID #2097, ¶ 11)

Likewise, it is also undisputed that Bolton formed his opinion that Strotman was not the right person for the role in late February or March – long before Strotman participated in the investigation of Pannek's complaint (Grey interviewed Strotman

on April 19, 2018).[1]  (*See* Bolton Dep., RE 39, PageID #1508, 1530; Bolton Decl., RE 43-2, PageID #2097, ¶ 11; Grey Dep. Ex. 4, RE 40-1, PageID #1934)

The District Court relied on a single statement by Bolton that the final determinations on all of the synergies were made "in the April timeframe" to determine that Appellants could establish the "minimal burden of a *prima facie* showing." (Order, RE 59, PageID #2706-2707)  However, as discussed above, the evidence is undisputed that Bolton had determined by late February or early March what he planned to do with Pannek and Strotman as they were not the right individuals to lead in the new combined group. (See Bolton Dep., RE 39, PageID #1508, 1527, 1530; Bolton Decl., RE 43-2, PageID #2097, ¶ 11)  That this decision was finalized after Pannek's complaint is insufficient to establish a causal connection.  *See Reynolds v. Fed. Express Corp.*, 544 F. App'x 611, 615 (6th Cir.

---

[1]   Strotman originally alleged other protected activity regarding Gemrich's mistreatment of Tom Markesbery; however, Strotman conceded this argument during briefing of the summary judgment motion that this did not qualify as protected activity under Title VII.  (Order, RE 59, PageID #2715, n. 6)  Strotman does not raise this in Appellants' Brief and therefore has abandoned any argument that this was his protected activity.  Similarly, Strotman has not attempted in his brief to base his retaliation claim on his association with Pannek, which was not originally pled and was raised for the first time in his opposition to summary judgment. Because it was not raised in Appellants' Brief, this argument is also abandoned. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005) ("failure to raise an argument in his appellate brief constitutes a waiver of the argument on appeal") Therefore, the only alleged protected activity in which he engaged (and upon which his retaliation claim possibly could be based) was his April 19, 2018 interview with Grey as part of her investigation of Pannek's hotline complaint.

2013) (evidence that decision-maker contemplated termination before he learned of plaintiffs' complaint of discrimination prevent plaintiffs from establishing temporal proximity necessary for causal connection, even where termination occurred 20 days after the complaint of discrimination). *See also Sosby v. Miller Brewing Co*., 211 F. App'x 382, 387 (6th Cir. 2006) (holding no prima facie case of retaliation where plaintiff failed to offer additional circumstances beyond temporal proximity to establish causation). In addition, there is no evidence that this final determination was made after Strotman's participation in the investigation on April 19.

Although the District Court did not find a lack of a *prima facie* case, its decision should be upheld for this additional reason.

## B.    Pannek and Strotman Failed to Show Pretext for Retaliation.

Even if Pannek and Strotman could establish a *prima facie* case of retaliation (which they cannot), the District Court properly granted summary judgment because they cannot establish that U.S. Bank's reasons for their terminations (see Statement of Case Section IV) were pretext for unlawful termination and that their alleged protected activity "was a but-for cause of the alleged adverse action". *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

### 1.    Bolton Conducted a Thorough Evaluation of the Leaders on His Team Prior to Executing the Reduction-in-Force.

Appellants have not established that the decision to eliminate their positions was pretextual. There is simply no evidence of a retaliatory motive by Bolton. It is

22

undisputed that groups were combined and positions overlapped resulting in a review by Bolton for synergies and efficiencies to determine which individuals could be eliminated. (Bolton Dep., RE 39, Page ID # 1474-1475) Pannek and Strotman's terminations, along with other employees' terminations, were part of a larger reorganization. *See, e.g., Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 726 (6th Cir. 2012). It is undisputed that both the feedback Bolton received and his own interactions with Appellants led Bolton to determine in February/March to eliminate their positions, among others. (Bolton Dep., RE 39, PageID #1508, 1510-1520, 1527, 1530; Bolton Decl., RE 43-2, PageID #2097, ¶ 11) There is no evidence of a retaliatory motive by Bolton.

It is also undisputed that several other employees, who were not terminated, also complained about Gemrich or participated in the investigation of Pannek's complaint. (Pannek Dep., RE 35, PageID #529, 556-557, 589 and Buster Dep., RE 42, PageID #1988 (Buster and Markesbery complained to HR about Gemrich); Grey Dep., RE 40, PageID #1850-1853; Ex. 4, RE 40-1, PageID #1936-1937 (Jeff Sorg and Kevin Turner participated in investigation)) Where Appellants and other employees engaged in the same protected activity and only Appellants suffered an adverse employment action, one cannot infer that the protected activity was the cause of the adverse action. *See, e.g., Hawk v. Providence Home Servs.,* 83 F. App'x 191, 192 (9th Cir. 2003) (affirming summary judgment and explaining that where

other employees engaged in the same alleged protected activity as the plaintiff and none of the other employees were terminated, "there is no nexus" between the plaintiff's complaint and subsequent termination).  Moreover, Strotman admits that Bolton never made any negative comments to him about his participation in the investigation.  (*See* Strotman Dep., RE 36, PageID #964)

Although Appellants quibble with the process and timing of the decisions, notably, Appellants do not assert that the reasons for their selection were false or not based in fact, were not sufficient to support their selection for termination or were not the true reasons for the decision.  As explained below, Appellants arguments are meritless and summary judgment in favor of U.S. Bank should be affirmed by this Court.

### 2.    The Timing Undercuts Any Argument of Pretext.

As described above, there is no causal or temporal link between the alleged protected activity – Pannek's March 27, 2018 complaint and Strotman's interview on April 19 – and Bolton's decision to eliminate their positions.  Even if the reduction-in-force decisions were not finalized until after any alleged protected activity, it is clear that this timing is not enough to establish pretext.  *See, e.g.*, *Tharp*, 2022 U.S. App. LEXIS 21050 at *9.  *See also Clark Cnty. Sch. Dist*., 532 U.S. at 272 ("proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Reynolds*, 544 F. App'x at 615

24

(evidence that decision-maker contemplated termination before he learned of plaintiffs' complaint of discrimination prevent plaintiffs from establishing temporal proximity necessary for causal connection, even where termination occurred 20 days after the complaint of discrimination). *See also Sosby v. Miller Brewing Co.*, 415 F.Supp.2d 809, 822 (S.D. Ohio 2005) ("evidence that the employer had been concerned about a problem before the employee engaged in protected activity undercuts the significance of temporal proximity."), *aff'd*, 211 F. App'x 382 (6th Cir. 2006).

The "evidence" that Pannek and Strotman attempt to cobble together to call into question the timing of this decision falls apart upon even a cursory review. For example, Pannek and Strotman suggest that the timing is suspect because Bolton did not contemporaneously share his thoughts with individuals like Watson or Roberts, who admittedly and undisputedly had no role in the decision-making process. (*See* Appellant's Brief, Doc. 26, p. 42; Deposition of Diane Watson ("Watson Dep."), RE 49, PageID #2322; Roberts Dep., RE 38, PageID #1377-1378; Grey Dep., RE 40, PageID #1876-1877; Little Dep., RE 48, PageID #2170, 2180-2181)  While there was no reason for these individuals to be involved with or have knowledge of the termination decisions in February or March, Grey testified that she knew there were going to be people severed during that time period (Grey Dep. RE 40, PageID #1876-1877), and Lydia Buster testified that it was clear to her that jobs would be

eliminated and that both Strotman and Pannek were also aware of this. (Buster Dep. RE 42, PageID #1985-86, 1998)

Likewise, Pannek and Strotman's implication that Bolton did not even begin to consider the reorganization of his team that led to their position eliminations until after Pannek's March 27, 2018 complaint and Strotman's April 19 protected activity is belied by the record. Bolton's testimony that he began to review his new team for potential synergies or duplications almost immediately upon the reorganization in early 2018 in order to identify which individuals could be terminated is unrefuted. (*See* Bolton Dep., RE 39, PageID #1474-1475; *see also* Watson Dep., RE 49, PageID #2319-2320 (Bolton started his assessment of the duties and responsibilities of his new team to make sure there was no duplication of efforts in early 2018)) And this testimony is further buttressed by email correspondence reflecting his requests for feedback on Pannek and Strotman from Gemrich and other bank leaders in February and March. (*See, e.g.,* Bolton Dep. Ex. 19, RE 39-1, PageID #1765) Similarly, his testimony that he had made his preliminary decision to terminate both Pannek and Strotman in February and March is undisputed and is bolstered by his e-mail to Roberts in February, in which he talks about moving Pannek's direct reports under her. (Bolton Dep., RE 39, PageID #1527, 1530; Bolton Dep. Ex. 10, RE 39-1, PageID #1737-1738)

In their Brief, Pannek and Strotman rely on an April 2 email from Bolton to attempt to establish a temporal link. (Appellants' Brief, Doc. 26, p. 18-20). Upon review of the email, however, it is clear that it does not support their claim for retaliation. First, this email was sent weeks *before* Strotman engaged in protected activity. And at the time of the email neither Bolton nor U.S. Bank was aware of Pannek's later allegations that Gemrich was discussing his personal sex life. The written complaint that U.S. Bank received from its third-party hotline provider did not include any allegations of sex based comments. (See Bolton Dep. Ex. 2, RE 39-1, PageID #1706-08), and U.S. Bank only learned of such allegations when Grey interviewed Pannek on April 16 (after Bolton's email). (See Grey Dep. Ex. 4, RE 40-1, PageID #1930) Further, Bolton described in detail his legitimate concerns with Pannek and Strotman and his plans moving forward. (Watson Dep. Ex. 4, RE 49-1, PageID #2438-2440) Indeed, he referenced back to the decision he made in February to move much of Pannek's team under Roberts who he states "is one of our strongest leaders". (*Id.* at #2440) He also notes that Pannek had tried to convince Bolton not to move other of his reports to work under Varol. (Watson Dep., RE 49-1, Ex. 4, PageID #2440) (further demonstrating Bolton had already made the decision to move additional direct reports away from Pannek, and that Pannek was aware of this) With respect to Strotman, the April 2 email is undisputed evidence that Bolton had already decided that Strotman was not the right person for the change

management role long before Strotman engaged in protected activity by participating in the April 19 interview with Grey.

With respect to Pannek, while Bolton mentions Pannek's hotline complaint in the email, he does so only in the context of expressing that he was "very concerned on what is in there," and was "very glad [Pannek] raised these issues." (*See id.* at #2438)  Far from demonstrating a causal connection between Pannek's complaint and his later termination, the April 2 email shows that Bolton purposefully separated Pannek's complaint from the organizational decisions that he was already making: "I do not want these events to impact the decisions I need to make on whom the right leaders are for my organization, the leadership concerns I have with both of them [Pannek and Strotman] are valid and mutually exclusive of any complaints filed or potentially filed." (*See id.*)  In other words, Bolton made clear that Pannek's complaint was neither the reason for his termination nor an "insurance policy" that would protect him from termination.  The District Court properly found that "[n]othing in Bolton's email supports a claim of pretext." (Order, RE 59, PageID #2712).

To the extent that there was any "suspicious timing" afoot here, it was the timing of Pannek's complaint in late March 2018, about events that allegedly occurred months earlier.  As Buster described, "when we moved under Bryan Bolton [in early 2018], it was very apparent to me that a consolidation was happening and

that there would be jobs that would be eliminated from that." (Buster Dep., RE 42, PageID #1985) Buster testified that Pannek was well aware of the consolidation that was happening and specifically tied his complaint to that effort: "Mark said that they had, you know, filed a complaint with the ethics line as kind of an insurance policy to protect themselves against the consolidation that was happening." (Buster Dep., RE 42, PageID #1998)

Both the Supreme Court and the Sixth Circuit have recognized that "employees who see the proverbial writing on the wall that they are about to be fired should not be able to use Title VII protections to insulate themselves from adverse employment actions that were previously contemplated." *Tharp v. Apel Int'l, LLC*, 2022 U.S. App. LEXIS 21050, at *8 (6th Cir. July 28, 2022) (internal quotations omitted); *Nassar*, 570 U.S. at 358. "To prevent this, we have held that causation is lacking when an employer follows a pre-existing line of action regardless of the employee's protected action... An employer proceeding along lines previously contemplated, *though not yet definitively determined*, is no evidence whatever of causality..." *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S, 268, 272 (2001) (per curiam) (internal quotations omitted and emphasis added). Likewise, here, Pannek and Strotman cannot use Title VII protections to insulate themselves from a reduction in force. Under these circumstances, there is no inference of causation, even if the decision was not finalized until later. *See also*, *Sosby v. Miller*

29

*Brewing Co.*, 415 F.Supp.2d 809, 822 (S.D. Ohio 2005) ("evidence that the employer had been concerned about a problem before the employee engaged in protected activity undercuts the significance of temporal proximity."), *aff'd*, 211 F. App'x 382 (6th Cir. 2006).

Appellants cannot establish pretext by arguing there is a dispute about the timing. Moreover, temporal proximity alone is insufficient to establish pretext. *See Judge v. Landscape Forms, Inc.,* 592 F. App'x 403, 411 (6th Cir. 2014) (affirming grant of summary judgment and holding that "under our precedent temporal proximity alone is insufficient to establish pretext."); *Seeger v. Cincinnati Bell Tel. Co. LLC*, 681 F.3d 274, 285 (6th Cir. 2012) ("the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext").

### 3.    Bolton Followed the Bank's Process

Appellants also try to argue that Bolton failed to follow the Bank's peer group analysis process and that this alleged failure demonstrates pretext. (Appellants' Brief, Doc. 26, p. 44) This argument is not supported by the record evidence. First, Appellants' characterization of the Bank's peer group analysis process as a rigid and inflexible process is contrary to the evidence in the record. Human Resources Business Partner Diane Watson, for instance, explained that the forms on which Appellants so heavily rely are mere guidelines that managers are ***not*** required to use. (Watson Dep., RE 49, PageID #2338-2339 ("It does not have to be completed. It's

a guideline.")) Rather, Watson explained that the peer group analysis process was not "black and white" for employees in higher-level roles with multiple responsibilities, like Pannek and Strotman. (*Id.* at PageID #2338) As Watson described, ***Bolton's months-long evaluation of the leaders on his team was itself a peer group analysis*** – regardless of if or how he used the PGA forms. (Watson Dep., RE 49, PageID #2332 ("I don't recall if the actual forms were used, but Mark – or Bryan did an analysis of his management team. And again, combining the two groups together and he was giving other responsibilities, so I think he had to overall look at his entire management team to see how he wanted to structure on a go-forward basis. So he – I think he, in his mind or on a piece of paper, he put down pros and cons of his management team knowing what responsibilities he was going – Bryan was going to be charged with. He then made decisions on who would be selected to be on his team on a go-forward basis.") and PageID #2338 ("In my mind, Bryan did a peer group analysis. Whether he used this exact form, I don't know.")) Similarly, Appellants' citation to David Little's deposition is not dispositive as he testified that he had no experience or involvement with peer group analyses. (Appellants' Brief, Doc. 26, p. 26; Deposition of David Little ("Little Dep."), RE 48, PageID #2174-2177).

To the extent that Appellants contest the timing of when Bolton eventually filled out the PGA forms, their argument is likewise without merit. First, their

reliance on the testimony about when a peer group analysis should be completed from witnesses who had no involvement in the decision-making process is particularly unpersuasive. (Grey Dep., RE 40, PageID #1876-1877; Watson Dep., RE 49, PageID #2322) Furthermore, as described above, Bolton engaged in a thorough analysis of Appellants and the other members of the team before filling out the PGA forms in approximately April. Bolton reasonably waited to fill out the forms until after he had time to gather information about Strotman and Pannek (who were new to his team) and make his own observations of them before filling out the forms as the final piece of his decision-making process. (*See* Bolton Dep., RE 39, PageID #1618 (Bolton waited to fill out PGA forms until he got more background information on them) and PageID #1620 (explaining that he did not know Pannek or Strotman when they first moved to his group, "[s]o to do a PGA on them, say, February 15th...would have been unfair, because I wouldn't have had enough knowledge to properly fill that out.")) Regardless, it is undisputed that the PGA forms did not have to be completed, but instead, served as a guideline for managers to use in a reduction-in-force. (Watson Dep., RE 49, PageID #2338)

### 4. Human Resources Conducted a Thorough Investigation, Which Resulted in Gemrich's Discipline.

Appellants incredulously claim that Human Resources' investigation was insufficient in a desperate attempt to establish pretext. But once again, this is wholly unsupported by the record. Pannek and Strotman's assertion in their Brief that "U.S.

Bank simply chose *not to* investigate any of the sex-based statements or conduct"
(Appellant's Brief, Doc. 26, p. 46) is absolutely unfounded in the record. It is
undisputed that during the course of her investigation, Grey interviewed Pannek,
Strotman, Gemrich, Jeff Sorg and Kevin Turner. (Grey Dep. Ex. 4, RE 40-1, PageID
#1930-1937; Grey Dep., RE 40, PageID #1832-1836, 1839, 1848-1853). Although
it is undisputed the initial complaint that U.S. Bank received from the third party
vendor did not have any allegations of sex-based statements or conduct (Pannek
Dep. Ex. 7, RE 35-1, PageID #766-768), Grey testified specifically that when the
allegations came up during her interview of Pannek, she asked him about it:

> Mark [Pannek] was not comfortable sharing specifics of what
> exactly John [Gemrich] had said during that conversation. I remember
> I asked him, you know, a couple of different times if he could please,
> you know, share some of those specific words that were said or verbiage
> that he had used, but Mark [Pannek] wasn't comfortable sharing those,
> you know, the specific verbiage.

(Grey Dep., RE 40, PageID #1833) Likewise, when Grey interviewed
Strotman about Gemrich's conversations, "Tom [Strotman] did say he was very
uncomfortable sharing specific of John [Gemrich]'s content, you know, specific
verbiage...Not saying anything more than...he felt it was...just very inappropriate
workplace conversation. You know, that it was about his sex life and that...John
[Gemrich] shared a lot of specific details, but was not comfortable sharing...those
specific details or verbiage with me." (Grey Dep., RE 40, PageID #1848) When
Grey shared the results of the completed investigation with Bolton, she shared the

feedback from the employees that she had interviewed, including Pannek's reference to "the P-word" and Pannek and Strotman's discomfort repeating the specific words used by Gemrich. (Grey Dep., RE 40, PageID #1857-1858) It is also undisputed that at the conclusion of her investigation, Gray determined that Pannek's allegations – *including Gemrich's conversations about his sex life* – were substantiated and that Gemrich's conduct violated U.S. Bank's Workplace Respect Policy. (Grey Dep., RE 40, PageID #1859)

In consultation with Watson, Bolton decided to issue Gemrich a Written Warning as a result. (Grey Dep., RE 40, PageID #1860; Bolton Decl., RE 43-2, PageID #2097, ¶ 12) The Written Warning outlined several instances of poor judgment, including participation in the bet with Pannek and discussing details of his personal life at work, in addition to other leadership deficiencies. (Bolton Dep. Ex. 3, RE 39-1, PageID #1709-1710) Gemrich was cautioned that "[f]ailure to meet the expectations outlined [in the Written Warning] may result in further disciplinary action, up to and including termination of your employment." (*Id.*) The Written Warning had a "substantial financial impact" on Gemrich's annual variable compensation. (Bolton Dep., RE 39, PageID #1580-1581; Ex. 3, RE 39-1, PageID #1709-1710) And there is no evidence of any similar conduct after the warning. Pannek and Strotman's arguments regarding the adequacy of U.S. Bank's

investigation are simply baseless and do not establish pretext or any retaliatory motive.

### 5. Pannek and Strotman Offered No Evidence That They Were Qualified For Any Open and Available Positions.

Next, Pannek and Strotman argue that the Court disregarded evidence submitted by Pannek and Strotman regarding open and available positions for which they were denied. Appellants have not presented any evidence of positions for which they were qualified. Their generalized assertions in their Declarations that they believed they were qualified for the two positions that at some point were open is insufficient. (*See* Pannek Decl., RE 50-2, PageID #2537, ¶ 10; Strotman Decl., RE 50-1, PageID #2532, ¶ 17, 19) (Appellants' Brief, Doc. 26, p. 46-47) *See Johnson v. Lockheed Martin Corp.*, 598 F. App'x 364, 369 (6th Cir. 2015) ("Absent additional evidence, plaintiffs' beliefs about their own qualifications "cannot sustain a claim of discrimination."); *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 462 (6th Cir. 2004) ("Moreover, Hedrick's subjective view of her qualifications in relation to those of the other applicants, without more, cannot sustain a claim of discrimination."). The District Court properly found that "qualifications Pannek may have possessed to fill other positions at U.S. Bank do not necessarily prove that U.S. Bank's stated reason for his termination was pretextual" and that Strotman

offered "only disagreement with U.S. Bank's assessment of his performance[2] and that disagreement does not render U.S. Bank's termination decision pretextual." (Order, RE 59, PageID #2713, 2717-2718 (quotation cleaned up), *citing Johnson v. Lockheed Martin Corp.*, 598 F. App'x 364, 369 (6th Cir. 2015))

Moreover, only Strotman applied for an open position. It is undisputed Bolton was looking for someone with a very specific type of experience relating to credit risk and collections strategy. (Bolton Decl., RE 43-2, PageID #2097, ¶ 14) Neither Appellant alleged (much less offered evidence proving) that they had that particular type of experience. It is undisputed that Bolton hired someone, Ellie Liu, who had this experience. (*See id.*) Bolton's decision to hire a more qualified candidate for this position is not evidence of pretext. To the extent that Pannek and Strotman allege that there was another open position in Bolton's organization, they have offered no evidence regarding that position, how they were qualified and who (if anyone) filled it.

Appellants have not established that the reasons for their termination as part of a reduction in force was pretextual or that their alleged protected activity after

---

[2] Strotman argues that the District Court disregarded evidence that he was a "high performer historically." (Appellants' Brief, Doc. 26, p. 47) Strotman was employed for roughly a year. Strotman pointed to accolades he received from a previous manager, Mike Ryan. It is undisputed, however, that Bolton did not put weight on Ryan's opinion of Strotman or his performance because Bolton did not think highly of Ryan's own performance or leadership. (Bolton Decl., RE 43-2, PageID #2096, ¶ 8)

Bolton had made the preliminary decision to terminate them was the but for cause of their terminations. The District Court's decision granting summary judgment should be affirmed.

### III. The District Court Properly Granted Summary Judgment to U.S. Bank on Pannek and Strotman's Harassment Claims.

To establish a *prima facie* claim for sexual harassment, Pannek and Strotman must each show that (1) he was a member of a protected class; (2) he was subject to unwelcome sexual harassment; (3) the conduct was because of his sex; (4) the harassment was sufficiently severe or pervasive to affect the terms and conditions of employment; and (5) there is a basis for employer liability. *Hensman v. City of Riverview*, 316 F. App'x 412, 416 (6th Cir. 2009). The District Court properly found that Pannek and Strotman cannot establish even a *prima facie* case of sexual harassment because they cannot show that the alleged conduct was based on sex. In addition, while the District Court's analysis correctly ended after this conclusion, Pannek and Strotman also cannot show that the alleged harassment was severe or pervasive. And U.S. Bank is not liable for any alleged harassment because it exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and both Pannek and Strotman failed to take advantage of any preventative or corrective opportunities provided by U.S. Bank or avoid harm otherwise.

### A.    The Alleged "Harassment" Was Not Based On Sex.

Pannek and Strotman's sexual harassment claim fails for the simple reason that they cannot establish that Gemrich's alleged harassment of them was because they are male. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (for same-sex sexual harassment to be actionable, the plaintiff must prove "the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimination*… because of … sex.'")).  Where the alleged harasser and the plaintiff are members of the same sex, there are three ways for the plaintiff to demonstrate that the alleged harassment was "based on" sex: (1) where the harasser was acting out of sexual desire; (2) where the harasser is motivated by general hostility towards the presence of members of the harasser/victim's sex in the workplace; and (3) where the plaintiff offers "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Wade v. Automation Pers. Servs.*, 612 F. App'x 291, 297 (6th Cir. 2015) (quoting *Oncale*, 523 U.S at 80-81 (1998)).  Regardless of which avenue a plaintiff chooses, he must prove that "the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimination…because of…sex.*" *Oncale*, 523 U.S. at 81.  Pannek and Strotman's sexual harassment claim fails because they cannot demonstrate that Gemrich's conduct was based on sex.

Pannek and Strotman cannot show that Gemrich acted out of sexual desire toward them or that Gemrich was motivated by a general hostility towards men. (Pannek Dep., RE 35, PageID #587, 716; Strotman Dep., RE 36, PageID #956)  This leaves Pannek and Strotman with only one available alternative to prove that Gemrich's alleged harassment was based on their sex: offering "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."  *See Wade v. Automation Pers. Servs.*, 612 F. App'x 291, 296-297 (6th Cir. 2015).

Pannek and Strotman argue that they "were regularly subjected to inappropriate sex-based commentary from Gemrich."  (Appellants' Brief, Doc. 26, p. 49)  First, the mere fact that Gemrich allegedly made sexual comments to Pannek and Strotman does not prove that the alleged harassment was because of their sex. *See Oncale*, 523 U.S. at 80 (workplace harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations"); *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 566 (6th Cir. 2021) (same).  The District Court agreed, finding that "[i]n a context such as this one, where the alleged harasser makes sexually explicit comments to other men because of perceived fellowship or common interest as men, the audience for those comments – here, Pannek and Strotman – is not being *discriminated against* as men. Arguably they are being treated more favorably by being let i[n] on jokes their

female colleagues in the workplace are not." (Order, RE 59, PageID #2722) The District Court properly found that the "conduct complained of here falls in the broad category of objectionable and unwise workplace conduct that is outside of Title VII's reach." (*Id.*) *See, e.g., Baugham v. Battered Women, Inc.*, 211 F. App'x 432, 439 (6th Cir. 2006) (dismissing same-sex sexual harassment hostile work environment claim where plaintiffs presented no evidence that employer's vulgar behavior – including comments about her sex life – were motivated by plaintiffs' sex).

Second, as noted in the District Court's decision, Pannek and Strotman's claim that Gemrich directed these comments to men only is not supported by the record. (Order, RE 59, PageID #2722) Pannek testified that he "would be floored if [Gemrich] didn't make those comments to other people… [Y]ou could just go down the laundry list and ask anybody who still works at U.S. Bank, and they'll tell you the same thing." (Pannek Dep., RE 35, PageID #588)

In fact, Pannek and Strotman both testified that Gemrich mistreated men and women alike. (Pannek Dep., RE 35, PageID #528-585; Strotman Dep., RE 36, PageID #891-893) They testified repeatedly and extensively about Gemrich's alleged hostility towards and mistreatment of women:

- "John [Gemrich] had issues with ladies. He was extremely hostile and demeaning to ladies." (Pannek Dep., RE 35, PageID #543)

- Gemrich sent a "demeaning" and "overtly hostile" email to a female employee and later called her a "bitch." (Pannek Dep., RE 35, PageID #542-543, 558-559; Strotman Dep., RE 36, PageID #900-904)

- Gemrich "was very big on speaking down to women" and was "dismissive" of a female colleague. (Pannek Dep., RE 35, PageID #528, 550-52)

- Another female colleague confided in Pannek that she would quit before working for Gemrich again, which Pannek speculated could have been "sexually related." (Pannek Dep., RE 35, PageID #543)

They also testified about Gemrich's poor treatment of men: Gemrich belittled a male employee (Strotman Dep., RE 36, PageID #891-892) and that Gemrich made disparaging remarks about another male employee, including saying that he was not good at his job (Strotman Dep., RE 36, PageID #896-98).

Thus, the undisputed "direct comparative evidence" – most notably, Pannek and Strotman's own testimony – demonstrates that Gemrich treated women as poorly as men. Under these circumstances, Pannek and Strotman cannot satisfy their burden of proving that Gemrich's conduct towards them was because of their sex. *See Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 467 (6th Cir. 2012) ("In other words, the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's gender."). Pannek and

41

Strotman, therefore, cannot prove that Gemrich's alleged harassment of them was because they are male. Their sexual harassment claim fails and summary judgment must be affirmed for this reason alone.

### B. The Alleged "Harassment" Was Not Severe and Pervasive.

In addition, summary judgment was appropriate because they cannot establish that any "harassment" was sufficiently severe and pervasive to alter the conditions of their employment and create an abusive work environment. In order for a hostile work environment claim to be actionable, the "environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (Actionable hostile work environment must be permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive enough to alter the conditions of the employee's employment and create abusive working environment.); *Handshoe v. Mercy Medical Center*, 34 F. App'x 441, 448 (6th Cir. 2022) ("In order to be actionable, a plaintiff must show that the alleged harassment was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive working environment." (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000)). Moreover, "[t]he conduct must be objectively hostile or abusive before it can be legally proscribed." *Black v.*

*Zaring Homes*, 104 F.3d 822, 826 (6th Cir. 1997), *cert. denied*, 522 U.S. 865 (1997) (holding that offensive conduct was not sufficiently severe or pervasive to create an objectively hostile work environment, despite plaintiff's testimony that it left her "devastated.")  Further, even when verbal comments are offensive and inappropriate, or if other employees did not act in a professional manner, "Title VII was not designed to purge the workplace of vulgarity." (internal quotation omitted).  *Id.* Conduct that is 'merely offensive' will not suffice to support a hostile working environment action." *Trepka v. Board of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (citing *Harris*, 510 U.S. at 21).  These standards are designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788.

Here, the only comments Pannek and Strotman allege were directed at them were a handful of comments that Gemrich made about his own sex life while he, Pannek, and Strotman were engaging in small talk before their weekly meetings. Specifically, Pannek and Strotman allege that Gemrich: (1) on one occasion referred to himself as a "fucking unicorn," which he explained meant "a handsome single male that had a house and money and a good job: (Pannek Dep., RE 35, PageID #568-571); (2) on two or three occasions, said he could "fuck or nail any pussy he wanted" (Pannek Dep., RE 35, PageID #572-574); (3) on one occasion, said that he

43

"nailed or fucked a deaf woman" who had large breasts that he "motorboated" (Pannek Dep., RE 35, PageID #574-576); and (4) on one occasion, told Pannek that he thought a female co-worker's accent was "hot" (Pannek Dep., RE 35, PageID #578-579).

Courts have repeatedly found conduct much worse than that alleged here insufficient to support a claim for sexual harassment. *See e.g., Walker v. Nat'l Revenue Corp.*, 43 F. App'x 800, 804 (6th Cir. 2002) (Supervisor's conduct in rubbing plaintiff's hair, neck, thighs, and legs, and positioning herself in a manner that revealed her underwear was not severe or egregious enough to alter the condition of plaintiff's employment.); *Richmond-Hopes v. City of Cleveland*, 1998 U.S. App. LEXIS 29572, at *12-14 (6th Cir. Nov. 16, 1998) (no hostile work environment based on sex despite plaintiff's supervisor grabbing his crotch mimicking masturbation , and saying "Stroke me"). There is no evidence that any alleged "harassment" by Gemrich was sufficiently severe and pervasive to alter the conditions of Pannek and Strotman's employment and create an abusive work environment. Summary judgment can be affirmed on Pannek and Strotman's hostile work environment claim for this additional independently dispositive reason.

### C.    U.S. Bank Is Not Liable for Any Alleged Harassment Under *Faragher/Ellerth*.

Finally, U.S. Bank is not liable for any alleged harassment because it can satisfy the *Faragher/Ellerth* defense. First, Pannek and Strotman argue that the

affirmative defense under *Faragher/Ellerth* does not apply because Pannek and Strotman experienced a tangible employment action. (Appellants' Brief, Doc. 26, p. 51). Such argument ignores the fact that Bolton, not Gemrich, made the decision regarding Pannek and Strotman's positions in the reduction in force. *See, e.g. Williams v. Memphis Light*, 2024 U.S. App. LEXIS 17623, at *20 n.3 (6th Cir. 2024) (noting that the *Faragher/Ellerth* defense is available where alleged harasser was not involved in the decision to suspend plaintiff's employment).

Where, as here, no tangible employment action is taken as a result of the alleged harassment, an employer is not liable for the alleged harassment where it can show: (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. *See Faragher*, 524 U.S. at 807.

An employer satisfies the first prong of the defense when it has promulgated and enforced a sexual harassment policy. *See EEOC v. AutoZone, Inc.*, 692 F. App'x 280, 284 (6th Cir. 2017). Here, it is undisputed that U.S. Bank has promogulated and enforces such a policy. (Grey Dep. Ex. 1, RE 40-1, PageID #1919-1921) The Workplace Respect Policy expressly prohibits sexual harassment, which the policy both defines and provides examples of. (*Id.* at PageID #1919-1920) In fact, the Workplace Respect Policy goes even further, and prohibits all inappropriate conduct

in the workplace, even if that conduct does not rise to the level of unlawful harassment or discrimination. (*Id.* at PageID #1920) The policy requires managers and supervisors to report any unacceptable behavior, and provides employees with multiple avenues to report any alleged harassment – including to a manager or supervisor, a human resources business partner, or through the U.S. Bank Ethics Line via telephone or online. (*Id.*) The policy also states that retaliation against anyone who makes a good faith complaint of harassment or discrimination is strictly prohibited. (*Id.* at PageID #1921) Furthermore, it is undisputed that U.S. Bank took prompt action to investigate Pannek's March 2018 complaint (including interviewing Pannek, Gemrich, and three other witnesses identified by Pannek), and thereafter took appropriate corrective action by issuing a Written Warning to Gemrich. (*See supra*) There is no evidence that Gemrich ever engaged in the inappropriate behavior alleged by Pannek after receiving the Written Warning. (*See* Bolton Dep., RE 39, PageID #1698-1699) In short, the Workplace Respect Policy worked like it was supposed to. Based on the undisputed facts, U.S. Bank satisfied its obligation under the first prong of the *Faragher/Ellerth* defense.

Likewise, the undisputed evidence demonstrates that U.S. Bank satisfies the second prong of the *Faragher/Ellerth* defense as well because Pannek unreasonably failed to report Gemrich's alleged inappropriate conduct for several months. Pannek alleged that Gemrich made inappropriate comments about his sex life during their

weekly meetings when Pannek and Strotman reported to him, beginning in late October or early November 2017 and ending in early 2018. (*See* Pannek Dep., RE 35, PageID #515-516, 527, 566, 595-600)  He did not report the conduct, however, until much later, on March 27, 2018.  (Pannek Dep. Ex. 7, RE 35-1, PageID #766-768)  The Sixth Circuit has held that a delay of even two months is unreasonable. *See EEOC v. AutoZone, Inc.*, 692 F. App'x at 286. *See also Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1063 (10th Cir. 2009) (unreasonable reporting delay of two or two-and-a-half months); *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1289-91 (11th Cir. 2003) (per curiam) (same).  In addition, during the investigation, Pannek and Strotman declined to provide specific details of the inappropriate remarks by Gemrich, which also points to unreasonably failing to take advantage of U.S. Bank's Workplace Respect Policy. *See, e.g. Williams v. Memphis Light*, 2024 U.S. App. LEXIS 17623, at *21-22 (6th Cir. 2024) (where plaintiff "didn't report much of the conduct she now complains of – her email to HR that mentions a 'hostile work environment' does not indicate she believed she faced sex discrimination, and only complains that [her supervisors] used crude language, spoke poorly of her, and gave her 'dirty looks….[b]y failing to inform [her employer] of the scope of the harassment she says she faced or explaining how it was based on her sex, there is no way [her employer] 'knew or should have known' of the hostile work environment [plaintiff] now complains of.")

Because U.S. Bank has satisfied both elements of the *Faragher/Ellerth* defense, it is not liable for any alleged harassment. Summary judgment can be affirmed for this additional independently dispositive reason.

## IV. The District Court Properly Granted Summary Judgment to U.S. Bank on Pannek's Age Discrimination Claim.

In order to establish a *prima facie* case of unlawful age discrimination, Pannek must demonstrate that: (1) he is a member of the protected class; (2) he suffered an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a substantially younger person. *See Alfrey v. AK Steel Corp.*, 211 F. App'x 393, 395 (6th Cir. 2006). If Pannek is able to establish a *prima facie* case of age discrimination, the burden then shifts to U.S. Bank to articulate a legitimate, non-discriminatory reason for Pannek's termination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Alfrey,* 211 F. App'x at 396. If U.S. Bank satisfies that low burden, the burden shifts back to Pannek to prove that U.S. Bank's proffered reason was mere pretext for unlawful age discrimination. *See id.* Ultimately, it is Pannek's burden to prove that he was terminated ***because of*** his age. *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175-176 (2009) ("the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of age' is that age was the 'reason' that the employer decided to act").

Initially, Pannek cannot establish even a *prima facie* case of age discrimination because he cannot prove that he was replaced. *See Barnes v.*

48

*Gencorp., Inc.,* 896 F.2d 1457, 1465 (6th Cir. 1990) ("[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.").  It is undisputed that Pannek's third-party risk/vendor management duties were transferred to Roberts, who was already performing similar work.  (Bolton Dep., RE 39, PageID #1524, 1534; Pannek Dep., RE 35, PageID #625-626; Roberts Dep., RE 38, PageID #1401)  His other duties were distributed to other employees outside of Bolton's organization.  (Bolton Decl., RE 43-2, PageID #2097, ¶ 10)  As such, Pannek must provide additional direct, circumstantial or statistical evidence tending to indicate that U.S. Bank singled him out for discharge because of his age.  *Barnes*, 896 F.2d at 1465.  Pannek failed to do so.  Indeed, where as here an older decisionmaker selected to retain an older individual instead of the other plaintiff there can be no inference of age discrimination, just because a younger individual took some of Pannek's duties. Summary judgment is appropriate for this reason alone.

Even if Pannek could establish a *prima facie* case of age discrimination (which he cannot), it is undisputed that U.S. Bank has proffered a legitimate, non-discriminatory reason for his termination.  *See supra.*  Accordingly, the burden shifts back to Pannek to prove that this reason was pretext for unlawful age discrimination – in other words, but for his age, he would not have been terminated.  *See Gross,*

557 U.S. at 176 ("To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision.").  Pannek cannot identify any offensive age-related comments that anyone at U.S. Bank ever made to him.  (Pannek Dep., RE 35, PageID #708)  It is undisputed that Bolton (the decision maker) is also a member of the protected class – and in fact is *older* than Pannek.  (Bolton Decl., RE 43-2, PageID #2097, ¶ 15 (Bolton was 55 at the time))  It is further undisputed that, at the time of the merger, Bolton had supervised Roberts for approximately a year and a half, and had a very high opinion of her job performance.  (Bolton Dep., RE 39, PageID #1700 (describing Roberts as "extraordinary" and a "superstar."))  And even Pannek believes that his age was just one (of many) factors in his termination. (Pannek Dep., RE 35, PageID #682-683)

The only "evidence" that Pannek can offer to support his age discrimination claim is the fact that Roberts, who took over his third-party risk/vendor management duties, is younger.  (*See, e.g.,* Pannek Dep., RE 35, PageID #691-692, 708-709)  The mere fact that some of Pannek's duties were transferred to someone younger than him is not sufficient to prove pretext.  *See Chappell v. GTE Prods. Corp.,* 803 F.2d 261, 267 (6th Cir. 1986); *Hedrick v. Western Reserve Care System,* 355 F.3d 444, 462 (6th Cir. 2004); *Sublett v. Masonic Homes of Ky., Inc,* 2022 U.S. App. LEXIS 19876, at *25-26 (6th Cir. July 18, 2022).

In his Brief, Pannek argues that he was the "the plainly superior candidate" over Roberts. (Appellants' Brief, Doc. 26, p. 54)  While Pannek suggests that he had more experience in third-party risk/vendor management work, it is undisputed that Roberts had more experience performing such work *for U.S. Bank*, and had many years of such experience prior to coming to U.S. Bank.  (Roberts Dep., RE 38, PageID #1285-1304 (describing prior employment history); Bolton Dep., RE 39, PageID #1531)  Moreover, Bolton testified that he did not even consider either employee's pre-U.S. Bank experience when deciding which employee to retain. (Bolton Dep., RE 39, PageID #1531, 1533).  Likewise, Pannek tries to nitpick Bolton's scoring in an individual category in the PGA summary for Pannek and Roberts.  This again is a reiteration of Pannek's personal belief that he was more qualified than Roberts and not any indication that age was a factor in Bolton's decision.  Pannek's subjective opinion that his qualifications were superior to those of Roberts is not proof of unlawful age bias.  *See, e.g., Hedrick*, 355 F.3d at 462 ("A plaintiff's "subjective view of [his] qualifications in relation to those of the other applicants, without more, cannot sustain a claim of discrimination.");  *Brennan v. Tractor Supply Co*., 237 F. App'x 9, 23 (6th Cir. 2007) (holding that a plaintiff's "perception of his competence and the incompetence of those competing against him, is irrelevant.")

Pannek's assertion that Bolton inaccurately assessed the scores on his and Roberts' PGA forms is flat wrong. First, with respect to Pannek, Bolton testified repeatedly that he filled out Pannek's PGA form using what he had learned from managing Pannek for the prior three months – a perfectly reasonable metric for a manager to rely on. (Bolton Dep., RE 39, PageID #1661-1663) Bolton used the same method to complete Roberts' PGA form – using the information he had learned from managing her. (Bolton Dep., RE 39, PageID #1665-1671) Pannek offers no evidence to prove that this method was improper, and the fact that Bolton used the same method for both Pannek and the peer with whom he was compared (Roberts) demonstrates a lack of discriminatory animus.

Pannek also argues that Roberts was unqualified for any position at U.S. Bank because she had a prior criminal record. This argument conveniently overlooks Bolton's undisputed testimony that he was not aware that Roberts had any criminal record prior to becoming employed at U.S. Bank. (Bolton Dep., RE 39, PageID #1531)

In sum, Pannek cannot establish that his age was the but-for cause of his termination. *See Geiger v. Tower Auto,* 579 F.3d 614, 620 (6th Cir. 2009) ("the burden of persuasion remains on ADEA plaintiffs to demonstrate 'that age was the 'but-for' cause of their employer's adverse action.'") (partially quoting *Gross,* 557 U.S. at 183 n.4). Summary judgment must be affirmed.

**V.    Pannek and Strotman Conceded Their Claims Under Ohio State Law and Strotman's ADEA Claim.**

Pannek and Strotman did not oppose U.S. Bank's Motions for Summary Judgment, with respect to their state law claims or Strotman's ADEA claim; nor did they appeal the District Court's decision granting U.S. Bank's Motions for Summary Judgment and dismissing these claims.  (Appellants' Brief, Doc. 26, p. 35, n. 2; Memo. in Opp., RE 50, PageID #2489, n. 1)  Thus, these claims are abandoned and this Court should affirm the District Court's dismissal of these claims.  (Order, RE 59, PageID #2703, 2723 at n. 9)  *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005) ("failure to raise an argument in his appellate brief constitutes a waiver of the argument on appeal").

## CONCLUSION

The District Court properly granted summary judgment in favor of Appellee U.S. Bank on all of Appellants Pannek and Strotman's claims.  For the reasons outlined above, U.S. Bank respectfully requests this Court to affirm the District Court's decision.

Respectfully submitted,

*/s/ Patricia Anderson Pryor*
PATRICIA ANDERSON PRYOR
(00069545)
PATRICIA K. GAVIGAN (0081258)
JACKSON LEWIS P.C.
201 East Fifth Street, 26th Floor
Cincinnati, Ohio 45202
(513) 898-0050
pryorp@jacksonlewis.com
tricia.gavigan@jacksonlewis.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed R. App. P. 32(a)(7)(B) because:

This brief contains 12403 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in proportionately spaced typeface using Microsoft Word, in 14-point Times New Roman.

/s/ *Patricia Anderson Pryor*
Patricia Anderson Pryor

Dated: January 26, 2026.

**CERTIFICATE OF SERVICE**

I certify that, on January 26, 2026, a true and accurate copy of the foregoing was filed with the Court's CM/ECF system which will serve notice on all counsel of record.

*/s/ Patricia Anderson Pryor*
Patricia Anderson Pryor

Dated: January 26, 2026.

56

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry | Description | PageID # Range |
|---|---|---|
| 1 | Complaint | 1-12 |
| 35 | Deposition of Mark Pannek | 441-749 |
| 35-1 | Exhibit 4 to Deposition of Mark Pannek | 758-759 |
| 35-1 | Exhibit 7 to Deposition of Mark Pannek | 766-768 |
| 36 | Deposition of Thomas Strotman | 830-1006 |
| 36-1 | Exhibit 2 to Deposition of Thomas Strotman | 1009-1012 |
| 36-1 | Exhibit 4 to Deposition of Thomas Strotman | 1017 |
| 38 | Deposition of Alyson Roberts | 1272-1408 |
| 39 | Deposition of Bryan Bolton | 1451-1704 |
| 39-1 | Exhibit 2 to Deposition of Bryan Bolton | 1706-1708 |
| 39-1 | Exhibit 3 to Deposition of Bryan Bolton | 1709-1710 |
| 39-1 | Exhibit 10 to Deposition of Bryan Bolton | 1737-1738 |
| 39-1 | Exhibit 19 to Deposition of Bryan Bolton | 1765 |
| 40 | Deposition of Laurie Grey | 1776-1917 |
| 40-1 | Exhibit 1 to Deposition of Laurie Grey | 1919-1921 |
| 40-1 | Exhibit 4 to Deposition of Laurie Grey | 1930-1937 |
| 42 | Deposition of Lydia Buster | 1968-2012 |
| 43 | U.S. Bank's Motion for Summary Judgment as to All Claims Asserted by Mark Pannek | 2013-2035 |
| 43-2 | Declaration of T. Bryan Bolton | 2095-2097 |
| 44 | U.S. Bank's Motion for Summary Judgment as to All Claims Asserted by Thomas Strotman | 2109-2130 |
| 48 | Deposition of David Little | 2152-2237 |
| 49 | Deposition of Diane Watson | 2276-2400 |
| 49-1 | Exhibit 4 to Deposition of Diane Watson | 2438-2440 |
| 50 | Plaintiff's Memorandum in Opposition to U.S. Bank's Motion for Summary Judgment | 2487-2607 |
| 50-1 | Declaration of Thomas Strotman | 2530-2533 |
| 50-2 | Declaration of Mark Pannek | 2536-2537 |

| 59 | Opinion and Order Granting U.S. Bank's Motion for Summary Judgment | 2694-2726 |
| 61 | Notice of Appeal | 2728-2729 |

4897-8595-6731, v. 6