Case No. 25-3706

_____

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

◆

MARK PANNEK AND THOMAS STROTMAN,

Plaintiffs – Appellants,

v.

U.S. BANK NATIONAL ASSOCIATION

Defendant – Appellee.

◆

Appeal from the Final Judgment of The United States District Court for the
Southern District of Ohio, Western Division
Case No. 1:19-CV-00852

_____

_____

REPLY BRIEF OF PLAINTIFFS-APPELLANTS

_____

_____

/s/ Joshua M. Smith
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
Bailey E. Sharpe (0103565)
SSP LAW CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
jms@sspfirm.com
**Attorneys for Plaintiffs-Appellants**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS .............................................................................................1

TABLE OF AUTHORITIES.....................................................................................3

I.  Plaintiffs' retaliation claims contain multiple material disputes of fact requiring jury resolution—U.S. Bank's arguments to the contrary highlight those disputes...................................................................................................4

    A.  Strotman neither forfeited nor abandoned his associational retaliation arguments. ......................................................................................................4

    B.  Pannek never stated he filed the ethics complaint "as an insurance policy." 7

    C.  The timing of Bolton's decision to recommend Plaintiffs for termination is a material factual dispute requiring jury resolution. .....................................8

    D.  The case law cited by Appellee is inapposite and distinguishable. ..........9

    E.  Bolton's self-serving declaration highlights the factual dispute as to the timing of his decisions. .....................................................................................12

    F.  Other record evidence cited by U.S. Bank actually confirms that Bolton had made no preliminary decisions prior to April 2, 2018. .............................15

    G.  The Bank's arguments that other employees were not terminated for complaints about Gemrich have no merit nor bearing on pretext. .................17

    H.  The Bank's failure to follow its established RIF processes is further evidence of pretext. ..........................................................................................18

    I.  U.S. Bank did not seriously investigate Plaintiffs' complaints of harassment.......................................................................................................21

    J.  That Bolton had additional open and available positions on his team is further evidence of a retaliatory motive...........................................................23

II.  Plaintiffs' Title VII Hostile Work Environment claims are inappropriate for summary judgment...............................................................................................24

    A.  Gemrich's harassment was based on sex................................................24

    B.  Gemrich's harassment was severe and pervasive...................................27

    C.  U.S. Bank is still liable for Gemrich's harassment under the *Faragher/Ellerth* standard. ............................................................................31

III.    Pannek's ADEA discrimination claims survive summary judgment.........35

IV.    Conclusion....................................................................................37

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(b)............................38

CERTIFICATE OF SERVICE ................................................................................38

ADDENDUM # 1 .....................................................................................................39

# <u>TABLE OF AUTHORITIES</u>

*Abeita v. TransAmerica Mailings*, 159 F.3d 246 (6th Cir. 1998) ...............................31

*Adamov v. United States Bank Natl. Assn.,* 681 F.App'x 473 (6th Cir.2017) ..........12

*Black v. Zaring Homes*, 104 F.3d 822 (6th Cir. 1997) ....................................... 30, 31

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257 (1998)...............32

*Clark v. United Parcel Service, Inc.*, 400 F.3d 341 (6th Cir. 2005).........................33

*Faragher v. City of Boca Raton,* 524 U.S. 775 (1998) ...........................................28

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263 (6th Cir. 2009)............33

*Gallenstein v. United States*, 975 F.2d 286 (6th Cir. 1992) .........................................6

*Gentry v. Summit Behavioral Healthare*, 197 Fed. App'x 434 (6th Cir. 2006) ........10

*Grano v. Dep't of Dev.*, 699 F.2d 836 (6th Cir. 1983) ................................................37

*Hanson v. Madison Cty. Detention Ctr.*, 736 F. App'x 521 (6th Cir. 2018)...............7

*Hawk v. Providence Home Servs.*, 83 F. App'x 191 (9th Cir. 2003).........................18

*Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321 (6th Cir. 2008) ................. 24, 29, 30

*Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999).............................................30

*Jenkins v. Holloway Sportswear, Inc.*, Nos. 9204942, 92-4074, 1993 U.S. App.
    LEXIS 32240 (6th Cir. Dec. 8, 1993) ....................................................................36

*King v. Super Serv.*, 68 Fed. App'x 659 (6th Cir. 2003) ...........................................26

*Lucaj v. FBI*, 852 F.3d 541 (6th Cir. 2017) ................................................................6

*Mack v. Otis Elevator Co.*, 326 F.3d 116 (2d Cir. 2003).........................................32

*Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883 (6th Cir. 2020)...............36

*Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497 (6th Cir. 2014) .............10

*Nascimento v. Univ. Of Cincinnati*, No. 1:08-CV-326, 2010 U.S. Dist. LEXIS 77612
    (S.D. Ohio July 28, 2010) ...................................................................................11

*Riley v. Columbus Bd. Of Educ.*, 2008 U.S. Dist. LEXIS 19446 (S.D. Ohio Mar. 13,
    2008) ..................................................................................................................11

*Robinson v. Georgia-Pacific Corrugated, LLC*, 2020 U.S. Dist. LEXIS 15623 (S.D.
    Ohio Jan. 29, 2020) ...............................................................................11, 12, 19

*Romstadt v. Allstate Ins. Co.*, 59 F.3d 608 (6th Cir.1995) .........................................9

*Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274 (6th Cir. 2012)............................10

*Smith v. Rock-Tenn Servs.*, 813 F.3d 298 (6th Cir. 2016).........................................28

*Temple v. Pflugner*, 866 F. Supp. 2d 735 (E.D. Ky. 2011)................................ 30, 31

*Tharp v. Apel Int'l, LLC*, 2022 U.S. App. LEXIS 21050 (6th Cir. July 28, 2022) . 10,
    19

*Thornson v. Fed. Express Corp.*, 530 F.3d 451 (6th Cir. 2008) ...............................30

*Yee v. City of Escondido*, 503 U.S. 519 (1992) ........................................................6

Appellee U.S. Bank's ("U.S. Bank" or the "Bank") brief does nothing more than highlight key factual disputes on which summary judgment is inappropriate. Unfortunately, instead of properly submitting only undisputed facts for this Court's consideration, its Brief is littered with facts in dispute that Appellee seeks to have this Court view in a light most favorable to it. But that is not the standard for summary judgment under Rule 56, and to do so would only compound the errors of law made by the district court.

I.  **Plaintiffs' retaliation claims contain multiple material disputes of fact requiring jury resolution—U.S. Bank's arguments to the contrary highlight those disputes.**

Summary judgment as to Plaintiffs' retaliation claims is inappropriate because, as U.S. Bank's brief confirms, the timing and motivations behind Senior VP Bryan Bolton's April 2, 2018 recommendation to terminate Plaintiffs is subject to conflicting evidence. Unfortunately, the Bank asks this Court to ignore those disputes, and instead credit disputed facts and testimony in its favor. Those arguments have no merit.

A.  **Strotman neither forfeited nor abandoned his associational retaliation arguments.**

On a threshold procedural matter, U.S. Bank argues in a footnote that Strotman has abandoned arguments regarding third-party / associational retaliation. (*See* Appellee Brief, R. 27, PageID # 31, at fn. 1). U.S. Bank is wrong, and in reality

they have abandoned any argument about associational retaliation by failing to specifically address the district court's finding on this point.

Strotman did not forfeit or abandon any arguments related to his retaliation claim. An argument is raised, and thus preserved for appellate review, if a party "state[s] the issue with sufficient clarity to give the court and opposing parties notice that it is asserting the issue and provide[s] some minimal level of argumentation in support of it." *Lucaj v. FBI*, 852 F.3d 541, 548, n. 4 (6th Cir. 2017). Once a claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below. *Yee v. City of Escondido*, 503 U.S. 519, 534-535 (1992); *Gallenstein v. United States*, 975 F.2d 286, 290 (6th Cir. 1992)(citing *Yee*, rejecting waiver/forfeiture arguments: "[t]his argument mistakes the failure to raise a claim below with the failure to make an argument in support of that claim.").

Strotman did that below, addressing his retaliation claims at pages 29-30 of Plaintiffs' memorandum in opposition to Defendant's motion for summary judgment (*See* Plaintiffs' Memo in Opp., R. 50, PageID # 2517-2518). Argument on those issues was supported by reference to and discussion of facts also cited in Plaintiffs' principal brief to this Court.

Strotman's arguments in the underlying case were also sufficient to give the court notice of the issue. The district court specifically addressed the associational

retaliation issue in its opinion and order finding a causal connection between the protected activity and the adverse action. (*See* Opinion & Order, R. 59, PageID # 2715-2719. Forfeiture of an argument does not apply "where a district court 'fully addresses' an argument—whether or not a party below fully raised it in an appropriate fashion—[because this Court's] consideration of that argument is not made more difficult. In these cases, we have the district court's order and subsequent briefing on appeal." *Hanson v. Madison Cty. Detention Ctr.*, 736 F. App'x 521, 534 (6th Cir. 2018). Because Strotman raised his associational retaliation claims in the underlying case, and the district court directly addressed the same, as a matter of law, these arguments cannot be considered "abandoned" by Plaintiffs.

U.S. Bank has not attempted to specifically argue against the district court's finding as to third party / associational retaliation. Regardless, the district court's basis for its finding is supported by the record and the law. Specifically, Bolton's April 2 e-mail makes clear that he lumped Pannek and Strotman as one for purposes of the protected activity (i.e., the ethics complaint). (*See* Exhibits to Watson Dep., R. 49-1, PageID # 2438). By lumping the two Plaintiffs together for termination immediately after Pannek's complaint—especially considering his opinions that both are "close" and his concern that Strotman may do the same—provides evidence of retaliation as to both Plaintiffs. The district court agreed with Strotman's arguments, holding that with respect to his third-party associational retaliation claim,

Strotman adequately made out a *prima facie* case. (Opinion & Order, R. 59, PageID # 2716).

### B. Pannek never stated he filed the ethics complaint "as an insurance policy."

As but one example of *disputed* facts being inappropriately presented as *undisputed*, the Bank asserts throughout its brief that Pannek referred to his ethics complaint as an "insurance policy" against termination. He did not do so, has never testified to having done so, and he submitted a declaration unequivocally affirming that he did not do so. (*See* Pannek Dec., R. 50-2 PageID # 2537, at ¶ 9 ("I am aware of the testimony of Lydia Buster in this litigation, and deny having any conversations with her surrounding my ethics line complaint. I also deny having ever referred to my ethics hotline complaint as an 'insurance policy' to Lydia Buster, or stating anything of that nature.")).

U.S. Bank's sole support for this claim is hearsay testimony from Lydia Buster ("Buster"), a current Bank VP who retained her role following the 2018 merger, and asserted for the first time at her deposition that Pannek made this statement. There is no documentation supporting this recent testimony, nor any other witnesses to the purported statement. (Buster Dep., R. 42, PageID # 1998-2001 ("Q. Was this conversation documented in writing at all. A. No.") and ("Q. Were...any of these conversations documented at all? A. No., no. It wouldn't have been.") and ("Q. Did

you ever mention these conversations to anyone else? A. I don't recall. I—I mean—I don't--I didn't, like, do anything official.").

This is a disputed fact requiring jury resolution, but for summary judgment purposes, Pannek's testimony is to be believed, making U.S. Bank's arguments to the contrary irrelevant. *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 610 (6th Cir.1995)("In a motion for summary judgment, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

### C. The timing of Bolton's decision to recommend Plaintiffs for termination is a material factual dispute requiring jury resolution.

The fact is, Bolton became aware of Plaintiffs' protected activity on March 29, 2018 via an e-mail from his HR Business Partner Diane Watson and a call that followed. Four days later, he made a recommendation to HR to terminate their employment in a detailed e-mail insinuating that the timing of Pannek's ethics complaint about Gemrich is suspicious, that he expects Strotman to take a similar tact, and then goes on to lay out vague and subjective bases for including them in a reduction in force "severance exercise." (Exhibits to Watson Dep., R. 49-1, PageID # 2438-2440). This recommendation was made prior to any of the steps of U.S. Bank's mandatory RIF policy (the peer group analysis procedures) being conducted, discussed further below.

8

As made clear in their brief, this timing is problematic for Appellee because a causal connection is established when an "action occurs very close in time after an employer learns of a protected activity" and "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014); *See also Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 285 (6th Cir. 2012). While the Bank does what can to dispute this clear connection, its arguments do not have merit for summary judgment purposes.

**D. The case law cited by Appellee is inapposite and distinguishable.**

U.S. Bank heavily relies upon an exception to the causal connection case law cited above. Specifically, a line of cases holding that, "causation is lacking when an employer follows a pre-existing line of action regardless of the employee's protected action." (Appellee Brief, R. 27, PageID # 30, *citing Tharp v. Apel Int'l, LLC*, 2022 U.S. App. LEXIS 21050, at *8 (6th Cir. July 28, 2022)). Such an exception can apply where an employer has already come to a decision prior to any protected activity. *See Gentry v. Summit Behavioral Healthcare*, 197 Fed. App'x 434, 441 (6th Cir. 2006)(where "several of the adverse acts occurred prior to the protected activity."); *Riley v. Columbus Bd. Of Educ.*, 2008 U.S. Dist. LEXIS 19446, at *35-36 (S.D. Ohio Mar. 13, 2008)(where plaintiff was terminated seven months prior to engaging in the protected activity); *Nascimento v. Univ. Of Cincinnati*, No. 1:08-CV-326, 2010 U.S.

Dist. LEXIS 77612, at *22-23 (S.D. Ohio July 28, 2010)(where plaintiff failed to perform specific job-related duties three weeks prior to engaging in the protected activity).

But this rule has no application here, where the question of whether any decision was made prior to the Bank becoming aware of Plaintiffs' ethics complaint is a disputed material fact. At best, this exception once again highlights a factual dispute requiring jury resolution.

A case which U.S. Bank omits, but is relevant to the current dispute is *Robinson v. Georgia-Pacific Corrugated, LLC*, 2020 U.S. Dist. LEXIS 15623 (S.D. Ohio Jan. 29, 2020). In *Robinson,* the district court directly wrestled with the issue of what it means to "proceed[] along lines previously contemplated, though not yet definitively determined" when considering whether to "insulate an employer from liability." *Id*. at *28. The court looked to guidance from this Court in *Adamov* (ironically another case against U.S. Bank), in which this Court found:

> There is no evidence that U.S. Bank 'previously contemplated' terminating the plaintiff. First, Burk did not recommend and Hartnack did not decide to terminate the plaintiff until after plaintiff complained of discrimination...it is true that the anti-money laundering department launched an investigation into the plaintiff before plaintiff complained. But, as the dissent points out, these investigations appear to be 'routine' and unrelated to punishment, let alone termination.

*Id*. at *31.

The district court in *Robinson* followed this same reasoning, holding that the investigation at issue was related to punishment in a broad sense, but that, "there is no evidence in the record to suggest that this investigation began with an eye toward termination." *Id.*

Similarly, while a merger of divisions was occurring and departments were being reorganized, there is no evidence—let alone undisputed evidence—that this merger was being conducted with an eye toward terminating Plaintiffs. To the contrary, the evidence points to Bolton still attempting to learn Plaintiffs' positions as of March 2018, and then very quickly coming to a decision to terminate them just four days after being made aware of Pannek's ethics complaint, and presuming Strotman would make a similar complaint. (*See* Bolton Dep., R. 39, PageID # 1501; Exhibits to Watson Dep., R. 49-1, PageID # 2438-2440). If anything, such evidence further supports a causal connection between the Plaintiffs' protected conduct and Bolton's recommended adverse action. *See Adamov v. United States Bank Natl. Assn.*, 681 F.App'x 473, 480-481 (6th Cir.2017)("Hartnack, who knew that Adamov complained of discrimination, decided to terminate Adamov eleven days later. Such temporal proximity between complaints of discrimination and termination 'seems suspicious' and supports an inference of retaliation.").

Other Bank employee testimony supports the lack of any contemplated terminations at that time, further contradicting Bolton's declaratory testimony. (*See,*

11

*e.g.,* Watson Dep. R. 49, PageID # 2341 ("Q. At the time this complaint came in [March 28, 2018], were you aware that some employees within Mr. Bolton's group were being considered for job elimination? A. No."); Roberts Dep., R. 38, PageID # 1385 ("Q. Do you know if any decision had been made at this point [February 22, 2018] as to whether Mr. Pannek or anyone else was going to be – if that position was going to be eliminated? A. No."); Little Dep., R. 48, PageID # 2170 ("Q. Was it your understanding that employees were going to be terminated as a result of this reorganization? A. No expectations."); Grey Dep., R. 40, PageID # 1875 ("Q. Did you have any knowledge at the time you were conducting your investigation with respect to Mr. Pannek's complaint that either him or Mr. Strotman were being considered for termination of their employment at U.S. Bank? A. I don't recall having any knowledge of that, no.")).

The fact is, the Bank's claims that Bolton was simply proceeding along a "pre-existing line of action" is a disputed fact at best, and there is no evidence let alone disputed evidence that U.S. Bank had made *any* decisions about Plaintiffs' employment prior to learning of the March 29, 2018 ethics complaint. The law simply does not support U.S. Bank here.

### E. Bolton's self-serving declaration highlights the factual dispute as to the timing of his decisions.

U.S. Bank attempts to support its arguments about a "pre-existing line of action" by pointing to the self-serving declaration of Bolton, filed for the first time

on summary judgment, in which he claims that, "by late February or early March 2018, I had already made preliminary decisions about what I planned to do with both Pannek and Strotman's positions." (Bolton Dec., R. 43-2, PageID # 2097, at ¶ 11). U.S. Bank claims (wrongly) that this declaration establishes *as a matter of law* that "Bolton had determined by late February or early March what he planned to do with Pannek and Strotman as they were not the right individuals to lead in the new combined group." (Appellee's Brief, R. 27, PageID # 31). But the record evidence says otherwise.

First, consider the murkiness of the dates in which this purported "preliminary decision" occurred. Even in his declaration Bolton only *estimates* that he made these preliminary decisions in "late February or early March" at least a four week period. Bolton also fails to pinpoint any specific dates when the merger began, instead estimating it was "in early 2018" (i.e., anywhere between January and March). (Bolton Dec., R. 43-2, PageID # 2096, at ¶ 4).

Then there is Bolton's deposition testimony, which further highlights timing contradictions. In particular, Bolton testifies that following the merger (in "early 2018") he engaged in a "synergy process" that lasted "roughly 60 to 90 days," again placing end point of that "exercise" anywhere between March, April, or May 2018. (Bolton Dep., R. 39, PageID # 1475). Further confusing matters, Diane Watson ("Watson") (Bolton's HR counterpart), testified that Bolton took "five months or so,

13

six months, to do his analysis of how he was going to have his team lined up," which would place the end point between May, June, or July 2018. (Watson Dep., R. 49, PageID # 2388).

This timing is important because Bolton also testifies that staff determinations were made "closer to the end than in the beginning" of this process. (Bolton Dep., R. 39, PageID # 1475-1476). Bolton specifically confirms this timing as to Pannek, stating that he made the determination to retain Roberts over Pannek "sometime in late March to early April." (*Id.* at PageID # 1524). Bolton explained further that "I didn't make it at the beginning because I didn't understand the talent that I had on the consumer side to see if there was someone[,] and, "I didn't know Mark well enough that Mark was as good as her, or not as good as her, or better than her. So it wasn't done at the beginning, because I needed to understand – I needed to learn about people and how they ran their organization and what type of leaders they were." (*Id.* at PageID # 1525).

At best, Bolton's self-serving declaration claiming to have made "preliminary decisions" in "late February or early March 2018," when read with his prior testimony, confirms a factual dispute requiring jury resolution. This is particularly so in light of all the other Bank employee testimony as to when they became aware of such decisions (including his HR counterpart, Watson). (*See, e.g.,* Watson Dep.

14

R. 49, PageID # 2341; Roberts Dep., R. 38, PageID # 1385; Little Dep., R. 48, PageID # 2170; Grey Dep., R. 40, PageID # 1875).

### F. Other record evidence cited by U.S. Bank actually confirms that Bolton had made no preliminary decisions prior to April 2, 2018.

U.S. Bank points to other record evidence which it wrongly claims confirms the lack of any timing dispute.  But yet again, this evidence does nothing more than *highlight* the dispute rather than defeat it.

First is the February 22, 2018 organizational chart Bolton sent to Alyson Roberts ("Roberts").  (Exhibits to Bolton Dep., R. 39-1, PageID # 1738; Appellee Brief, R. 27, PageID # 26). But this e-mail says nothing about a decision (preliminary or otherwise) to terminate the Plaintiffs,  nor does it address Pannek's other job responsibilities and direct reports (a fact which U.S. Bank conveniently emphasizes in their "lack of replacement" arguments in Pannek's age discrimination claims).

Moreover, the e-mail is theoretical, and is sent at the very beginning stages of an "early 2018" merger of departments (which again, could have begun in January or February 2018). It would make little sense that Bolton made a preliminary decision to terminate Pannek or Strotman at the beginning of that process, given his prior testimony that such determinations were not made until the end of his "60 to 90 day" process. (*See* Bolton Dep., R. 39, PageID # 1525 ("So it wasn't done at the beginning because I needed to understand – I needed to learn about people and how they ran their organization and what type of leaders they were.")). Further, Bolton

15

did not engage in the required PGA comparison until April 2018, two months after this e-mail was sent.

As it pertains to Strotman, the e-mail says nothing about him. In fact, an April 20, 2018 e-mail confirms that Bolton was still discussing potentially retaining Strotman in a role on his team, but based on Gemrich's feedback he retained Strotman's direct report Greg Hovis instead. (Exhibits to Bolton Dep., R. 39-1, PageID # 1751).

U.S. Bank also points to Bolton's "requests for feedback" on Plaintiffs "from Gemrich and other bank leaders in February and March." (Appellee Brief, R. 27, PageID # 36). But this evidence instead confirms that Bolton *had not* made any kind of "preliminary decision" to terminate Plaintiffs. To the contrary, it would indicate he was still in the beginning stages of this process. (*See* Bolton Dep., R. 39, PageID # 1501 ("I began forming opinions before that – well before that timeframe, getting to know people, getting to understand people, and how they ran their operation and things of that nature. But going through the process in its entirety and landing on final decisions, that would have been most likely sometime in the April timeframe, as I recall.")).

In the end, it is clear that *when* Bolton made his decisions (preliminary or otherwise) regarding Plaintiffs is a materially disputed fact—the Bank asserts it was in "late February to early March," while prior testimony and record evidence

16

indicate those decisions did not occur until at least April 2. And, if Bolton made those decisions immediately following Plaintiffs' protected activity, the timing is inherently suspicious and supportive of a pretext for retaliation. That evidence, particularly when combined with other independent evidence discussed below, renders summary judgment inappropriate.

### G. The Bank's arguments that other employees were not terminated for complaints about Gemrich have no merit nor bearing on pretext.

U.S. Bank argues that because other employees besides Plaintiffs were involved in the investigation into Pannek's complaint or otherwise raised other informal complaints about Gemrich but were not terminated, Plaintiffs' protected activity could not be the cause of their terminations. However, U.S. Bank failed to cite to a single 6th Circuit case in support of this proposition. Rather, they cite to a single case from the 9th Circuit—*Hawk v. Providence Home Servs.*, 83 F. App'x 191 (9th Cir. 2003). However, this case is not published, and even states that "[t]his disposition is not appropriate for publication and may not be cited to or by the courts of this circuit[.]" *Id*. at fn. 1. Moreover, this case is not binding on this Court, nor does the case indicate that its holding has any application here.

Beyond the fact there is no case law from this circuit for which Appellee can point to, the actions of the other employees referenced by the Bank are easily distinguishable from the protected activity Plaintiffs engaged in. Here, Pannek filed a formal ethics complaint alleging that Gemrich engaged in sexually explicit

17

conduct. Strotman similarly raised the issue of Gemrich's sexually harassing behavior. These other employees, however, never filed any formal complaints. They were simply interviewed as part of Pannek's complaint, or at other times raised informal complaints about Gemrich's management style. At least one of these other complaints involved an inappropriate e-mail Gemrich sent to another female colleague. (Buster Dep., R. 42, PageID # 1990-1991). After learning of this complaint, Gemrich voiced his anger to Plaintiffs during a phone conference about the report, calling the target of his e-mail (who had not been the one to report the e-mail) a "f***ing bitch." (Buter Dep., R. 42, PageID # 1993-1994; Pannek Dep. R. 35, PageID # 529, 546, 558-559; Strotman Dep., R. 36, PageID # 903-904). This behavior just goes to show Gemrich's proclivity for retaliation when his inappropriate conduct is reported. However, none of these other employee complaints have any bearing on Plaintiffs' pretext argument, and U.S. Bank is unable to point to any 6th Circuit case law to the contrary.

### H. The Bank's failure to follow its established RIF processes is further evidence of pretext.

U.S. Bank's failure to follow its own mandatory RIF procedures (the "Peer Group Analysis" or "PGA" process) when terminating Plaintiffs pursuant to a RIF is another key piece of evidence indicating pretext. U.S. Bank asks this Court to ignore that policy, however, claiming yet again based on self-serving testimony that

it is a "mere guideline" and was not "black and white" for employees in higher-level roles. (Appellee Brief, R. 27, PageID # 40-41).

Yet the policy is very clearly *mandatory* on its face, stating that it "<u>must be completed</u> when there are two or more employees in the position being considered for elimination, but not all employees in the job will be severed." (Exhibits to Watson Dep., R. 49-1, PageID # 2441). And, per Watson, "the termination of [Plaintiffs] was subject to the [PGA] process" for which there are "written policies or guidelines that were to be followed in conducting this [PGA] process." (Watson Dep., R. 49, PageID # 2332-2333). U.S. Bank also provides no response to the fact that Gemrich was terminated for failing to correctly follow that PGA process less than a year later. (*See* Exhibits to Gemrich Dep., R. 37-1, PageID # 1262-1270 (recommendation to terminate Gemrich based in part on substantiated finding that "Gemrich elected not to execute the RIF/PGA process according to guidelines" resulting in "potential elimination of two managers who, by the guidelines, should not have been eliminated[.]")).

U.S. Bank also asks this Court to ignore the testimony from other Bank employees *in human resources* as to when the PGA process is supposed to be completed. *See* Appellant's Brief, R. 27, PageID # 41-42 ("[T]heir reliance on the testimony...from witnesses who had no involvement in the decision-making process is particularly unpersuasive.")). In other words, this Court should ignore the

19

testimony of Diane Watson, Bolton's HR counterpart at time of this merger and RIF, indicating that a termination decision should not be made before a PGA is performed. (*See* Watson Dep., R. 49, PageID # 2337 ("Q. When doing a peer group analysis, obviously no decision would be made or should be made as to who's going to be terminated before that analysis is performed; is that right? A. Correct.")). This is same HR business partner that the PGA indicates should "support" Bolton in completing sections of the PGA relating to "experience," "tenure," "License/Certifications," and "written disciplinary action." (*See* Exhibits to Watson Dep., R. 49-1, PageID # 2441; *See also* PageID # 2443 ("[PGA] Skills and Performance Overview - This form, which provides a consistent way to evaluate employees being considered as part of a reduction in force, should be completed by management and reviewed by HR[.]")).

U.S. Bank also has no response to Bolton's complete inability to explain his basis for calculating the numbers he indicated on the PGA summary form. (*See* Bolton Dep., R. 39, PageID # 1661-1664 (testifying scores were based on simply "what I had learned over those couple months," and "I would guess that I looked at a performance review or had like HR look up [the] performance review.")). As to performance reviews specifically, despite Bolton providing a score there is no evidence that 2017 performance reviews were completed, or what the actual scores were. (*See* Smith Dec., R. 50-3, PageID # 2540, at ¶¶ 1-4).

Finally, without citing one case in support, U.S. Bank argues that Bolton "reasonably" waited to fill out the forms until April after he had time to gather information about Strotman and Pannek[.]" (Appellee Brief, R. 27, PageID # 42). That may be U.S. Bank's interpretation of the evidence. But another more reasonable way to interpret the timing of filling out these forms later in April 2018, *after* Bolton had already recommended Plaintiffs' terminations to HR, is that Bolton made a kneejerk reaction to an ethics complaint by recommending Plaintiffs for termination pursuant to an upcoming reduction in force. Then, to paper over that recommendation to appear in compliance with U.S. Bank's RIF policies, Bolton completed PGA summary forms which were meant to support the termination decision he had already made. But in doing so, Bolton still did not follow the steps in that process, which in all likelihood would have established superior qualifications.

Such a failure to follow U.S. Bank's PGA process is significant evidence of pretext, particularly when considered with the timing of Bolton's April 2 e-mail recommending termination shortly after learning of the March 29 ethics complaint.

## I. U.S. Bank did not seriously investigate Plaintiffs' complaints of harassment.

While U.S. Bank emphatically claims the lack of an investigation into Gemrich's inappropriate comments is "unfounded," it fails to refute a few critical facts, including that:

- No one ever interviewed Gemrich about the sexually charged comments;

- No one ever followed up with Plaintiffs as to the specifics of the comments, given Plaintiffs' discomfort repeating them in front of Grey (a woman);

- The other witnesses called were never asked about any sex-based comments;

- Laurie Grey (HR Investigator) and Diane Watson (Bolton's HR partner) point the finger at one another as to who was supposed to follow up with Gemrich regarding the sex-based comments;

- No one ever responded to Pannek's subsequent complaint that the hostile work environment , including the sexually charged comments, were not being addressed or taken seriously; and

- Following the investigation, Gemrich was given more responsibility and direct reports.

Instead, the Bank focuses on the fact that Grey "interviewed Pannek, Strotman, Gemrich, Jeff Sorg and Kevin Turner," while ignoring that she only asked Pannek about the sexually based comments; Strotman had to volunteer them, Gemrich was never asked about them nor were the others . (Appellee Brief, R. 27, PageID # 47; Grey Dep., R. 40, PageID # 1862-1863; Strotman Dep., R. 36, PageID # 923-927).

The Bank also focuses on the written warning issued to Gemrich, which it claims impacted his pay. Yet, there were *no* remedial actions relating to his ongoing abusive behaviors toward others, nor the guttural remarks he made to Plaintiffs. And,

just over a month later, he was given additional responsibilities and direct reports .
(Gemrich Dep., R. 37, PageID # 1215-1216).

Overall, viewing the evidence in a light most favorable to Plaintiffs, a jury can reasonably infer that U.S. Bank "responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances." *Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 347 (6th Cir. 2008). This leads to an inference of pretext, particularly when combined with the other evidence described above.

### J. That Bolton had additional open and available positions on his team is further evidence of a retaliatory motive.

Finally, U.S. Bank attempts to discredit evidence that there were open and available positions on Bolton's team at the time of Plaintiffs' terminations by very simply arguing there is no evidence of such positions or of Plaintiffs' qualifications for them. But this ignores the testimony of Bolton in which he confirmed there were two open roles in 2018 in "risk and controls" and "risk strategy." (Bolton Dep., R. 39, PageID # 1672-1674). It also ignores Plaintiffs' declaration testimony in which Pannek confirms that he has over 35 years of experience in Governance, Risk, and Compliance in the banking industry, is widely regarded as an expert in Third Party Risk Management best practices, and his prior work at Chase, Citi Bank, Fidelity, and other Tier 1 financial institutions. (Pannek Dec., R. 50-2, PageID # 2536-2539, at ¶¶ 3, 5-7, 10 and Attachment 1 (Resume)).

23

Strotman similarly confirmed his experience and qualifications for the roles, including his past career in risk management at various financial institutions, his current role as "Vice President of Governance Control" at US Bank in which he was hired to "improve the Governance Control group," and his Legends of Possible award for the top 1% of performers at the Bank. (Strotman Dep., R. 36, PageID # 868, 874-878, 979-988; Strotman Dec., R. 50-1, PageID # 2532, at ¶ 15; Attachments to Strotman Dec., R. 50-1, PageID # 2534-2535).

Plaintiffs have presented evidence of these open roles and that they were qualified for them. The fact that such roles were open and available at the time Plaintiffs were terminated is further evidence of pretext, particularly when considered alongside the suspicious timing of Bolton's recommendation and the failure to follow U.S. Bank PGA Guidelines.

## II. Plaintiffs' Title VII Hostile Work Environment claims are inappropriate for summary judgment.

U.S. Bank's opposition boils down to three points—(1) Plaintiffs have no actionable Title VII hostile work environment claim because they are men; (2) Gemrich's sex-based comments about females including co-workers were not severe or pervasive; and (3) U.S. Bank acted promptly to correct and prevent the harassment *(Faragher/Ellerth)*. None of these arguments have merit.

### A. Gemrich's harassment was based on sex.

The Supreme Court is clear—same-sex harassment is actionable under Title VII, including through "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace. *King v. Super Serv.*, 68 Fed. App'x 659, 663 (6th Cir. 2003). In this case, the record evidence establishes that Gemrich's harassment was based on sex through direct comparative evidence.

Gemrich directed sexually explicit comments *specifically to Plaintiffs* during weekly meetings, including statements that he could "f**k any p***y he wanted" and detailed descriptions of sexual encounters. (Pannek Dep., R. 35, PageID # 530-531, 566-567, 569, 572; Strotman Dep., R. 36, PageID # 924-925; Gemrich Dep., R. 37, PageID # 1145-1148). These comments were made exclusively to Plaintiffs (both men) and often involved demeaning references to other female employees of the Bank. (Pannek Dep., R. 35, PageID # 530-533; Gemrich Dep., R. 37, PageID # 1145-1148).

Female employees were not subjected to the sexually explicit commentary by Gemrich including his sex life or crude remarks about a particular co-workers. (Pannek Dep., R. 35, PageID # 528-533, 546, 558-559; Gemrich Dep., R 37, PageID # 1145-1148; Strotman Dep., R. 36, PageID # 899-904). Instead, when it came to females Gemrich would act in a demeaning fashion, acting hostile and speaking down to them, and was dismissive. Notably US Bank cites to these examples of

Gemrich's inappropriate behavior, while failing to acknowledge the distinctive conduct between men and women. (Appellee Brief, R. 27, PageID # 50-51).

U.S. Bank argues that men and women were equally subjected to Gemrich's conduct, and thus it cannot be sex-based. But what Appellees ignore in their own arguments is the distinct conduct Gemrich is engaging in between men and women. With women, Gemrich is hostile and demeaning, speaking down to them, and was dismissive of their comments. (Pannek Dep., R. 35, PageID # 528, 542-543, 550-552, 558-559; Strotman Dep., R. 36, PageID # 900-904). With men, he would make crude sex jokes *about women,* and only in men's presence.

Plaintiffs were subjected to these crude comments about female co-workers and Gemrich's sex life more generally *because* they were also men. These comments were made during weekly meetings between Gemrich, Pannek, and Strotman. (Pannek Dep., R. 35, PageID # 530, 566-567; Gemrich Dep., R. 37, PageID # 1145-1446). The comments were made about women in the office, about women Gemrich was having sexual relations with, and about women in general. The comments were unwelcome, and altered the conditions of Plaintiffs' employment—so much so that Pannek began seeking out transfer opportunities within the Bank just to get away from Gemrich. (Pannek Dep., R. 35, PageID # 610-611).

The district court's holding that such conduct constitutes "perceived fellowship" among men mischaracterizes the evidence and diminishes the true

impact of Gemrich's conduct on Plaintiffs. (Opinion & Order, R. 59, PageID # 2722). By doing so, the Court is telling Plaintiffs that their feelings do not matter, and that they cannot be harmed by Gemrich's sexually explicit comments *about women* because they are men. But this is not true—both Plaintiffs have wives and daughters, and comments were being made about their female coworkers. Being the target of Gemrich's behavior, and having women in their lives whom these comments belittled, heightened the severity of the situation and thus created a hostile work environment. (Pannek Dep., R. 35, PageID # 645-646; Strotman Dep., R. 36, PageID # 839-840).

**B. Gemrich's harassment was severe and pervasive.**

Next, U.S. Bank argues *as a matter of law* that Gemrich's harassment was not severe or pervasive. This is wrong, and in any event is a question reserved for the jury. *Smith v. Rock-Tenn Servs.*, 813 F.3d 298, 210 (6th Cir. 2016), quoting *Jordan v. City of Cleveland*, 464 F.3d 5584, 597 (6th Cir. 2006)("Like several of our fellow circuits, we consider whether harassment was so severe and pervasive as to constitute a hostile work environment to be 'quintessentially a question of fact.'"). The case is no different here, where there is evidence from both an objective and subjective standpoint that Plaintiffs were subjected to discriminatory intimidation, ridicule and insult that was both severe and pervasive enough to alter the conditions of their employment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998); *See*

*also Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333-34 (6th Cir. 2008)(holding summary judgment is improper where a plaintiff puts forth evidence of harassment that is "ongoing," "commonplace," and "continuing.").

While U.S. Bank belittles the discriminatory and harassing nature of Gemrich's sex-life commentary, Gemrich's sexually explicit comments occurred during regular weekly meetings over the course of several months, between him and the two Plaintiffs. (Pannek Dep., R. 35, PageID # 566-567). The harassment was so severe that Pannek began avoiding Gemrich and started applying for transfers to escape his supervision. *(Id*. at PageID #531, 609 ("I didn't want to be  near him. I didn't want to be in the same room as him. I don't like him."), 610-611).

Gemrich's harassment extended beyond verbal comments to Plaintiffs during meetings, and included following Pannek into restrooms to make sexual comments about female employees. (*Id*. at PageID # 531-532 (testifying that Gemrich followed Pannek into the restroom and began describing how "hot" a female employee's Russian accent was, and that Gemrich would "like to f**k her.").

Moreover, Gemrich's conduct created a pattern of intimidation and retaliation against those who complained. (Exhibits to Bolton Dep., R. 39-1, PageID # 1709-1710 ("From both his current and prior mgt teams a fear of retaliation if anything was elevated or shared about concerns with [Gemrich's] behavior or just be transparent when asked about his leadership style.").

Gemrich's actions were clearly severe and pervasive, altered the terms and conditions of Plaintiffs' employment. A finding of summary judgment on this basis is therefore inappropriate. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 659-660 (6th Cir. 1999)(in determining whether a hostile work environment exists, courts are to consider the "totality of the circumstances."); *Thornson v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008)(summary judgment was denied where plaintiff's supervisor was preoccupied with sex talk and made unwelcome, persistent, and increasingly intimidating advances); *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334-35 (6th Cir. 2008)(summary judgment was denied where the harasser repeatedly made "graphic, personal, and sexually explicit" comments).

In fact, courts in this circuit have routinely found that similar conduct is enough to meet the severe and pervasive element of a hostile work environment claim. For example, in *Temple v. Pflugner*, 866 F. Supp. 2d 735, 741 (E.D. Ky. 2011), the Eastern District of Kentucky found a supervisor's conduct to be severe and pervasive where the plaintiff alleged sexual comments were made "constantly," "daily," and "weekly" over a four month period. In that case, the court found that the frequency and regularity of the sexually harassing comments was established that it was severe and pervasive conduct.

Additionally, this court, in *Black v. Zaring Homes*, 104 F.3d 822, 826 (6th Cir. 1997) held that "verbal conduct alone can be the basis of a successful hostile work

environment claim.". While in *Black* this Court ultimately did not find the alleged harassment to be severe and pervasive, the court did find similar conduct to be severe and pervasive in *Abeita v. TransAmerica Mailings*, 159 F.3d 246, 252 (6th Cir. 1998). The difference, this court held, was the fact that the sexual comments alleged by Abeita were "commonplace, ongoing, and continuing." *Id*. (holding that although the nature of the "specific sexual and gendered statements made by defendant Katz" appeared to equal the severity of the alleged comments made in *Black*, "plaintiff's assertion that comments like these were commonplace, ongoing, and continual establishes that the statements were more pervasive and widespread than the ones made in *Black*.").

Like the situation in *Temple*, Gemrich repeatedly and consistently subjected Plaintiffs to these comments on a weekly basis over the course of several months. Moreover, unlike the case of *Black*, Gemrich's conduct went beyond verbal conduct alone. Here, there is evidence that Gemrich cornered Pannek in the bathroom and forced Pannek to listen to Gemrich degrade a female colleague, telling Pannek how "hot" the employee's Russian accent was, and that Gemrich would "like to f**k her." (Pannek Dep., R. 35, PageID # 531-532). This is not a case of a single offhand comment made by Gemrich—Gemrich made these types of comments to Plaintiffs *at every single meeting*. And, the environment became so hostile that Pannek would routinely need to excuse himself from the meetings, would avoid Gemrich as much

as possible, and even began seeking out transfer opportunities. (Pannek Dep., R. 35, PageID # 531, 609 ("I didn't want to be near [Gemrich]. I didn't want to be in the same room as him. I don't like him."; *Id.* at PageID # 610-611 ("I was looking to get away from John Gemrich.").

This evidence, in addition to the nature and frequency of Gemrich's comments and U.S. Bank's own admission that Gemrich created "an uncomfortable work environment" (*see* Exhibits to Bolton Dep., R. 39-1, PageID 1723), is enough to raise a question of fact as to whether the alleged conduct was severe and pervasive.

### C. U.S. Bank is still liable for Gemrich's harassment under the *Faragher/Ellerth* standard.

Where harassment is attributed to a supervisor and that supervisor's behavior "culminate[d] in a tangible employment action" against an employee, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257 (1998), the "employer will…be vicariously liable." *Mack v. Otis Elevator Co.*, 326 F.3d 116, 124 (2d Cir. 2003). A tangible employment action is any action effecting a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth* at 762.

Here, despite Appellee's arguments to the contrary, Plaintiffs suffered a tangible employment action. Namely, they were terminated in retaliation for complaining about Gemrich's sexually harassing conduct—Pannek raised a formal

31

complaint, and Strotman was targeted for his association and participation in the "investigation." Thus, the affirmative defense under *Faragher-Ellerth* does not apply.

However, even in the event this Court were to agree with Appellee's argument—that Plaintiffs were not terminated in retaliation for complaining about Gemrich's harassment—U.S. Bank would still be liable for the hostile work environment claims unless it can successfully establish that it (a) exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by U.S. Bank or to otherwise avoid the harm. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275 (6th Cir. 2009), citing *Ellerth*, 524 U.S. at 765.

First, there is record evidence that U.S. Bank's response to Plaintiffs' complaints of Gemrich's harassing conduct was inadequate, to say the least, and certainly does not constitute reasonable steps to eliminate the harassment. *See Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 349 (6th Cir. 2005)("Once the employer has knowledge of the harassment, the law imposes upon the employer a duty to take reasonable steps to eliminate it.").

Despite both Plaintiffs making general references to frequent sexual comments by Gemrich during their interviews with Laurie Grey, she never followed

up on them to understand the specifics of the comments. (Strotman Dep., R. 36, PageID # 923-927; Grey Dep., R. 40, PageID # 1833-1834). Grey had options—she could have asked a male colleague to obtain the comments from Plaintiffs. She could have asked the Plaintiffs to write the comments down. She could have re-assured Plaintiffs that she is comfortable hearing the comments. But she did none of that and instead chose not to look any further. She did not even inquire to Gemrich about whether he made the comments, or the extent of them.

Grey instead chose to limit her focus of the investigation to just the "betting" incident. In fact, Grey failed to raise the harassment claims at all with Gemrich during his interview, and it took Strotman bringing up the claims himself during his interview. (Grey Dep., R. 40, PageID # 1862-1863 ("My conversation with John was focused on the bet[.]"; Strotman Dep., R. 36, PageID # 923-927 ("My impression is that she was really focused on the bet solely.")). And despite being well-aware of these claims—and even asking her colleague Diane Watson if she should follow up on them—Grey was told not to continue down that path. (Grey Dep., R. 40, PageID # 1854-1865).

At the conclusion of the investigation, Pannek was never provided any information as to the hostile work environment complaint. Instead, Pannek was asked to join a follow up phone call with Bolton and Watson, where the discussion was again solely focused on the "bet." (Watson Dep., R. 49, PageID # 2357-2358;

Exhibits to Watson Dep., R. 49-1, PageID # 2450-2454; Pannek Dep., R. 35, PageID # 665-666). During this call, Pannek again raised the issue of his harassment claims, and the complained of the fact that no one at the Bank was addressing Gemrich's inappropriate behavior. (Pannek Dep., R. 35, PageID # 668-670; Exhibits to Pannek Dep., R. 35-1, PageID # 777-781). Again, there was zero follow up from anyone on these claims, and Pannek was terminated less than two weeks later. (Watson Dep., R. 49, PageID 2359-2360, 2363-2364).

U.S. Bank's references to the written warning issued to Gemrich likewise do not establish *as a matter of* law that they exercised reasonable care to prevent further harassment. In fact, less than a year after Gemrich received the written warning related to Plaintiffs' claims, Gemrich was subject to another complaint investigation, and was ultimately terminated from the Bank. Part of this complaint included allegations that Gemrich was "practicing favoritism," "retaliating against one of his managers," making "unfair decisions in the handling of the RIF process and PGAs," and "[d]ue to a specific comment made by Gemrich during the RIF process, there was also a fear some of Gemrich's decisions were gender-based." (Exhibits to Bolton Dep., R. 39-1, PageID # 1723-1724).

Because the 2018 written warning was not targeted to end Gemrich's harassment, and Gemrich was in fact rewarded with additional responsibilities and direct reports, the Bank permitted Gemrich to continue this type of sexist, retaliatory,

and harassing behavior, leading to this second complaint in 2018 and ultimately, Gemrich's termination in 2019.

Given questions of fact the adequacy of U.S. Bank's response or lack thereof to Plaintiffs' complaints of sexually harassing conduct, the hostile work environment claims are likewise inappropriate for summary judgment particularly based upon an affirmative defense on which U.S. Bank owes the burden of proof.

## III.    Pannek's ADEA discrimination claims survive summary judgment

U.S. Bank's opposition claims Pannek cannot make a prima facie ADEA case because he has "no direct, circumstantial or statistical evidence tending to indicate that U.S. Bank singled him out for discharge because of his age." Yet, the bank goes on to offer arguments in response to that very evidence, namely: (1) evidence that Pannek was in fact compared with Alyson Roberts, a substantially younger employee, for retention in a vendor management role; (2) evidence that the decisionmaker Bryan Bolton filed to follow a mandatory Reduction in Force policy at U.S. Bank (the PGA Process) when making this decision; (3) evidence that Pannek had superior qualifications, while Roberts was uniquely unqualified for the role. For purposes of this reply brief, Plaintiffs will primarily address those arguments, but submits that they are the very evidence to make a *prima facie* case of age discrimination in this context.

First, U.S. Bank points to various after-the-fact testimony from Bolton "had a very high opinion" of Roberts, that she was "extraordinary" and "a superstar." But these are nothing more than subjective factors based on the perceptions of the decisionmaker in after-the fact testimony, which are subject to closer scrutiny from this court. *See Grano v. Dep't of Dev.*, 699 F.2d 836, 837 (6th Cir. 1983)("Courts have frequently noted that subjective evaluation processes intended to recognize merit provide ready mechanisms for discrimination. Moreover, the legitimacy of the articulated reason for the employment decision is subject to particularly close scrutiny where the evaluation is subjective[.]"). That is particularly so given the objective evidence of Plaintiffs' superior qualifications including his 35 years of experience in banking/risk management.

Second, U.S. Bank argues that any criticism of Bolton's PGA scoring of Pannek and Roberts for termination is "flat wrong" and that Bolton testimony that he simply filled in scores based on "what I had learned over those couple of months" is appropriate (Bolton Dep. R. 39, PAGEID # 1661-1662). But Bolton never identified job-specific skillsets from a required PGA list, never provided scores relating to those specific skillsets nor a basis for the scores, never reviewed performance reviews, never reviewed licenses or certifications, or took any of the other required steps in the process before filling in numbers and finalizing the forms.

Further, the evidence indicates that by the time Bolton conducted the PGA, he had already made a decision to terminate Plaintiff. (Exhibits to Watson Dep., R. 49-1, PageID # 2438-2440). U.S. Bank's claim that "Pannek offers no evidence to prove that this method was improper" is belied by its own policies and testimony.

In sum, there is evidence to establish a prima facie case of age discrimination including that Pannek was in fact compared to a substantially younger employee for job retention. There is also evidence that the basis for Plaintiff's termination, reduction in force pursuant to U.S. Bank's peer group analysis (PGA) process is a pretext for age discrimination, including the complete failure to follow that process and the superior qualifications of Plaintiff.

## IV.    Conclusion

For the foregoing reasons, Appellants Mark Pannek and Thomas Strotman respectfully request that this Court reverse the District Court's summary judgment decision in its entirety, and remand the case for trial.

                        Respectfully submitted,

                        /s/ Bailey E. Sharpe

Joshua M. Smith (0092360)
Peter A. Saba (0055535)
Bailey E. Sharpe (0103565)
SSP LAW CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
jms@sspfirm.com
**Attorneys for Plaintiffs-Appellants**

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(b)

In accordance with Rule 37(g), I certify that this brief complies with the type-volume requirements of Rule 32(a)(7)(b)(i). As determined by the word-count function of Microsoft Word, this brief contains 8,060 words.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and accurate copy of the foregoing was served electronically through the Court's electronic case filing system upon Patricia Anderson Pryor, Esq., and Patricia K. Gavigan, Esq., Jackson Lewis P.C., 201 E. Fifth Street, 26th Floor, Cincinnati, Ohio 45202, this 17th day of February, 2026.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)

**ADDENDUM # 1**

**DESIGNATION OF RELEVANT DOCUMENTS**

| Docket Entry Number | Description | PAGEID# and Range |
|---|---|---|
| 35 | Deposition of Plaintiff Mark Pannek | 528-533, 542-543, 546, 550-552, 558-559, 566-567, 569, 572, 609-611, 645-646, 665-666, 668-670 |
| 35-1 | Exhibits to Deposition of Mark Pannek | 777-781 |
| 36 | Deposition of Plaintiff Thomas Strotman | 839-840, 868, 874-878, 899-904, 923-927, 979-988 |
| 37 | Deposition of John Gemrich | 1145-1148, 1215-1216 |
| 37-1 | Exhibits to Deposition of John Gemrich | 1262-1270 |
| 38 | Deposition of Alyson Roberts | 1385 |
| 39 | Deposition of Bryan Bolton | 1475-1476, 1501, 1524-1525, 1661-1664, 1672-1674 |
| 39-1 | Exhibits to Deposition of Bryan Bolton | 1709-1710, 1723-1724, 1738, 1751 |
| 40 | Deposition of Laurie Grey | 1833-1834, 1854-1865, 1875 |
| 42 | Deposition of Lydia Buster | 1990-1991, 1993-1994, 1998-2001 |
| 43-2 | Declaration of Bryan Bolton | 2096-2097 |
| 48 | Deposition of David Little | 2170 |
| 49 | Deposition of Diane Watson | 2332-2333, 2337, 2341, 2357-2360, 2363-2364, 2388 |
| 49-1 | Exhibits to Deposition of Diane Watson | 2438-2441, 2443, 2450-2454 |

| 50 | Plaintiffs' Memorandum in Opposition to Defendant US Bank's Motion for Summary Judgment | 2517-2518 |
|---|---|---|
| 50-1 | Declaration of Plaintiff Thomas Strotman | 2532, 2534-2535 |
| 50-2 | Declaration of Plaintiff Mark Pannek | 2536-2539 |
| 50-3 | Declaration of Joshua M. Smith | 2540 |
| 59 | Opinion & Order Granting Defendant's Motions for Summary Judgment | 2715-2719, 2722 |
| 27 | Appellee's Brief | 26, 30-31, 36, 40-42, 47, 50-51 |