No. 25-3706

---

**In the United States Court of Appeals for the Sixth Circuit**

MARK PANNEK; THOMAS STROTMAN,

*Plaintiffs-Appellants,*

v.

U.S. BANK NATIONAL ASSOCIATION,

*Defendant-Appellee.*

On Appeal from the District Court for the Southern District of Ohio
(Case No. 1:19-cv-00852)

# PETITION FOR PANEL REHEARING AND REHEARING EN BANC OF DEFENDANT-APPELLEE

Patricia Anderson Pryor
Patricia K. Gavigan
**JACKSON LEWIS P.C.**
201 E. 5th Street, 26th Floor
Cincinnati, Ohio 45202
Telephone: (513) 898-0050
Fax: (513) 898-0051

*Counsel for Defendant-Appellee*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

STATEMENT REQUIRED BY RULE 40(b)(2) ..... 1

SUMMARY OF THE CASE ..... 3

ARGUMENT ..... 7

A. The Majority's Decision Contains Errors of Law and Fact; The Decision was in Process before any Protected Activity (Regardless of how that is Defined) ..... 7

1. The Majority Erred in Ignoring Bolton's Undisputed Testimony that the Decision was Made in February/March (Before any Potential Protected Activity) ..... 8

2. The Majority Erred in Finding U.S. Bank Failed to Follow Self-Imposed Rules and Failed to Follow Sixth Circuit Precedent. ..... 9

3. The Majority Erred in Relying on When the Decision Was Finalized and Failed to Follow Supreme Court and Sixth Circuit Precedent. ..... 11

B. The Majority Finding that U.S. Bank Forfeited Arguments Is Contrary to Fact and Law ..... 14

C. The March 27 Ethics Complaint Cannot Be the Basis for Causal Connection or Temporal Proximity Because it is Not Protected Activity As a Matter Of Law, and U.S. Bank Had No Knowledge of Protected Activity at the Time of Bolton's April 2 Email Confirming His Intent to Terminate Plaintiffs ..... 16

CONCLUSION ..... 18

CERTIFICATE OF COMPLIANCE ..... 19

CERTIFICATE OF SERVICE ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Booker v. Brown & Williamson Tobacco Co.*,
879 F.2d 1304 (6th Cir. 1989) ....................1, 17

*Clark County Sch. Dist. v. Breeden*,
532 U.S. 268 (2001) (per curiam) ....................1, 11

*Jones v. St. Jude Med. S.C., Inc.*,
823 F. Supp. 2d 699 (S.D. Ohio 2011) ....................10

*Montell v. Diversified Clinical Servs., Inc.*,
757 F.3d 497, 507 (6th Cir. 2014) ....................12

*Reynolds v. Federal Express Corp.*,
544 Fed. Appx. 611 (6th Cir. 2013) ....................13

*Tharp v. Apel Int'l, LLC*,
2022 U.S. App. LEXIS 21050 (6th Cir. July 28, 2022) ....................1, 11, 12

*United States v. Shultz*,
733 F.3d 616 (6th Cir. 2013) ....................2, 15

*University of Tex. Southwestern Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) ....................1, 7, 13

*White v. Columbus Metro. Hous. Auth.*,
429 F.3d 232 (6th Cir. 2005) ....................10

*Yazdian v. ConMed Endoscopic Technologies, Inc.*,
793 F.3d 634 (6th Cir. 2015) ....................1, 16, 17

**Other Authorities**

6 Cir. R. 40(a) ....................1, 19

Fed. R. App. P. 32(a)(5) ....................19

Fed. R. App. P. 32(a)(6) ....................19

Fed. R. App. P. 32(f) ....................19

Fed. R. App. P. 40(b)(2) ....................19

## STATEMENT REQUIRED BY RULE 40(b)(2)

Defendant-Appellee U.S. Bank National Association ("U.S. Bank") respectfully requests rehearing by the panel and rehearing en banc because the panel majority's decision reversing summary judgment on the Title VII retaliation claim (attached herewith as **Exhibit A** pursuant to 6 Cir. R. 40(a)) conflicts with decisions of the Supreme Court of the United States and this Court. As such, an en banc review is necessary to ensure uniformity and conformity. The Court has not previously expedited this matter for review.

Specifically, the panel majority's decision conflicts with U.S. Supreme Court precedent in *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (per curiam), and *University of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), and this Court's decision in *Tharp v. Apel Int'l, LLC*, 2022 U.S. App. LEXIS 21050 (6th Cir. July 28, 2022), which hold that temporal proximity is not evidence of causation when an employer proceeds along lines previously contemplated. Furthermore, the majority decision conflicts with *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634 (6th Cir. 2015) and *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304 (6th Cir. 1989), pursuant to which to the extent a causal connection is being attached to Pannek's March 27 ethics complaint, it is too vague to constitute protected activity.

Additionally, the majority's finding that U.S. Bank forfeited its arguments as to when Plaintiffs engaged in purported protected activity and U.S. Bank's knowledge of it is inconsistent with the record evidence and the Court's forfeiture principle as set forth in *United States v. Shultz*, 733 F.3d 616, 619 (6th Cir. 2013).

## SUMMARY OF THE CASE

This case involves a Title VII retaliation claim brought by two former employees of U.S. Bank. The District Court granted summary judgment in favor of U.S. Bank on all claims. This Court affirmed as to the hostile work environment and ADEA claims, but a divided panel reversed on the Title VII retaliation claim. Judge Batchelder authored a detailed dissent explaining why the majority erred in reversing on the retaliation claim.

U.S. Bank seeks rehearing from the panel and rehearing en banc solely on the panel's reversal of summary judgment on the Title VII retaliation claim. U.S. Bank does not seek rehearing on the hostile work environment or ADEA claims.

The essential facts are straightforward. In early 2018, U.S. Bank underwent a reorganization and merged its lending and mortgage divisions to form the CBSS Servicing Group. (Strotman Dep., R. 36, PageID #908; Strotman Dep., R. 36-1, PageID #1009-1012; Pannek Dep., R. 35, PageID #596-597; Pannek Dep., R. 35-1, PageID #758-759). Plaintiffs, who both had been employed less than a year, began reporting to Bryan Bolton, Senior Vice President and Chief Administrative Officer. (Strotman Dep., R. 36, PageID #909-910; Pannek Dep., R. 35, PageID #599). Almost immediately upon assuming responsibility for the combined group, Bolton began evaluating his new organization for synergies and redundancies in order to determine who could be terminated. (Bolton Dep., R. 39, PageID #1474-1475). He met with his

direct reports to identify best practices and observe how his direct reports worked together. (Bolton Dep., R. 39, PageID #1477-1480).

Bolton testified that he made the preliminary decision to terminate both Pannek and Strotman in February and March 2018. (Bolton Dep., R. 39, PageID #1508, 1527, 1530, 1652-1653; Bolton Dep., R. 39-1, PageID #1737-1738; Bolton Decl., R. 43-2, PageID #2097, ¶¶ 10-11). There is no dispute of this. On February 22, 2018, Bolton emailed Alyson Roberts about transferring Pannek's direct reports to her team. (Bolton Dep., R. 39-1, PageID #1737-1738). Bolton solicited feedback from others in February and March 2018 about the reorganization and Plaintiffs' roles, including from Plaintiffs directly. (Bolton Dep., R. 39, PageID #1484-1485, 1510-1512; Pannek Dep., R. 35, PageID #615-616; Strotman Dep., R. 36, PageID #938-939).

On March 27, 2018, Pannek filed a complaint against John Gemrich, who also reported to Bolton, with U.S. Bank's ethics hotline. (Pannek Dep., R. 35, PageID #634-637; Pannek Dep., R. 35-1, PageID #766-768). The three-page report focused solely on: (1) a betting and gambling incident, (2) Gemrich's aggressive management style, (3) requiring employees to work on vacation days, and (4) humiliating employees by reprimanding them and "pulling rank." Notably, the report did not contain any allegations regarding sex or any other protected characteristic. Pannek used the phrase "hostile work environment" solely in reference to Gemrich's

betting behavior and aggressive management—not in connection with any allegation of discrimination. (*Id.*).

On April 2, 2018, Bolton sent an email to HR confirming his intent to terminate Plaintiffs and “include them in the severance exercise.” (Watson Dep., R. 49-1, PageID #2440). U.S. Bank did not learn of Pannek’s sexual harassment allegations against Gemrich until April 16 and 17, 2018, when investigator Laurie Grey interviewed Plaintiffs relating to Pannek’s March 27 complaint. (Bolton Dep., R. 39, PageID #1556; Grey Dep., R. 40, PageID #1832-1836, 1882-1883). Plaintiffs were terminated, as planned by Bolton before any complaint was made, as part of a reduction in force on May 15, 2018. (Pannek Dep., R. 35, PageID #617, 619-620; Strotman Dep., R. 36, PageID #844). Other employees who did not engage in protected activity were also terminated in the RIF. (Strotman’s Proposed Undisputed Facts, R. 50-4, PageID #2583, ¶ 36).

The District Court granted U.S. Bank summary judgment on all claims. On the retaliation claim, the court found that even assuming Plaintiffs established a *prima facie* case, they failed to demonstrate pretext. The majority of the assigned panel of this Court reversed on Plaintiffs’ retaliation claim, finding genuine issues of material fact. Judge Batchelder dissented, concluding that Plaintiffs could not make out a *prima facie* case of retaliation, and even if they could, no reasonable jury could find but-for causation because Bolton’s termination decision had already been

contemplated and was in motion well before any protected activity occurred or was known to U.S. Bank.

For the reasons set forth below, the majority's decision conflicts with established precedent and the undisputed facts in this case. U.S. Bank therefore requests that its petition for rehearing and rehearing en banc be granted.

## ARGUMENT

### A. The Majority's Decision Contains Errors of Law and Fact; The Decision was in Process before any Protected Activity (Regardless of how that is Defined)

U.S. Bank respectfully requests a panel rehearing and/or en banc rehearing to correct errors of law and fact in the majority opinion and to ensure uniformity among this Court and Supreme Court authority. Allowing the decision to remain runs counter to the United States Supreme Court's decision in *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), where the Supreme Court made clear that the heightened causation standard in retaliation claims is important to prevent the filing of frivolous claims and to allow dubious claims to be dismissed at summary judgment. *Id.* at 358-59. As the Supreme Court explained in *Nassar*, the law requires that plaintiffs establish that "but for" their protected activity they would not have been terminated. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").

The Majority opinion places form over substance to reach its result, ignoring *Nassar* and other decisions of the Supreme Court and this Court.

### 1. The Majority Erred in Ignoring Bolton's Undisputed Testimony that the Decision was Made in February/March (Before any Potential Protected Activity)

As U.S. Bank pointed out both at the lower court and before this Court, there simply is no causation here, let alone "but for" causation, whether considered at the *prima facie* stage or the pretext stage. It is undisputed that the decisionmaker (Bolton) not only had already made the preliminary decision to terminate both Pannek and Strotman in February/March 2018, but had already taken steps to do so, including emailing Alyson Roberts about transferring Pannek's direct reports to her team. (Bolton Dep., R. 39, PageID #1508, 1527, 1530, 1652-1653; Bolton Dep., R. 39-1, PageID #1737-1738; Bolton Decl., R. 43-2, PageID #2097, ¶¶ 9-11). The majority's opinion that this email does not show that Pannek was going to be terminated, ignores Bolton's testimony and misses the point – the email is entirely consistent and supports the undisputed testimony by Bolton that he had already made the decision to terminate them (and what else would there be for Pannek to do if his direct reports are removed from him?). That others, including Bolton's manager, were not aware of this does not create an issue of fact as there is no evidence that they should have been aware at that point.[1] Bolton was a Senior Vice President and

[1] Lydia Buster testified that "when we moved under Bryan Bolton [in early 2018], it was very apparent to me that a consolidation was happening and that there would be jobs that would be eliminated from that." (Buster Dep., R. 42, PageID # 1985). Laurie Grey also testified knowing that terminations were going to occur. (Grey Dep., R. 40, PageID #1876-1877)

Chief Administrative Officer. (Bolton Dep., R. 39, PageID #1464). David Little, Bolton's manager, testified that he was not involved and that his direct reports (like Bolton) decided on position eliminations on their own, without any direction. (Little Dep., R. 48, PageID #2171-2172).

### 2. The Majority Erred in Finding U.S. Bank Failed to Follow Self-Imposed Rules and Failed to Follow Sixth Circuit Precedent.

Similarly, that a PGA was not completed in February/March when the decision was being made, only shows that Bolton's decision not to strictly use that process (which was not mandatory for this level) occurred before any alleged protected activity. Moreover, Human Resources testified that the PGA process was not mandatory particularly for employees in higher level roles with multiple responsibilities, like Pannek and Strotman. (Watson Dep., R. 49, PageID # 2338-2339). The majority relied on Grey with respect to her "oh gosh" testimony about what she believed the timing of the PGA process was, but ignored that Grey admitted she was not involved in the decisions at issue here, and also ignored her testimony that the PGA is used when employees are in the same job. (Grey Dep., R.40, #1876-1877, 1906). (Like Watson's testimony, this shows that the PGA was not required here because there is no evidence that others were in the same job as Pannek or Strotman – the duties from their high-level roles were redistributed to multiple employees in different roles and areas). Little testified that he was not aware of any

of his direct reports using a PGA, so it cannot be evidence of retaliation that he was not aware of one here. (Little Dep., R. 48, PageID #2175). There is simply no evidence that U.S Bank failed to follow any self-imposed rules, but even if there were, this Court has held that is not enough to show pretext. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005). As Judge Batchelder explained, procedural irregularities do not evidence retaliation where the decision-maker was "haphazardly executing a 'previously contemplated' plan." (Doc. 33-2 Page 24). And in this case there is no "constellation of evidence" to support a finding of pretext.

There is no evidence of any retaliatory motive by Bolton. The complaint was not about him, he never made any negative comments about it, the complaint was investigated and Gemrich was disciplined. Plaintiffs were treated the same as others who had not engaged in protected activity but were also terminated as part of the reorganization/RIF. (Strotman's Proposed Undisputed Facts, R. 50-4, ¶ 36). And other employees who also complained about Gemrich were not terminated. (Pannek Dep., R. 35, PageID #529, 556-557, 589; Buster Dep., R. 42, PageID #1988 (Buster and Markesbery complained to HR about Gemrich). This belies any suggestion that the RIF was some pretextual ruse created as a discriminatory mechanism for Plaintiffs' terminations. *See, e.g., Jones v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 750 (S.D. Ohio 2011) (employer entitled to summary judgment on retaliation

claim where Plaintiff was unable to establish pretext because other employees who had not engaged in protected conduct were also selected for the RIF).

### 3. The Majority Erred in Relying on When the Decision Was Finalized and Failed to Follow Supreme Court and Sixth Circuit Precedent.

As discussed above, it is undisputed that Bolton had already decided to terminate Pannek and Strotman in February/March 2018. The February email discussing removing job duties from Pannek supports this, Buster's testimony that she was aware terminations were coming as soon as Bolton took over, supports this. There is not one piece of evidence that contradicts this.

The majority's reliance on when the termination was finalized in order to establish causation directly conflicts with the Supreme Court's decision in *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (per curiam).

In *Breeden*, the Supreme Court held that an employer's "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." 532 U.S. at 272. This Court applied *Breeden* in *Tharp v. Apel Int'l, LLC*, 2022 U.S. App. LEXIS 21050 (6th Cir. July 28, 2022) and similarly held that temporal proximity between protected activity and an adverse action is not evidence of causation when the employer was already proceeding along lines previously contemplated. 2022 U.S. App. LEXIS 21050, at *8 ("[W]e have held that causation is lacking when an employer follows a pre-existing line of action

regardless of the employee's protected action"). The *Tharp* court reasoned that this principle is intended to prevent the U.S. Supreme Court's concern that "employees who see the proverbial writing on the wall that they are about to be fired should not be able to use Title VII protections to insulate themselves from adverse employment actions that were previously contemplated." *Id.* (quoting *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014)). In this case, U.S. Bank's reorganization occurred in early 2018 and Bolton had been gathering information to make related employment decision and modifications since February 2018 – several weeks before Plaintiffs made any complaints. Plaintiffs knew this and had participated in these discussions with Bolton. In other words, the "the proverbial writing was on the wall" regarding Plaintiffs' future employment at U.S. Bank. Bolton testified throughout his deposition that he had decided in February/March 2018 that Pannek and Strotman would be terminated. (Bolton Dep., R. 39, PageID #1508, 1527, 1530, 1652-1653).

The undisputed timeline demonstrates that Bolton was contemplating terminating Plaintiffs well before any protected activity (even if the March 27 ethics complaint was considered protected activity).

The majority contends that causation is established because Bolton did not make his "final determination" until after Pannek's ethics complaint. This reasoning is flawed, as the above cases establish. Bolton's "final determination" is not the

relevant point in time for the causation analysis. The fact that Bolton continued to gather information, follow procedural steps, complete the Peer Group Analysis ("PGA"), and made his decision "final" after the March 27 complaint is not evidence of causation—it merely shows consistency and execution of a decision that had already been contemplated and was in the works for weeks, if not longer. *See Reynolds v. Federal Express Corp.*, 544 Fed. Appx. 611, 615 (6th Cir. 2013) (no temporal proximity causation where employer contemplated termination before protected activity).

Title VII retaliation requires that a desire to retaliate was the but-for cause of the adverse action. *Nassar*, 570 U.S. at 358. Where, as here, the decision-maker was proceeding along lines previously contemplated before any protected activity occurred and/or was known to the employer, no reasonable jury could find but-for causation. The majority's decision to the contrary is inconsistent with established law. The timing evidence in this case cuts against Plaintiffs. Bolton had already preliminarily made the decision that Pannek and Strotman would be eliminated before even the ethics complaint. And his communication of that decision on April 2 occurred at least two weeks before Bolton became aware of any Title VII protected activity.[2] This is not a case where suspicious timing suggests retaliation; it is a case

[2] U.S. Bank has consistently argued that the March 27 complaint could not be used to establish temporal proximity or pretext, because the March 27 complaint did not constitute protected activity. It did not include any allegations of sex based

where the chronology demonstrates that the employment decision was already in motion before any protected activity or knowledge of it occurred. Plaintiff has not established causation, let alone "but-for" causation.

### B. The Majority Finding that U.S. Bank Forfeited Arguments Is Contrary to Fact and Law

The majority opinion erred in finding that U.S. Bank forfeited an argument that the March 27 ethics complaint was not protected activity. U.S. Bank did not argue at the *prima facie* case stage that there was ***no*** protected activity, because there was arguably protected activity when Plaintiffs were interviewed as part of the investigation in mid to late April. But U.S. Bank has consistently argued that the Court cannot use the March 27 ethics complaint to establish causal connection because neither Bolton nor U.S. Bank were aware that that complaint was intended to raise a claim under Title VII. In its appellate brief, U.S. Bank stated:

> Upon review of the email, however, it is clear that it does not support their claim for retaliation. First, this email was sent weeks *before* Strotman engaged in protected activity. And at the time of the email neither Bolton nor U.S. Bank was aware of Pannek's later allegations that Gemrich was discussing his personal sex life. The written complaint that U.S. Bank received from its third-party hotline provider did not include any allegations of sex based comments[,] (See Bolton Dep. Ex. 2, RE 39 1, PageID #1706-08), and U.S. Bank only

---

comments or activity in violation of Title VII. (Pannek Dep., R. 35-1, PageID #766-768). In fact, there is not a single reference to sex, gender, or any other protected characteristic anywhere in the three-page report. Regardless, Bolton had already contemplated and preliminarily decided to terminate Plaintiffs before the March 27 complaint. There is no causal connection or pretext based on temporal proximity.

> learned of such allegations when Grey interviewed Pannek on April 16 (after Bolton's email). (See Grey Dep. Ex. 4, RE 40-1, PageID #1930)[.]

(U.S. Bank's Appellate Brief, Doc. 27, PageID #37).

Likewise, U.S. Bank argued that the ethics hotline call did not constitute protected activity and that U.S. Bank lacked knowledge of purported protected activity at the time of Bolton's April 2 email in its summary judgment reply briefs:

> Upon review of the email, however, it is clear that it does not support Pannek's claim for unlawful retaliation. First, there is no evidence that Bolton even knew of Pannek's allegation that Gemrich discussed his personal sex life at that time that he drafted the email. The written complaint that U.S. Bank received from its third-party hotline provider did not include any allegations of sex-based comments (see Bolton Dep. Ex. 2, Doc # 39-1 at PageID 1706-08.), and U.S. Bank only learned of such allegations when Grey interviewed Pannek on April 16. (See Grey Dep. Ex. 4 p. 1, Doc # 40-1 at PageID 1930.)[.]

(U.S. Bank's Summary Judgment Reply to Pannek, R. 53, PageID #2659). *See also* U.S. Bank's Summary Judgment Reply to Strotman, R. 54, PageID #2680–2681.

The majority's reliance on the party presentation principle does not apply here because U.S. Bank *did* make and preserve these arguments both in its summary judgment briefs and its appellate brief. And Plaintiffs have forfeited any forfeiture argument as they had an opportunity to argue in their appeal that U.S. Bank forfeited these arguments by failing to raise them until its reply briefs. But they never did. Under this Court's precedent, Plaintiffs have "forfeited the [purported] forfeiture." *United States v. Shultz*, 733 F.3d 616, 619 (6th Cir. 2013). Thus, the majority's finding that U.S. Bank forfeited its arguments as to protected activity and employer

knowledge directly contravenes the record evidence and established precedent and warrants rehearing.

### C. The March 27 Ethics Complaint Cannot Be the Basis for Causal Connection or Temporal Proximity Because it is Not Protected Activity As a Matter Of Law, and U.S. Bank Had No Knowledge of Protected Activity at the Time of Bolton's April 2 Email Confirming His Intent to Terminate Plaintiffs

The majority's decision to find a *prima facie* case is also belied by its own decision. This Court stated: "Pannek's ethics complaint focused on the betting incident. Pannek only cursorily asserted that Gemrich 'created a hostile work environment,' without adding any information about Gemrich's sexual comments." (Doc. 33-2, page 16) In *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 646 (6th Cir. 2015), the Court explained that the term "hostile work environment" qualifies as protected activity only "when the context objectively reveals that the employee is using the expression to complain about repeated abusive discriminatory comments or treatment." *Id.* Without more, using the phrase alone does not rise to the level of protected activity. Indeed, as Judge Batchelder observed in the dissent, and as the majority opinion itself establishes, the context here reveals precisely the opposite. The uses of "hostile work environment" in Pannek's hotline complaint were specifically made in the context of non-Title VII comments around betting and reprimanding employees. (Pannek Dep., R. 35-1, PageID #766).

The majority's contrary conclusion cannot be squared with this Court's precedent or its own decision. As this Court has determined, a "vague charge of discrimination" is insufficient to support a Title VII retaliation claim. *Yazdian*, 793 F.3d at 645 (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313-14 (6th Cir. 1989)). Here, Pannek's ethics report did not contain a charge of discrimination at all. The Majority opinion expressly recognizes this and calls Pannek's complaint "vague." (Doc. 33-2, page 16). Because the Court itself recognizes that Pannek's complaint is "vague" it cannot form the basis of a retaliation claim. Pannek did not engage in protected activity on March 27 when he made his ethics complaint and as U.S Bank argued throughout this case, it cannot be used to establish a causal connection.

Because there was no protected activity on March 27, it is axiomatic that U.S. Bank had no knowledge of any protected activity prior to Bolton's April 2 email confirming his intent to terminate Plaintiffs. Bolton also testified that he was made aware of complaints regarding Genrich's alleged discriminatory behavior as a result of the April 16 and 17 HR investigation, which occurred after his April 2 email. (Bolton Dep., R. 39, PageID #1556).

The majority's analysis fails to grapple with this threshold problem. Even accepting that protected activity occurred at some point, the record is devoid of evidence that U.S. Bank knew about it before Bolton expressed his intent to

terminate Plaintiffs in his April 2 email. Therefore, the majority's reversal of summary judgment on Plaintiffs *prima facie* Title VII retaliation claim was err and contrary to law.

## CONCLUSION

For the foregoing reasons, Defendant-Appellee U.S. Bank National Association respectfully requests that this Court grant a panel rehearing and rehearing en banc, vacate the panel majority's opinion on the Title VII retaliation claim, and restore the case to the Court's docket for rehearing.

Respectfully submitted,

/s/ Patricia Anderson Pryor
Patricia Anderson Pryor
Patricia K. Gavigan
**JACKSON LEWIS P.C.**
201 E. 5th Street, 26th Floor
Cincinnati, Ohio 45202
Telephone: (513) 898-0050

*Counsel for Defendant-Appellee*
*U.S. Bank National Association*

## CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limitation of Fed. R. App. P. 40(b)(2) and 6 Cir. R. 40(a) because it contains 3,896 words, excluding the parts of the petition exempted by Fed. R. App. P. 32(f).

This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Patricia Anderson Pryor
Patricia Anderson Pryor
Counsel for Defendant-Appellee

Dated: August 21, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2026, I electronically filed the foregoing Petition for Panel Rehearing and Rehearing En Banc with Court's CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Patricia Anderson Pryor
Patricia Anderson Pryor
Counsel for Defendant-Appellee
U.S. Bank National Association

4897-9338-4393, v. 1

# EXHIBIT
# A

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0224p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MARK PANNEK; THOMAS STROTMAN,
*Plaintiffs-Appellants*,

*v*.

U.S. BANK NATIONAL ASSOCIATION,
*Defendant-Appellee*.

No. 25-3706

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:19-cv-00852—Jeffery P. Hopkins, District Judge.

Argued: June 3, 2026

Decided and Filed: August 7, 2026

Before: BATCHELDER, GRIFFIN, and MATHIS, Circuit Judges.

## COUNSEL

**ARGUED:** Joshua M. Smith, SSP LAW CO., L.P.A., Cincinnati, Ohio, for Appellants. Patricia Anderson Pryor, JACKSON LEWIS P.C., Cincinnati, Ohio, for Appellee. **ON BRIEF:** Joshua M. Smith, Peter A. Saba, Bailey E. Sharpe, SSP LAW CO., L.P.A., Cincinnati, Ohio, for Appellants. Patricia Anderson Pryor, Patricia K. Gavigan, JACKSON LEWIS P.C., Cincinnati, Ohio, for Appellee.

MATHIS, J., delivered the opinion of the court in which GRIFFIN, J., concurred, and BATCHELDER, J., concurred except as to section III.A. BATCHELDER, J. (pp. 19–26), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

MATHIS, Circuit Judge. This case involves several claims brought by Mark Pannek and Thomas Strotman against their former employer, U.S. Bank National Association. They allege that U.S. Bank violated Title VII of the Civil Rights Act of 1964 by retaliating against them after Pannek filed an ethics complaint against their former supervisor. They also assert that U.S. Bank violated Title VII by subjecting them to a hostile work environment through sexual harassment. Pannek further contends that U.S. Bank violated the Age Discrimination in Employment Act (ADEA) by replacing him with a younger colleague. The district court granted summary judgment to U.S. Bank on all claims. For the reasons discussed below, we affirm in part and reverse in part.

**I.**

In January 2017, U.S. Bank hired Thomas Strotman as its vice president of governance control for the Consumer Banking Default Management Group. In that role, he oversaw U.S. Bank's risk control programs. Six months later, Strotman recruited a former colleague, Mark Pannek, to serve as U.S. Bank's vice president of third-party risk for consumer lending services. Pannek reported to Strotman, and his responsibilities included verifying that U.S. Bank's vendors and other business partners had controls in place to protect the bank from risks associated with regulatory compliance, data security, and other potential liabilities.

In fall 2017, U.S. Bank reorganized its consumer lending division, which included Pannek and Strotman. Because of this reorganization, Pannek and Strotman began reporting to John Gemrich, U.S. Bank's senior vice president of quality control. According to Pannek and Strotman, Gemrich shared with them explicit details about his sex life while he was their supervisor.

During a team meeting in February 2018, Gemrich disagreed with Pannek about how much a third-party audit would cost the company. Gemrich suggested they place bets on which estimate would be correct, telling Pannek, "Put some money on it. Put your money where your

mouth is." R. 35, PageID 537. When Pannek resisted, Gemrich allegedly belittled him and started clucking like a chicken. Pannek says he became worried about the potential repercussions if he did not agree to the bet. So Pannek agreed and, in the end, Gemrich was correct about the cost estimate. Pannek gave Gemrich a $150 gift card to resolve their wager.

Around the same time, U.S. Bank underwent a second reorganization. U.S. Bank merged its lending and mortgage divisions to form the CBSS Servicing Group. As a result, Pannek, Strotman, and Gemrich began reporting to Bryan Bolton, U.S. Bank's senior vice president and chief administrative officer.

During this reorganization, Bolton contemplated transferring several of Pannek's direct reports to Alyson Roberts, another employee in the CBSS Servicing Group. He also began conducting a "synergy exercise," which largely consisted of meetings with his direct reports to discuss their teams and workflow. R. 39, PageID 1479. The goal of the exercise, according to Bolton, was to identify best practices and ensure that teams with related responsibilities approached their work in a similar fashion. He also believed that this was a chance to observe how his direct reports worked together. The last of these group meetings occurred in April 2018.

The parties dispute whether the synergy exercise could result in terminations. U.S. Bank contends that Bolton evaluated the CBSS Servicing Group for duplication of functions to consolidate them so that the group could operate more efficiently. Whereas Pannek and Strotman assert that no discussions occurred about employees being recommended for termination or positions being eliminated because of the synergy exercise.

Meanwhile, in March 2018, U.S. Bank held an employee training about appropriate workplace conduct. U.S. Bank requires its employees "to maintain a work atmosphere free of discrimination, harassment, intimidation and unwelcome, offensive or inappropriate conduct." R. 40-1, PageID 1919. Its workplace respect policy prohibits employees from engaging in sexual harassment and, more broadly, any conduct that "denigrates or shows hostility or aversion" to others because of race, gender, or age, among other traits. *Id.* Employees can report inappropriate conduct in various ways, including by contacting U.S. Bank's ethics hotline. After U.S. Bank receives a complaint, it will investigate the allegations and take disciplinary action as

appropriate. And, according to its policy, U.S. Bank does not tolerate retaliation against any employee who reports harassment in good faith.

On March 27, after attending the workplace training, Pannek reported Gemrich for his behavior by calling the ethics hotline and submitting a complaint. Pannek's complaint focused on the betting incident. He also claimed that Gemrich's inappropriate behavior "created a hostile work environment." R. 39-1, PageID 1706.

Two days later, HR business partner Diane Watson contacted Bolton to discuss Pannek's complaint. And a few days after their discussion, Bolton emailed Watson about "HR Related Concerns." R. 49-1, PageID 2438.

In the email, Bolton discussed Pannek and Strotman. He described them as "very close" and "worried about their jobs in this new organization." *Id.* He also mentioned that they had been reluctant to share information with him about their operations. For these reasons, Bolton "question[ed] the timing" of the ethics complaint. *Id.* He believed Pannek filed it out of concern about his future at U.S. Bank. And Bolton said he "wouldn't be surprised to see [Strotman] take a similar tac[k]." *Id*. Finally, Bolton signaled that he would be firing Pannek and Strotman soon and that the "leadership concerns [he] ha[d] with both of them [were] valid and mutually exclusive of any complaints filed or potentially filed." *Id*.

After sharing his plans to fire Pannek and Strotman, Bolton conducted a peer group analysis (PGA). According to U.S. Bank's policy, a PGA "must be completed where there are two or more employees in the position being considered for elimination, but not all employees in the job will be severed." *Id.* at 2441. Typically, a PGA is completed at the start of the reduction-in-force process and before a termination decision has been made. U.S. Bank requires that the PGA be completed so "that employees are evaluated and ranked consistently against criteria that take into account relevant skills, knowledge and experience." *Id.*

In the meantime, U.S. Bank assigned HR business partner Laurie Grey to investigate Pannek's ethics complaint. During the investigation, Grey interviewed Pannek, Strotman, Gemrich, and several other employees. And in the end, her investigation substantiated Pannek's allegations, and she concluded that Gemrich violated U.S. Bank's workplace respect policy.

After receiving Grey's report, U.S. Bank issued a written warning to Gemrich. It reprimanded him for demonstrating "poor judg[]ment" by "making a bet and accepting the financial reward" and "discussing his personal life with staff in a manner that made them feel uncomfortable," including "explicit details on his dating life." R. 39-1, PageID 1709 (citation modified). And about a year later, U.S. Bank fired Gemrich after an internal investigation revealed that, among other things, he failed to execute a PGA in accordance with U.S. Bank's policy.

On May 15, 2018, U.S. Bank terminated Pannek's and Strotman's employment. Bolton transferred the bulk of Pannek's duties to Roberts and distributed his other responsibilities to employees outside the CBSS Servicing Group.

Pannek and Strotman then sued U.S. Bank, alleging retaliation and hostile-work-environment claims under Title VII and Ohio law, and age discrimination under ADEA and Ohio law. The district court granted summary judgment to U.S. Bank on all claims. Pannek and Strotman appeal the dismissal of their Title VII retaliation and hostile-work-environment claims, and Pannek appeals the dismissal of his ADEA claim.[1]

## II.

We review a grant of summary judgment de novo. *Boyd v. N. Biomedical Rsch., Inc.*, 165 F.4th 424, 431 (6th Cir. 2026). Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *Halasz v. Cass City Pub. Schs.*, 162 F.4th 724, 732 (6th Cir. 2025).

[1] Pannek and Strotman do not challenge the district court's dismissal of their employment claims under Ohio law. Nor does Strotman appeal the court's dismissal of his ADEA claim.

### III.

We begin with the Title VII claims.[2] First, Pannek and Strotman contend that U.S. Bank retaliated against them because Pannek filed an ethics complaint against Gemrich. And second, they argue that U.S. Bank subjected them to a hostile work environment through sexual harassment. As for their retaliation claims, a factual dispute exists that a jury must resolve. But their hostile-work-environment claims fail because U.S. Bank is entitled to the *Faragher*/*Ellerth* affirmative defense to vicarious liability.

### A.

*Title VII Retaliation Claims*. Title VII prohibits an employer from "discriminat[ing] against any of [its] employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Unlawful employment practices include sexual harassment. *Id.* § 2000e-2; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79–80 (1998). An employee can establish a retaliation claim using direct or circumstantial evidence. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 644–45 (6th Cir. 2015). Here, Pannek and Strotman rely on circumstantial evidence. So we evaluate their retaliation claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hamm v. Pullman SST, Inc.*, 167 F.4th 382, 393 (6th Cir. 2026).

Under the *McDonnell Douglas* framework, Pannek and Strotman must first establish a prima facie case for retaliation. *Id.* To do so, they must show: "(1) [they] engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the[m], and (4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008).

---

[2]Pannek's and Strotman's retaliation and hostile-work-environment claims are based on the same core set of facts. We thus consider them together.

If successful, the burden of production shifts to U.S. Bank. It must articulate "a legitimate, nondiscriminatory reason" for firing Pannek and Strotman. *Id*. If U.S. Bank satisfies its burden, then Pannek and Strotman must show that U.S. Bank's proffered reason was "only a pretext designed to mask retaliation." *Id*. "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quotation omitted).

U.S. Bank challenges only the causation element of the prima facie case. To prove a causal link, Pannek and Strotman must produce sufficient evidence from which one could infer that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). At the prima facie stage, their burden of proof is "minimal"; all they "must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009) (quotation omitted). U.S. Bank argues that Pannek and Strotman cannot establish a causal connection because Bolton decided to fire them weeks before Pannek filed the ethics complaint on March 27, 2018. And it contends that no evidence shows that Bolton made his decision to fire Strotman after he participated in the ethics investigation on April 19.

Pannek and Strotman have met their "minimal" burden. *See id.* During his deposition, Bolton testified that he reached his "final determination" in April 2018 about whom he would terminate from the CBSS Servicing Group. R. 39, PageID 1501. In other words, Bolton did not make his final decision until after Pannek filed the ethics complaint against Gemrich. As for Strotman, Bolton asked Gemrich on April 20 for feedback about Strotman because Bolton was contemplating keeping him on in the interim. So contrary to U.S. Bank's assertion, evidence exists in the record that Bolton may have decided to fire Strotman after he participated in the ethics investigation.

The close temporal proximity between Bolton learning of the protected activity and his decision to terminate Pannek and Strotman could suffice to show causation. *See Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 789 (6th Cir. 2024). But there is more. Bolton did not terminate Pannek and Strotman based on work performance. Instead, he purportedly terminated them as

part of a reorganization. But, as we discuss below, Bolton's supervisor did not expect Bolton to terminate employees as part of the reorganization. This supports the inference that Bolton terminated Pannek and Strotman because of the ethics complaint.

When viewing this evidence in the light most favorable to Pannek and Strotman, a genuine dispute of material fact exists as to whether U.S. Bank fired them in retaliation for the ethics complaint. Pannek and Strotman have thus established a prima facie case for retaliation.

The dissent argues that Pannek's and Strotman's retaliation claims fail at the prima facie stage because they did not engage in a protected activity and, even if they did, U.S. Bank was unaware of that activity. But U.S. Bank did not make these arguments before the district court or in their briefing on appeal. So U.S. Bank has forfeited these arguments.

We generally do not address arguments that a party chooses not to raise before the district court or in its appellate briefing. *See Rockwood Auto Parts, Inc. v. Monroe County*, 155 F.4th 557, 574 n.5 (6th Cir. 2025); *Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 984 (6th Cir. 2000). "Our forfeiture rule is justified by two main policy goals. First, the rule eases appellate review by having the district court first consider the issue. Second, the rule ensures fairness to litigants by preventing surprise issues from appearing on appeal." *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 528 (6th Cir. 2014) (citation modified). But this rule is not jurisdictional, *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 445–48 (1993), and we may "exercise our discretion to entertain issues not raised before the district court only in exceptional cases or when application of the rule would produce a plain miscarriage of justice," *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 445 (6th Cir. 2021) (citation modified).[3]

---

[3] The dissent suggests that Pannek and Strotman have forfeited U.S. Bank's forfeiture. But U.S. Bank did not argue in its briefing to this court that Pannek and Strotman could not satisfy the protected-activity element of their prima facie case. "Our forfeiture rules exist in part because we find it inappropriate to consider arguments raised by one party when the other party has not had the opportunity to respond to that argument." *L.C. v. United States*, 83 F.4th 534, 545–46 (6th Cir. 2023) (citation modified). Thus, "[a] party that sees a forfeited argument must preemptively raise forfeiture." *Id.* at 545. Before this court, U.S. Bank challenged only the causation element: "Pannek and Strotman's *prima facie* case fails as a matter of law because they cannot prove a causal connection between their alleged protected activity – Pannek's March 27, 2018 complaint about Gemrich and Strotman's participation in the investigation on April 19, 2018 – and their terminations." D. 27 at pp.29–30. So Pannek and Strotman had no reason to raise a forfeiture argument about the protected-activity element.

No such exceptional circumstances exist here. *Cf. United States v. Chesney*, 86 F.3d 564, 568 (6th Cir. 1996) (finding that exceptional circumstances existed to review an issue not raised below because a Supreme Court case that squarely addressed the issue was decided after the district court entered judgment in the case). And no miscarriage of justice will occur by us declining to make these arguments for U.S. Bank.

Moreover, we "adhere to the principle of party presentation." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (per curiam). Under that principle, the parties "frame the issues for decision" and we assume "the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (quotation omitted). The dissent runs afoul of the party-presentation principle by ruling on "points not argued." *United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring in the judgment).

Because Pannek and Strotman have made out a prima facie case, we move to the next steps of the *McDonnell Douglas* framework. U.S. Bank has identified a neutral reason for terminating Pannek's and Strotman's employment: a reduction in workforce. This is a legitimate, nonretaliatory reason for discharging an employee. *See Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 539 (6th Cir. 2014). So Pannek and Strotman bear the burden of showing that U.S. Bank's reason is pretext for retaliation.

At the pretext stage, Pannek and Strotman must point to "evidence that would allow a reasonable jury to find that" U.S. Bank's "identified reason" for terminating their employment was pretext for its real retaliatory reason. *See Hamm*, 167 F.4th at 393. An employee "can show pretext in three interrelated ways: (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the employer's action, or (3) that the proffered reason was insufficient to motivate the employer's action." *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 350–51 (6th Cir. 2021) (citation modified). These are common ways to show pretext, but they "are not the only ways." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). Instead, these "categories are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?" *Id.* (citation modified). The burden of showing pretext "is not heavy, though, as summary judgment is warranted only if no reasonable juror could conclude that the employer's

offered reason was pretextual." *George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020). Put another way, an employee "does not need to prove pretext; [he] only needs to show that the question of pretext is a genuine factual dispute." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 667 (6th Cir. 2020).

A reasonable jury could conclude that U.S. Bank's supposed reduction in force did not motivate its decision to terminate Pannek and Strotman.

On the one hand, evidence in the record supports U.S. Bank's claim that Bolton fired Pannek and Strotman because he was downsizing the department. Bolton testified that soon after the reorganization, he began evaluating the CBSS Servicing Group to detect potential synergies and to consolidate some functions. And after evaluating his direct reports for several months, he found that the department could function with fewer employees. Bolton terminated Pannek and Strotman because he decided to eliminate their positions from the organization. If a jury accepts Bolton's testimony, it could conclude that U.S. Bank fired Pannek and Strotman as part of a workforce reduction.

But on the other hand, some evidence undercuts U.S. Bank's proffered reason. Start with the timing. Bolton learned about the ethics complaint two days after Pannek filed it. And a few days after that, Bolton "question[ed] the timing" of the complaint, asserting that Pannek filed it because he was worried about his future at U.S. Bank. R. 49-1, PageID 2438. Bolton also said he "wouldn't be surprised to see [Strotman] take a similar tac[k]" and file his own ethics complaint. *Id*. In the same breath, Bolton announced his plan to fire Pannek and Strotman. Coupled with other evidence, "such temporal proximity can be used as indirect evidence to support an employee's claim of pretext." *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 256 (6th Cir. 2023) (citation modified).

It also seems that the terminations were not anticipated as part of the reorganization. David Little, Bolton's supervisor and an executive vice president at U.S. Bank, testified that he had "[n]o expectations" that any employees would be fired because of the reorganization. R. 48, PageID 2170. He explained that U.S. Bank's vice chairman restructured the divisions to streamline the bank's consumer side. In fact, around the time of Pannek's and Strotman's

Case: 25-3706 Document: 32 Filed: 08/27/2025 Page: 11



terminations, Bolton had open positions on his team for "risk and controls" and "risk strategy." R. 39, PageID 1673. Bolton could not recall considering whether Pannek and Strotman were good fits for those positions.

It further seems that U.S. Bank failed to follow its process for assessing employees and determining whom to terminate during a reduction in force. U.S. Bank's PGA form "must be completed" when multiple employees are being "considered for elimination, but not all employees in the job will be severed." R. 49-1, PageID 2441. Watson, a U.S. Bank HR business partner, testified that Pannek's and Strotman's terminations were "subject to th[e] [PGA] process" for which U.S. Bank has "written policies or guidelines" that it must follow. R. 49, PageID 2333. On April 2, 2018, Bolton stated that he was firing Pannek and Strotman as part of a "severance exercise," and he prepared the PGA forms later that month. R. 49-1, PageID 2440. And although certain parts of the PGA process needed to be completed with HR, Bolton completed the PGA exercise on his own. Thus, Bolton seemingly failed to follow U.S. Bank's termination policy by deciding to fire Pannek and Strotman before completing the PGA process—a process U.S. Bank takes so seriously that it later fired Gemrich, in part, for failing to properly execute a PGA.

Typically, "an employer's failure to follow self-imposed regulations or procedures" will not, on its own, suffice to show pretext. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005). That said, an employer's failure to follow its own policies and procedures, "while not enough on its own to establish pretext, can be considered as part of the constellation of evidence." *Kean v. Brinker Int'l, Inc.*, 140 F.4th 759, 776 (6th Cir. 2025).

U.S. Bank pushes back on Pannek and Strotman's pretext arguments. It says that there is nothing suspicious about the timing of Pannek's and Strotman's terminations. U.S. Bank points to an email Bolton wrote months before Pannek filed the ethics complaint that shows he wanted to move some of Pannek's direct reports over to Roberts. But this email shows, at most, that Bolton contemplated reshuffling duties, not terminating employees. Nor does the email mention Strotman.

U.S. Bank also claims that testimony from one of its current employees, Lydia Buster, shows that the timing of Bolton's termination decisions had no connection to the ethics complaint. Buster testified that Pannek called his ethics complaint an "insurance policy" to keep his job. R. 42, PageID 1998. But Pannek disputes ever speaking to Buster about his ethics complaint. Whether to credit Buster's or Pannek's testimony is for a jury to decide. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

U.S. Bank argues that Bolton's failure to follow the PGA process is not evidence of pretext because it is a "mere guideline[] that managers are *not* required to use." D. 27 at p.40. And Watson's testimony supports this contention. Watson testified that the PGA is a "guideline," and that she would classify Bolton's evaluation of the CBSS Servicing Group as a PGA. R. 49, PageID 2338. But other evidence cuts against U.S. Bank's assertion. Another HR business partner—Grey—testified that a manager completes the PGA form at the start of the reduction-in-force process and before a decision to terminate has been made. And Little, Bolton's supervisor, testified that no one told him that a PGA of the CBSS Servicing Group was taking place.

In the end, a jury should decide whether U.S. Bank retaliated against Pannek and Strotman. Of course, a reasonable jury could find no connection between the sexual-harassment complaint and Pannek's and Strotman's terminations. But a jury could also find Pannek's and Strotman's evidence compelling and conclude that a reduction in workforce did not actually motivate Bolton's actions. When the parties present "two reasonable interpretations of the evidence," we must allow the jury to answer the ultimate question of whether the employer terminated the employee in retaliation "for opposing an unlawful employment practice." *Jackson*, 999 F.3d at 351 (quotation omitted).

**B.**

*Title VII Hostile-Work-Environment Claims*. Title VII makes it illegal for employers to "discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This prohibition includes actions that create a sex-based hostile work environment. *See Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–67 (1986). It also covers hostile-work-environment claims based on same-sex harassment. *Oncale*, 523 U.S. at 82. To establish this type of claim, employees must prove: (1) they were members of a protected class; (2) they were subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment unreasonably interfered with their work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability. *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008).

We can resolve the hostile-work-environment claims on the employer-liability element. Pannek and Strotman claim that their then-supervisor, Gemrich, sexually harassed them by making frequent inappropriate comments about women.

"An employer is vicariously liable when a supervisor takes a tangible employment action." *Vance*, 570 U.S. at 429 (citation modified). A tangible employment action includes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (quotation omitted). If the "supervisor's harassment does not culminate in a tangible employment action, the employer can be vicariously liable for the supervisor's creation of a hostile work environment if the employer is unable to establish an affirmative defense." *Id.*

Pannek and Strotman cannot show that Gemrich took a tangible employment action against them. Gemrich was not involved in the decision to terminate Pannek's and Strotman's employment. Bolton made that decision. And while Bolton solicited feedback from Gemrich about Pannek's and Strotman's performance, this is not a case of delegated decisionmaking. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 413 (6th Cir. 2021). So their discharge was not part of Gemrich's harassment. *See Williams v. Memphis Light, Gas & Water*, No. 23-5616, 2024 WL 3427171, at *7 n.3 (6th Cir. July 16, 2024).

Thus, we must consider whether U.S. Bank can establish an affirmative defense to liability. An employer may assert an affirmative defense to supervisor liability under the *Faragher/Ellerth* framework. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). To succeed with this defense, U.S. Bank must show by a preponderance of the evidence that: (1) it "exercised reasonable care to prevent and correct any harassing behavior," and (2) Pannek and Strotman "unreasonably failed to take advantage of the preventive or corrective opportunities" that U.S. Bank provided. *Wyatt*, 999 F.3d at 414 (quoting *Vance*, 570 U.S. at 424). This defense does not apply if U.S. Bank loses on either prong. *Id.*

Start with the first prong. We consider whether U.S. Bank "had a reasonable sexual harassment policy and whether such policy was effective in practice." *Id.* (citation modified). And although no precise "formula" tells us what qualifies as a "reasonable" sexual-harassment policy, several factors assist us in our inquiry. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349 (6th Cir. 2005). A reasonable policy requires supervisors to report any instances of sexual harassment, allows employees to file formal and informal complaints, and includes a mechanism for employees to circumvent a harassing supervisor when filing a complaint. *Id.* An employer should also provide training about its harassment policy. *Id.* at 349–50.

While an employer must have a sexual-harassment policy in place, the duty does not end there. The "existence and provision of a harassment policy alone are insufficient to show reasonable care to prevent and correct promptly any . . . harassing behavior." *Smith v. P.A.M. Transp., Inc.*, 154 F.4th 375, 394 (6th Cir. 2025) (citation modified). We need to "look[] behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior." *Clark*, 400 F.3d at 349. An employer can meet this requirement if it has a "proven, effective mechanism for reporting and resolving" incidents of harassment. *Faragher*, 524 U.S. at 806. So we must review not only U.S. Bank's sexual-harassment policy but also its implementation of that policy.

U.S. Bank has a reasonable sexual-harassment policy. Its workplace respect policy prohibits sexual harassment and other inappropriate conduct. The policy defines sexual harassment and provides examples of such behavior, emphasizing that "it isn't about intent—it's

about the effect harassment has on others." R. 49-1, PageID 2431. The policy also requires managers and supervisors to report any issues, including harassment. And it provides employees with several reporting options. An employee can make a verbal or written report to his manager, supervisor, or HR. He can also call U.S. Bank's ethics line or submit a complaint online. Once an employee files a complaint, U.S. Bank will investigate and will act if it finds that a policy violation occurred. The policy also requires new employees to complete a workplace-harassment training, and managers must complete a specialized training. Employees must also participate in periodic refresher training.

Still, Pannek and Strotman argue that U.S. Bank's policy is ineffective because the investigation into Gemrich's conduct was "inadequate." D. 28 at p.33. The record does not support this contention. Pannek filed his complaint on March 27, 2018, and Grey's investigation was well underway a few weeks later. During her investigation, Grey interviewed Pannek, Strotman, Gemrich, and several other employees. And while interviewing Pannek and Strotman, Grey learned that Gemrich had been making comments about his sex life during team meetings. In the end, Grey substantiated Pannek's allegations, finding that Gemrich violated U.S. Bank's workplace respect policy.

After receiving Grey's report, U.S. Bank issued a written warning to Gemrich. It reprimanded him for, among other things, "discussing his personal life with staff in a manner that made them feel uncomfortable" and sharing "explicit details on his dating life." R. 39-1, PageID 1709 (citation modified). As a result of the warning, Gemrich faced several financial consequences. He became ineligible for any promotions or pay increases for 90 days. And U.S. Bank could reduce or withhold his annual bonus at its discretion. Eventually, if Gemrich failed to correct his behavior, U.S. Bank would terminate his employment. And Bolton, Gemrich's supervisor, testified that after Gemrich received this warning, he did not make any more inappropriate sexual comments. Based on these facts, U.S. Bank "exercised reasonable care to prevent and correct promptly any [sexually] harassing behavior by its supervisor." *See Smith*, 154 F.4th at 394 (citation modified).

As for the second prong, we must determine whether Pannek and Strotman unreasonably failed to take advantage of any preventative or corrective measures U.S. Bank provided. *See*

*Wyatt*, 999 F.3d at 414. In evaluating an employee's conduct, "we look at how and when [he] uses the company's existing corrective and protective measures." *Id.* at 415–16. In some situations, an employee unreasonably fails to take advantage of corrective opportunities when he waits months to report harassing behavior. *Thornton*, 530 F.3d at 457–58 (concluding that an employee failed to take advantage of any corrective measures because, in part, she did not report the harassment until two months after she began a leave of absence). *But see Wyatt*, 999 F.3d at 416 (finding that a factual dispute existed over whether an employee unreasonably failed to take advantage of corrective measures despite her two-month delay in reporting the harassment because she "was under a credible threat of retaliation" (quotation omitted)).

Pannek testified that Gemrich started making inappropriate sexual comments soon after he and Strotman began reporting to him, sometime in November 2017. But Pannek waited until March 2018, about four months later, to alert U.S. Bank to Gemrich's behavior. And Pannek's ethics complaint focused on the betting incident. Pannek only cursorily asserted that Gemrich "created a hostile work environment," without adding any information about Gemrich's sexual comments. R. 49-1, PageID 2435. Later, during the investigation, Pannek told Grey that Gemrich made sexual comments during team meetings. But when Grey asked him about the specific comments, Pannek broadly referenced the "Access Hollywood tapes" and said that Gemrich used the "p-word . . . a few times." R. 40, PageID 1833. Pannek's roughly four-month delay in filing a complaint, coupled with his vague allegations about Gemrich's sexual comments, show that he failed to take advantage of U.S. Bank's corrective measures. *See EEOC v. AutoZone, Inc.*, 692 F. App'x 280, 286 (6th Cir. 2017) (per curiam).

Likewise, Strotman never took advantage of U.S. Bank's corrective opportunities. He never reported Gemrich's behavior. And during the investigation of Pannek's complaint, Strotman confirmed that Gemrich made sexual comments during team meetings. But he did not provide any further details because he was uncomfortable repeating Gemrich's statements.

U.S. Bank has thus shown that Pannek and Strotman unreasonably failed to take advantage of its preventative or corrective measures. So U.S. Bank has established the *Faragher/Ellerth* affirmative defense to supervisor liability.

**IV.**

We turn now to Pannek's age-discrimination claim. The ADEA prohibits employers from refusing to hire, discharging, or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). When, as here, an employee based his age-discrimination claim on circumstantial evidence, we apply the *McDonnell Douglas* burden-shifting framework. *Hayes v. Clariant Plastics & Coatings USA, Inc.*, 144 F.4th 850, 857 (6th Cir. 2025).

Pannek must first establish a prima facie case of age discrimination. *Id.* An employee makes out a prima facie case of age discrimination by showing: (1) he was over 40 years old, (2) his employer took an adverse employment action, (3) he was qualified for the position, and (4) his employer replaced him with someone outside his protected class or treated him less favorably than a similarly situated nonprotected employee. *McNeal v. City of Blue Ash*, 117 F.4th 887, 895 (6th Cir. 2024). Pannek has failed to do so.

At issue is the fourth element: whether U.S. Bank replaced Pannek with someone else. Pannek argues that U.S. Bank replaced him with a former colleague: Roberts. Roberts is much younger than Pannek and took over most of Pannek's duties after his termination. For ADEA purposes, a "person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (quotation omitted). Instead, a plaintiff "is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Id.* (quotation omitted).

U.S. Bank did not replace Pannek with Roberts. After Bolton eliminated Pannek's position, Roberts took over most of Pannek's duties in addition to her own. And Bolton distributed Pannek's other responsibilities to employees outside the CBSS Servicing Group. "Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992).

When a termination arises as part of a workforce reduction, we "ha[ve] modified the fourth element to require the plaintiff to provide additional direct, circumstantial, or statistical

Case: 25-3706 Document: 36 Filed: 08/27/2026 Page: 42



evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009) (citation modified). So Pannek must provide circumstantial or statistical evidence that Bolton singled him out for termination because of his age. *Id.* at 624. Pannek has provided no such evidence.

**V.**

For these reasons, we **AFFIRM** the district court's grant of summary judgment to U.S. Bank on Pannek's and Strotman's Title VII hostile-work-environment claims and Pannek's ADEA claim. We **REVERSE** the district court's grant of summary judgment to U.S. Bank on Pannek's and Strotman's Title VII retaliation claims and **REMAND** for further proceedings consistent with this opinion.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part. I join Judge Mathis's opinion except as to section III.A. Defendant U.S. Bank National Association is entitled to judgment in its favor as a matter of law on Plaintiffs Mark Pannek's and Thomas Strotman's Title VII retaliation claims. So, I would affirm in full the district court's grant of summary judgment in U.S. Bank's favor.

Under the *McDonnell Douglas* framework, Plaintiffs must first establish a *prima facie* case of retaliation under Title VII by demonstrating that (1) they engaged in activity protected by Title VII; (2) their exercise of such protected activity was known by U.S. Bank; (3) thereafter, U.S. Bank took an action that was materially adverse to them; and (4) a causal connection existed between the protected activity and the materially adverse action. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993). If Plaintiffs successfully make out a *prima facie* case, the burden of production of evidence shifts to U.S. Bank to articulate some legitimate, non-discriminatory reason for its actions. *Laster*, 746 F.3d at 730. If U.S. Bank satisfies its burden of production, the burden shifts back to Plaintiffs to demonstrate that U.S. Bank's proffered reason was not the true reason for their termination. *Id.* "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." *Id.* (citation omitted).

U.S. Bank is entitled to summary judgment because it was unaware of any protected activity by Plaintiffs when the employment decisionmaker, Bryan Bolton, stated on April 2 his preliminary decision to terminate Plaintiffs' employment. *See* Brief of Appellee U.S. Bank at 27–28; U.S. Bank's Reply Br. in Supp. of Summ. J. Against Pannek, R. 53, PageID 2659; U.S. Bank's Reply Br. in Supp. of Summ. J. Against Strotman, R. 54, PageID 2680–81. In fact, the record indicates that Plaintiffs had not even engaged in Title VII protected activity on or before April 2. This fatal fact implicates three of the *prima facie* elements: whether and when Plaintiffs

engaged in activity protected under Title VII, whether and when U.S. Bank knew of that activity, and whether that activity caused Plaintiffs' terminations.

Complicating things, U.S. Bank challenges only the causation element at the *prima facie* stage, and then relies only on a factual contention that does not satisfy the summary-judgment standard. U.S. Bank argues that "the evidence is undisputed that Bolton had determined by late February or early March what he planned to do with Pannek and Strotman," relying on Bolton's deposition testimony and declaration. U.S. Bank's Br. at 21. U.S. Bank also relies on a single email from Bolton stating that most of Pannek's subordinates were being transferred to Pannek's colleague's organization. *See id.* at 20.

But the record is not as undisputed on this point as U.S. Bank suggests. The subordinate-transfer email does not eliminate Pannek's entire organization. Nor does it directly address Bolton's plan to terminate his employment. And a reasonable finder of fact might question Bolton's after-the-fact testimony regarding his decision-making timeline when the documentary record suggests that he was still obtaining feedback in April and that Plaintiffs were terminated in May. *See, e.g.*, R. 39-1, PageID 1751 (Bolton's April 20 instant message to John Gemrich inquiring whether Strotman or another employee would be better for a particular position). At any rate, this particular argument by U.S. Bank is insufficient under the summary-judgment standard to foreclose Plaintiffs' showing at the *prima facie* stage. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009) ("The burden of proof at the prima facie stage is 'minimal'; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action." (citation omitted)).

But as previously mentioned, Bolton announced his intention to terminate Plaintiffs' employment on April 2—before anyone at U.S. Bank was aware of protected activity by Plaintiffs. Again complicating things, U.S. Bank raises this particular argument, which sounds more in terms of the *prima facie* elements stated above, at the pretext stage. *See* U.S. Bank's Br. at 27–28; *but see* U.S. Bank's Reply Br. in Supp. of Summ. J. Against Pannek, R. 53, PageID 2659 (raising this argument in rebuttal to the *prima facie* causation element); U.S. Bank's Reply Br. in Supp. Of Summ. J. Against Strotman, R. 54, PageID 2680–81 (same). But because there

can be no retaliation for protected activity that has not yet happened (or that was unknown to the employer, or that did not actually cause the adverse employment action), the employer's action also cannot be pretextual. For legal clarity, I will analyze U.S. Bank's argument in terms of the *prima facie* elements it clearly implicates. But whether considered in terms of the elements of retaliation or, as U.S. Bank argues, in terms of refuting a finding of pretext, the April 2 email dooms Plaintiffs' retaliation claim.

Regarding the first element, "the operative question is not whether the complained of conduct was actually unlawful, but whether Plaintiff held an objectively reasonable and good faith belief to that effect." *Graf v. Morristown-Hamblen Hosp. Ass'n*, 155 F.4th 578, 589 (6th Cir. 2025) (citation modified). Prior to April 2, Plaintiffs' only action remotely resembling protected activity is Pannek's March 27 call to the U.S. Bank ethics-and-compliance hotline (Strotman has repeatedly abandoned arguing retaliation based on his defense of employee Tom Markesbery, *see* U.S. Bank's Br. at 21 n.1). A call to an ethics-and-compliance hotline sounds like the kind of activity that would usually qualify as protected under Title VII. But a closer look reveals that Pannek's hotline complaints were clearly beyond the reach of that law. The independent, third-party operator of the hotline generated a three-page report recording Pannek's complaint. The bulk of Pannek's allegations address a betting incident in which Pannek contends that Gemrich coerced him into a bet over a business matter. According to the report, Pannek also alleged that Gemrich (1) wrote a "verbally aggressive document" in December 2017 in which he belittled a female employee; (2) aggressively stated his distaste for employees taking vacation time around the holidays or working remotely; (3) required Pannek, Strotman, and another employee to work on a scheduled vacation day around Christmas; (4) tried to terminate two employees for working remotely; and (5) humiliated employees by reprimanding them and "pull[ing] rank." The report concludes by noting that Pannek "has additional examples pertaining to this type of behavior by [Gemrich]."

Nothing in this report brings Pannek's call within the ambit of Title VII, even under our objectively-reasonable-and-good-faith-belief standard. The closest thing to protected activity is his allegation that Gemrich wrote an email belittling a particular female employee. But Pannek did not allege that this "belittling" was based on sex, and at any rate, Pannek told the hotline

operator that Gemrich had already been reported to U.S. Bank's human resources department for this behavior. In fact, this initial report was made long before Pannek's complaint, and Gemrich apparently had already faced some sort of consequence or investigation.

Nor can Plaintiffs rely on allegations outside the report, at least at this point in the timeline. In his deposition, Pannek contended that he reported Gemrich's "guttural language," by which Pannek means Gemrich's alleged sexual commentary, to the hotline operator. But when pressed, Pannek admitted that he could not recall "exactly what [he] said at that time" or "what examples [he] gave to the hotline [operator] that are not included . . . in th[e] report." And there is no evidence in the record that U.S. Bank would have been aware of anything Pannek told the third-party hotline operator except what was transmitted to U.S. Bank in the report.

Nor can Plaintiffs rely on Pannek's mere utterance of the phrase "hostile work environment." While this court has held that "'[h]ostile work environment' is a term of art" capable of putting an employer "on notice," *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015), it is not a talisman: "[A]n employee who complains that an employer is creating a 'hostile work environment' engages in Title–VII–protected activity *when the context objectively reveals* that the employee is using the expression to complain about *repeated abusive discriminatory comments or treatment*." *Id.* (emphasis added). Here there is no such context. In fact, the words "hostile work environment" appear twice in Pannek's initial ethics complaint, and both instances are immediately preceded or followed by non-Title VII allegations:

> [B]etting is against company policy and it violates codes 4.5, 4.5.1, 4.5.4 and 4.5.5 of the USBank code of ethics. . . . [B]etting could make the employees feel uncomfortable and it could create a hostile work environment.
>
> . . .
>
> [Pannek] stated that [Gemrich] has created a hostile work environment. [Pannek] said that [Gemrich] reprimands employees and pulls rank in front of the staff. [Pannek] said that this is humiliating to the employees.

R. 35-1, PageID 766. This inapt use of the "hostile work environment" label even appears in Plaintiffs' briefing before this court. *See e.g.,* Brief of Appellants Pannek and Strotman at 12

(citing Gemrich's "verbally aggressive behavior during employee meetings," "his engaging in conduct which [wa]s 'humiliating to [his] employees,'" and his coercing Pannek into taking a bet as "examples of the hostile work environment" (citation omitted)).

At best, Pannek's call to the ethics hotline amounted to a mere "vague charge of discrimination." *Yazdian*, 793 F.3d at 645 (citation omitted). This will not support a Title VII retaliation claim. *Id.* The first time Plaintiffs engaged in colorable protected activity—and certainly the first time U.S. Bank was aware of any protected activity—was when a U.S. Bank investigator interviewed Pannek and Strotman on April 16 and 17, respectively. Between Pannek's unactionable March 27 call and Plaintiffs' mid-April interviews, Bryan Bolton sent the April 2 email to U.S. Bank human-resources staff in which he thoroughly explained his evaluations of Pannek, Strotman, and other employees. Bolton's assessments of Plaintiffs—based on weeks of his own observations and feedback from Bolton's team—were not favorable. Bolton concluded by expressing his "prefer[ence] to include them in the severance exercise." So we need not determine here whether Plaintiffs' disclosures during their mid-April interviews satisfy the objectively-reasonable-and-good-faith-belief standard; Even if they do, they clearly did not cause Bolton's April 2 decision. Nor do we need to decide whether Strotman preserved an "associational retaliation" claim based on Pannek's unmeritorious retaliation claim. *See* Pannek's and Strotman's Reply Br. at 4–7.

And while Plaintiffs were terminated weeks later on May 15, this does not sustain their retaliation claim. "When [an] employer 'proceed[s] along lines previously contemplated,' we must not take the temporal proximity of the adverse employment action as evidence of causality. Thus, we recognize that '[an employer's] proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality,' but where an employer deviates from those lines, temporal proximity can certainly be evidence of causality." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) (internal citations omitted) (quoting *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 272 (2001) (per curiam)). This rule serves an important purpose. Title VII shields employees from retaliation for their protected activities. But that shield can become a sword in the hands of employees "who see the

proverbial writing on the wall that they are about to be fired" for lawful reasons. *Id.* (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 358 (2013)).

Without casting aspersions toward Plaintiffs here, we cannot say there is any issue of material fact suggesting that U.S. Bank deviated from the course Bolton charted on April 2. Even when Bolton continued to obtain feedback from his team and completed the "Peer Group Analysis" forms after the April 2 email, he acted entirely consistently with his preliminary decision, which need only be "previously contemplated," "not . . . definitively determined." *See Montell*, 757 F.3d at 507 (citation omitted). Plaintiffs' terminations were not "unlike the action[s] previously contemplated," nor did they contradict a "schedule previously laid out." *Id.* So, it is also of no moment that Bolton allegedly failed to precisely follow U.S. Bank's employee-termination procedures. Assuming Plaintiffs' contention is correct, this might be a violation of internal U.S. Bank policy, but it does not support an inference of retaliation when Bolton was at most haphazardly executing a "previously contemplated" plan. Nor does it matter that Plaintiffs were not placed in other open roles at U.S. Bank. The "lines previously contemplated" were not to terminate Plaintiffs' employment merely because their roles were being eliminated, but also to terminate their employment because of Bolton's perceptions of them.

As a final note, the majority argues that U.S. Bank forfeited its argument that Plaintiffs' activities prior to April 2 do not support their retaliation claim because U.S. Bank failed to raise that argument before the district court or this panel. I respectfully disagree. U.S. Bank's brief before this court reads:

> In their Brief, Pannek and Strotman rely on an April 2 email from Bolton to attempt to establish a temporal link. (Appellants' Brief, Doc. 26, p. 18-20). Upon review of the email, however, it is clear that it does not support their claim for retaliation. First, this email was sent weeks *before* Strotman engaged in protected activity. And at the time of the email neither Bolton nor U.S. Bank was aware of Pannek's later allegations that Gemrich was discussing his personal sex life. The written complaint that U.S. Bank received from its third-party hotline provider did not include any allegations of sex based comments[,] (See Bolton Dep. Ex. 2, RE 39 1, PageID #1706-08), and U.S. Bank only learned of such allegations when Grey interviewed Pannek on April 16 (after Bolton's email). (See Grey Dep. Ex. 4, RE 40-1, PageID #1930)[.] Further, Bolton described in detail his legitimate

> concerns with Pannek and Strotman and his plans moving forward. (Watson Dep. Ex. 4, RE 49-1, PageID #2438-2440)[.]

U.S. Bank's Br. at 27. And while U.S. Bank did not make this explicit argument in its initial motions for summary judgment, it clearly raised it in its summary-judgment reply briefs, responding to Plaintiffs' argument that the April 2 email supports an inference of retaliation. *See* Plaintiffs' Mem. in Opp'n to Summ. J., R. 50, PageID 2522. U.S. Bank's summary-judgment reply brief against Pannek reads:

> In his Opposition, Pannek relies heavily on an April 2 email from Bolton to attempt to establish a temporal link. Upon review of the email, however, it is clear that it does not support Pannek's claim for unlawful retaliation. First, there is no evidence that Bolton even knew of Pannek's allegation that Gemrich discussed his personal sex life at that time that he drafted the email. The written complaint that U.S. Bank received from its third-party hotline provider did not include any allegations of sex-based comments (see Bolton Dep. Ex. 2, Doc # 39-1 at PageID 1706-08.), and U.S. Bank only learned of such allegations when Grey interviewed Pannek on April 16. (See Grey Dep. Ex. 4 p. 1, Doc # 40-1 at PageID 1930.)[.] Furthermore, in the email Bolton described in detail his legitimate concerns with Pannek and his plans moving forward[.]
>
> . . .
>
> Accordingly, in the absence of any evidence of a causal connection, Pannek's retaliation claim fails as a matter of law.

U.S. Bank's Reply Br. in Supp. of Summ. J. Against Pannek, R. 53, PageID 2659. U.S. Bank's reply brief against Strotman reads similarly:

> In his Opposition, Strotman relies heavily on an April 2 email from Bolton to attempt to establish a temporal link. Far from supporting Strotman's retaliation claim, the email actually does the opposite and demonstrates the clear lack of a causal connection between Strotman's protected activity and his eventual termination. In the email (which was sent weeks before Strotman engaged in protected activity), Bolton outlined his decision to eliminate Strotman's position[.]
>
> . . .
>
> Here, the April 2 email is undisputed evidence that Bolton had already decided that Strotman was not the right person for the change management role long before Strotman engaged in protected activity by participating in the April 19 interview with Grey. Accordingly, there can be no causal connection between his

> alleged protected activity and termination, and his retaliation claim fails as a matter of law.

U.S. Bank's Reply Br. in Supp. of Summ. J. Against Strotman, R. 54, PageID 2680–81.

The only avenue to forfeiture that I can fathom is through the fact that U.S. Bank did not articulate this version of its causation argument in its initial summary-judgment motions against Plaintiffs. U.S. Bank did raise a form of this argument in those filings, though it relied on a different factual predicate. *See* R. 43, PageID 2032 (arguing that Bolton's deposition testimony and March 27 email indicate his intention to terminate Pannek before Pannek made his complaint); R. 44, PageID 2127–28 (arguing that Bolton "formed his opinion that Strotman was not the right person for the role in late February or March—long before Strotman participated in the investigation of Pannek's complaint"); *see also* U.S. Bank's Br. at 20–21 (similar). Regardless, Plaintiffs do not contend that U.S. Bank forfeited this argument by failing to raise it until its summary-judgment replies. They do not argue forfeiture at all. In other words, they have "forfeited the forfeiture." *United States v. Shultz*, 733 F.3d 616, 619 (6th Cir. 2013). Nor are we "left guessing each party's argument." *L. C. v. United States*, 83 F.4th 534, 545 (6th Cir. 2023). U.S. Bank contends that the April 2 email demonstrates a lack of causation because it was sent before U.S. Bank knew of any protected activity by Plaintiffs. U.S. Bank's Br. at 27. Plaintiffs counter that Pannek's March 27 ethics complaint fully apprised U.S. Bank of the protected nature of his actions. Pannek's and Strotman's Reply Br. at 8. Because U.S. Bank has the better argument in light of our precedents, I would affirm the district court's grant of summary judgment in U.S. Bank's favor on the retaliation claim. On this issue, I respectfully dissent.